UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MADHU JAIN,<br>    Plaintiff,<br>v.<br>CAPE ANN WHALE WATCH, INC.,<br>    Defendant. | CIVIL ACTION NO. 05-11267-MEL |

JOINT PRE-TRIAL MEMORANDUM

**GENERAL NATURE OF THE CASE:**

    This case involves an ankle fracture that occurred as the plaintiff was departing from the defendant's vessel, the *Hurricane II*, at about 4:30 pm on August 19, 2004, following a whale watch trip.

**I.    PLAINTIFF'S SUBMISSIONS:**

**A.    Ms. Jain's Summary Of Expected Evidence**

    The three most important pieces of Ms. Jain's expected evidence are (1) the testimony of three disinterested, bystanders from New Jersey that the gangway was slippery including the testimony of one bystander that she called up to her mother and children, from the dock, to be careful because of the ramp because it is slippery; (2) X-rays of Ms. Jain's ankle depicting the hinged plate and six shorter screws and two 44mm cortical screws that are permanently implanted in her ankle to repair her ankle fractures and (3) the makeshift gangway itself and photographs thereof showing incomplete and obstructed handrails, unnecessary and dangerous steepness, overhang, narrowness and an outdoor walking surface that becomes slippery when wet.

    Ms. Jain will show through the testimony of six eyewitnesses that the gangway was slippery and through testimony and admissions of defendant's employees that they were aware that the gangway was sometimes slippery. Evidence will show that the employees should have paid attention to the passengers who were calling up to those still on board or otherwise discussing the slippery condition. Ms. Jain will prove through the testimony of six witnesses that the defendant, despite the contrary claims of two of its employees, were not, in fact, instructing or warning passengers.

    Testimony will show that the defendant, despite its admitted knowledge that the gangway got slippery when wet failed to notice or inspect to see if, after the rough journey, the gangway was, in fact, wet and slippery before unloading passengers.

    The Ms. Jain will establish through testimony (see witness disclosure incorporated herein) and photographs that (1) the gangway was too steep and violated all known applicable building codes, (2) that the gangway had missing lengths of handrail where Ms. Jain fell and 4 large, sharp couplings that made it impossible for her to grasp in certain places (3) that the gangway was too narrow to properly fit in the corresponding

opening in the side of the boat and had an unnecessary step up onto the walking surface (4) the gangway was not protected from wetness nor inspected for wetness despite defendant's knowledge that the gangway was slippery when wet, (5) defendant failed to warn and inform passengers that the gangway was slippery when this claimed as their usual practice (6) Ms. Jain will show that the gangway was used by the general public who were there to engage in recreation and most of whom were inexperienced with gangways, thus the circumstances mandated that the defendant take great care to get passengers off the boat (7) that defendant failed to <u>inspect the gangway to determine it was, in fact, not slippery</u> despite their knowledge that it was sometimes slippery and that if they did not know on this occasion if it was wet they should have warned passengers that the gangway might be slippery, (8) that the defendant surfaced the gangway with a bumpy metal sheet that got slippery when wet and is not generally used on sloped surfaces or gangways and gives less traction than ordinary outdoor carpeting (9) Ms. Jain will show that the defendant used an underage and untrained crewmember to perform the offloading .

Ms. Jain will show that she fractured her ankle because of slipping and the fractures required the surgical openings of the area and the placement of a hinged plate and six screws into the fibula bone and the placement of two 44 mm screws up into the her medial malleolus. Ms. Jain was an outpatient at Addison Gilbert Hospital and an inpatient at Beverly Hospital from 8/19/07 until 8/23/07 her operating surgeon warned her that pain and stiffness was a risk. Ms. Jain will introduce Mass General Hospital's Doctor Lohwe and Doctor Vinod Datta's reports and show that, in addition to permanent disability in walking and stair management, even her ability to stand is permanently limited. X rays and medical bills exceeding $12,000 and show that money was spent for a plane ticket for her husband to accompany Ms. Jain back to India and home and that Ms. Jain is permanently disabled and limited in her abilities to walk because of the injury caused by Defendants carelessness and that Ms. Jain's business suffered and she has become unable to mobilize for the same distances or lengths of time as she could have before. Scars will be shown. The gangway itself will be used as evidence. Lost income of approximately $12,000 in the past year and other amounts in preceding years will be established by tax returns and testimony. Other evidence of liability and damage will be shown.

Ms. Jain will use rebuttal evidence.

**B.      Plaintiff's Factual Assertions**
Madhu Jain is a married mother and resides in New Delhi, India.
No alternative means was provided for Ms. Jain to leave the Hurricane II on August 19, 2007.
Dr. David Lhowe M.D. stated: Ms. Jain will remain limited in her capacity to stand, walk and climb stairs for the foreseeable future.
Dr. Vinod Datta M.D. stated: The patient cannot dorsoflex her ankle so abnormal stresses are put on the neighboring joints, especially the knee. Further complications can also lead to undue stress on the spine because of limping.
One of defendant's I.M.E. doctors, Kyung Ae Hahn, stated: Right ankle joint

motion was slightly limited especially in supination and pronation. And also stated: She will continue to use conservative pain management at home and physical therapy follow-ups. She was instructed on the use of a cane and Neoprine ankle support or ankle brace to wear outside for walking if needed.
Rescue personnel brought Ms. Jain to the Addison Gilbert Emergency Room with an obvious deformity of the right ankle.
Ms. Jain was transported by ambulance from the Addison Gilbert Hospital to Beverly Hospital on August 19,2004.
Beverly Hospital Emergency Care Recorder /Order sheet pg. 1 of Ms. Jain's medical records contains the following sentence "I was coming off the boat and it was slippery. I think I twisted my ankle".
Ms. Jain underwent surgery for the injury and was an impatient.
Ms. Kusam Jain, testified at her 2/16/06 deposition:
> "I do remember that Madhu, who got hurt, she was behind me
> The only reason I remember that part, too, that the moment I put my foot on the ramp, I said, let me alert her [Ms. Jain], because I saw one person in front of me barely save himself from a serious slip."

Ms. Lisa Bodner testified at her 6/21/06 deposition:
> A. They were gradually. I was pretty much, like I said, the first off because I had to get her [10 month old child] off the boat. As I was off the boat on the left side, I looked up at my mom and she was still wandering around the boat with my father and my nephew and my older daughter, and I just mentioned to them, just be careful when you head on down.
> Q. Do you remember your exact words?
> A. Watch out. It's a little slippery.

Ann Berg testified at her 6/21/06 deposition
> A. I heard my daughter, who had already gotten off -- before that I heard a scream, and my daughter – then called us to take hold off the kid's hands because it's slippery.

Jonathan Bodner testified at his 6/21/06 deposition:
> Q. Do you remember hearing anything, any conversation, while you were getting out of the whale watch boat?
> A. I do remember people saying the gangplank was slippery.
>
> Q. Did the crewmembers ever tell you to hold onto the handrail?
> A. No
> Did any crewmember ever tell you the gangway was slippery?
> A. No.
>
> D. Did other passengers say that it was slippery before she fell?
> A. Yes
>
> Q. Now how did you know that the gangplank was slippery?
> A. When I stepped on it.
> Q. What did you experience when you stepped on it?
> A. I could feel my feet were slipping, so I grabbed onto the handrail.

The first time Crewmember, Evan Douglas, claims to have seen Ms. Jain is when she was halfway down the ramp.
Crewmember Newman did not recall anyone warning passengers of slipperiness on the day of the slip.
Defendant states that Ms. Jain held onto the handrails when she stepped up onto gangway (Newman).
If the gangway was wet passengers are warned the ramp is slippery (Newman).
Weather can make the gangway slippery (Douglas).

The gangway was originally manufactured for use as staging.
The length of the gangway-walking surface, aboard the Hurricane II on August 19, 2007.was 8 feet.
The gangway's top handrails cease at least 16 inches away from any part of the ship (Interrogatory Answer).
The gangway handrails have 4 clamps that interrupt the continuity of the handrails.
The surface of the diamond plate walking surface of the ramp may have somewhat less friction if wet than dry  (Interrogatory Answer)
Nicholas Danikas cannot describe the gangway on the day of the incident and does not know if it is 3 inches either way or five inches either way (N.D. deposition p.44, 45).
The stanchions were moved a couple of times after Ms. Jain fell (N.D. deposition p45).
The uppermost handrail of the gangway is approximately 4 ½ feet high (N.D. deposition p. 8).
The gangway becomes slippery when wet.
Diamond plate is used in the engine room of the Hurricane II and the Coast Guard wanted a strip of non-skid down from the forward to the engine. (N.D. deposition p. 12)
 A lot of changes were made to the gangway after Ms. Jain's slip (N.D. deposition p. 15)
Jeff Newman and Nick Danikas each moved the handrails a couple of times (N.D. deposition p.19)
Nick Danikas told Rose's machine shop to put down the diamond plate (N.D. deposition p. 25).
Here is no particular danger that would require a person descending the gangway to hold on to the handrail. (N.D. deposition p. 30)
The ropes are there to secure the ramp and they do not want passengers to touch them. (N.D. deposition p. 33)
Cape Ann has no record of the weather conditions other then those set forth in its vessels logs.
The gangway had a slope of approximately 10-15 degrees.
When the gangway is resting on the deck edge it requires stepping up getting onto it.
Spray can get the decks wet when the ship is on a whale watch.
The ships log reports winds at 10-20 knots on the relevant trip.
It is not a requirement of defendant that passengers hold onto the handrail to walk

    down the gangway
    The gangway has four clamps that block complete grasping of the gang handrails.
    No known person observed Ms. Jain not holding the handrails between the times she stepped up onto the gangway until the time of her fall.
    No witness has testified that the gangway was not slippery at the time Ms. Jain fell.
    The gangway is slippery when it is wet.
    Ms. Jain fractured her right leg in the slip on the gangway.
    Placing a rod and six screws and two longer cortical screws into the injured area treated Ms. Jain's injury.
    Ms. Jain was scarred as a result of the surgery.
    Ms. Jain suffered a permanent loss relative to ability to walk.

## II.    DEFENDANT'S SUBMISSIONS:

### A.    Cape Ann's Summary of Expected Evidence
*(Cape Ann does not adopt or concur in plaintiff's submission in her sections above.)*

    The evidence will show that the plaintiff's account of events is not reliable. She was observed to walk down the gangway, and several witnesses place her at the bottom, in distinct contrast to her testimony, in which she asserts that she fell at the very top. Her testimony is unreliable for various other reasons, as reflected elsewhere in this submission.

    The gangway in question had been in use for at least five years in precisely this service, and had served some 100,000 patrons without a problem, including in conditions of rain during passenger boarding or debarkation.

    Its diamond-plate surface is a standard marine walking-surface material. It is also used in many non-marine applications to supply traction where the material is expected to get wet or muddy, precisely because of its superior traction characteristics. It can be found on stairways of public transit systems, numerous industrial stairways, and in many other applications.

    It is very widely used in the engine rooms of ships and boats, where traction is needed when the vessel is rolling from side to side, without ready access to handrails, and where the surface is expected to get wet.

    The *Coast Guard, as required by law, periodically inspects the Hurricane II.* The Coast guard inspectors board and leave the vessel by means of the gangway in question here, and have done so for many years. There is nothing about the gangway that is in violation of any applicable regulation or standard. OSHA standards are completely inapplicable because this is a Coast Guard-inspected vessel.[1] The Massachusetts Building

---

[1] "The parties do not dispute that OSHA's regulations have been pre-empted with respect to *inspected* vessels, because the Coast Guard has broad statutory authority to regulate the occupational health and safety of workers aboard inspected vessels, 46 U.S.C. § 3306 (1994 ed. and Supp. V), and it has exercised that authority. Indeed, the Coast Guard and OSHA signed a "Memorandum of Understanding" (MOU) on March 17, 1983,

Code has no applicability to vessels or their appurtenances, and even if they did, they would be pre-empted by the Coast Guard's regulations, just as the OSHA requirements are.

The gangway was not observed to be wet or slippery upon the return of the *Hurricane II* to port, and the crewmembers that worked to set it in place for disembarkation did not detect any slipperiness as they walked upon it to prepare it for the passengers to depart. After the incident, the crew traversed the gangway again, and found that it was not slippery.

The mate directly instructed the plaintiff to hold on to the handrails of the ramp as she stepped from the deck of the *Hurricane II* onto the ramp. The crew saw her not holding on at the time that she fell. She claims that she always holds onto handrails, under all circumstances**.**

The Gloucester EMTs responded to the scene. They recorded symptoms of a syncopal episode, *i.e.*, a fainting or dizziness episode. The plaintiff has denied this, but similar symptoms are recorded in the hospital records of Addison Gilbert Hospital in Gloucester. The EMTs also recorded that the plaintiff had become incontinent of urine, but the plaintiff denies this as well. The result is that it is not medically proper to rule out that the plaintiff fell as a result of her own pre-existing medical condition.

Plaintiff can document only modest medical expenses, and her claims of lost wages are not credible — in a travel insurance application a few weeks before this incident, the plaintiff admitted that she is a housewife, as distinct from the operator of a business, as she asserted in her deposition.

**Contested Factual Issues**
What were the events of the incident
Whether the defendant exercised due care under the circumstances
Whether the plaintiff exercised due care under the circumstances
What was the cause of the plaintiff's fall
Quantum of damages

### III.   MOTIONS

1.     PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE USE OF CERTAIN TERMINOLOGY AS AMBIGUOUS AND CONCLUSORY

---

evidencing their agreement that, as a result of the Guard's exercise of comprehensive authority over inspected vessels, OSHA "may not enforce the OSH Act with respect to the working conditions of seamen aboard inspected vessels." 48 Fed. Reg. 11365. The MOU recognizes that the exercise of the Coast Guard's authority–and hence the displacement of OSHA jurisdiction–extends not only to those working conditions on inspected vessels specifically discussed by Guard regulations, but to all working conditions on inspected vessels, including those "not addressed by the specific regulations." *Ibid*. Thus, as OSHA recognized in the MOU, another agency may "exercise" its authority within the meaning of §4(b)(1) of the OSH Act either by promulgating specific regulations or by asserting comprehensive regulatory authority over a certain category of vessels." *Chao v. Mallard Bay Drilling, Inc.*, 534 U.S. 235 (2002).

2. PLAINTIFF'S MOTION IN LIMINE TO CONDUCT PART OF DEFENDANT'S CROSS-EXAMINATION OF PLAINTIFF AT SIDEBAR
3. PLAINTIFF'S MOTION IN LIMINE TO STRIKE PORTIONS OF DAVID DUBOISE TESTIMONY AS STATING LEGAL CONCLUSIONS AND BEING BEYOND HIS EXPERTISE
4. PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE TESTIMONY OF PLAINTIFF FAINTING AS IRRELEVANT
5. PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF LACK OF PAST ACCIDENTS

6. Defendant's motion to preclude references to OSHA regulations and building code.

7. Defendant's motion to preclude references to reports or documentation from persons not testifying

7. Defendant's motion to preclude disruption of vessel operations

8. Motion to preclude any written submissions by Dr. Datta

### IV. WITNESSES

**Ms. Jain's Witnesses**
As set out in Rule 26 supplementation and Answers to Interrogatories
The testimony of Jonathan and Lisa Bodner of 28 Winant Road Kendall Park New Jersey and Alice Berg 603 Regency Drive Franklin Park New Jersey and Dr. Lhowe (depending on availability) Massachusetts General Hospital, Boston Massachusetts John Culver 603 474 5762 94 Marshview Circle, S
Seabrook New Hampshire 03874
Sidarth Jain and Kasum Jain 10 Betts Road, Belmont MA (Kasum may be unavailable so use of deposition is possible)
Madhu Jain and Varnit Jain D138 first floor East of Kailash New Delhi India
Robert Holt 978-371-0201, 91 Main Street, Concord MA 01742
Dr. V Datta 1/62 Sunder Vihar New Dehli-87
Those set out in Exhibit List in Ms. Jain's Proposed Evidence under Rule 26 and Supplementary Response to Defendant's Interrogatories and all keepers of records relative to exhibits.
The information in the appended documents entitled "Ms. Jain's Supplemental Response to Defendants First Interrogatories" identifying witnesses is incorporated by reference into this document.

**Cape Ann's Witnesses:**
Jeffrey Eagan
John Newman
Evan Douglass

Nicholas Danikas
David DuBois
Dr. Gerald Winkler
Keeper of Records of Addison Gilbert Hospital
Any Witnesses called by the plaintiff
(The testimony of some witnesses may have to be presented by deposition)

**V.     EXHIBITS**

**Agreed Exhibits:**
1.     Gloucester EMTs Report
2.     Plaintiff's U.S. Medical Records (to the extent timely disclosed by plaintiff)
3.     Vessel Log for date in question
4.     Photograph of vessel including Bodnar family
5.     Plaintiff's Responses to Defendant's Interrogatories (Jain Depo Exhibit 1)
6.     Plaintiff's Travel Insurance Application (Jain Depo Exhibit 3)
7.     Photograph of Ms. Jain while on board vessel (Jain Depo Exhibit 5)
*8.*     Photo of Gangway leading to *USS John F. Kennedy*
9.     Jain X-rays and notes taken 8/19/04, 11/10/05 and 12/2/05 including those taken at Beverly Hospital and Addison Gilbert Hospital and by Dr. Data and affixed to his report,
10.    Addison Gilbert hospital record service dates 8/19/04-8/23/04,
11.    Beverly Hospital record service dates 8/19/04,
12.    Northeast Hospital Corporation bill for service dates 8/19/04-8/23/04 in amount of $10,086.30,
13.    Beverly Anesthesia Associates bill $1430.09 ($214.50 balance)

Ms. Jain reserves the right to supplement response.

**Disputed Exhibits:**
14.    Werner Catalog (excerpt) showing the scaffolding used as gangway,
15.    Deposition transcripts of the depositions of Lisa Bodner, Alice Berg and Jonathan Bodner addresses as set out in depositions (telephone numbers not presently available),
16.    Hurricane II log, Gloucester Gazette, August 18, 2004,
17.    Hurricane II incident report,
18.    Medical Report of Dr. V Datta,
19.    Medical Report of Dr. David Lohwe,
20.    Defendant's Responses to Requests for Admissions and Defendant's Interrogatory Answers and all materials provided in response to Ms. Jain's Requests for Documents,
21.    Recent tax return showing $12,000 loss of income.
22.    Cape Ann web sight animated tour of ship and all other contents,
23.    All certified letters to Defendant,
24.    Reports of John Culver and Robert Holt,.
25.    Madhu Jain shoe
26.    Medical report of Kyung Ae Hahn

27. The gangway itself
28. Photographs of the Hurricane II and the dock

**VI.  LEGAL ISSUES:**
1. Applicable Legal Standard:
   > **Defendant's position** is that federal maritime law applies. *Montleone v. Bahama Cruise Line, Inc.*, 838 F.2d 63 (1988). A plaintiff has an obligation to take reasonable precautions for her own safety. *Menin v. Wilner*, 424 F.2d 1058 (5th Cir. 1970).
   >
   > **Plaintiff's position** these decisions are not decisions that this Court must follow.

2. Role of other standards:
   > **Defendant's position** is that neither OSHA standards nor any Massachusetts regulations apply, by reason of federal pre-emption specified above.
   >
   > **Plaintiff's position**:  Because a ramp and a fall upon are not uniquely maritime and are essentially land based objects and occurrences and Massachusetts local law is well developed in this area the Court is free to use this body of law as it sees fit based on the facts.
   > Plaintiff disagrees that the fact that the Coast Guard may have boarded the ship on that gangway establishes Coast Guard approval of it.

3. Effect of Fainting
   > **Plaintiff's position:**  Unexpected fainting is not comparative negligence. Under Massachusetts's law, it is well established that "a sudden and unforeseeable physical seizure rendering an operator unable to control his motor vehicle cannot be termed negligence." Carroll v. Bouley, 338 Mass. 625, 156 N.E.2d 687, 689 (Mass. 1959). However, even in the event of a medical emergency, the operation of a motor vehicle may be the basis for negligence when the operator knew or should have known that he was likely to be subject to an incapacitating physical seizure**.** Ellingsgard v. Silver, 352 Mass. 34, 223 N.E.2d 813, 815-16 (Mass. 1967); see McCall v. Wilder, 913 S.W.2d 150, 155-56 (Tenn. 1995) (liability may attach in case of medical emergency where "defendant was made aware of facts sufficient to lead a reasonably prudent person to anticipate that driving in that condition would likely result in an accident.") Specifically, liability may still be found in two types of circumstances: (1) the operator suffers from a condition which indicates, "from a medical viewpoint, a fairly immediate likelihood that it will result in an attack rendering him unconscious"; and (2) the operator suffers warning symptoms of a physical failure during actual operation, but neglects to heed such warnings and continues to

      operate the vehicle. Ellingsgard, 223 N.E.2d at 816. JOSEPH LANGLAND v. UNITED STATES OF AMERICA (CIVIL ACTION NO. 00-30201-FHF) UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS 2002 U.S. Dist. LEXIS 1516, (January 30, 2002)

      We have been referred to no case in this Commonwealth, which is precisely in point. By the great weight of authority a sudden and unforeseeable physical seizure rendering an operator unable to control his motor vehicle cannot be termed negligence. See cases collected in note in 28 A. L. R. 2d 20, 35 et seq. Such an operator does not fall within the definition by Chief Justice Rugg in *Altman* v. *Aronson*, 231 Mass. 588, 591: "Negligence, without qualification and in its ordinary sense, is the failure of a responsible person, either by omission or by action, to exercise that degree of care, vigilance and forethought which, in the discharge of the duty then resting on him, the person of ordinary caution and prudence ought to exercise under the particular circumstances." ." Carroll v. Bouley, 338 Mass. 625, 156 N.E.2d 687, 689 (Mass. 1959).

      **Defendant's position**:   Fainting, etc., is highly pertinent to the question of causation as to the plaintiff's fall, and also as to her capabilities as a percipient witness and as to the reliability of her memory.

3.     Holding onto Handrails

      **Plaintiff's position**   The Defendant cannot establish comparative negligence by claiming Ms. Jain failed to hold the handrails if no witness claims to have observed her not holding the handrails until the time of her slip.

      No witness testified that Ms. Jain failed to grasp the handrail which was provided for anyone using the ladder, or that he failed, in any respect, to take proper precaution to insure his own safety. Juries cannot be permitted to speculate on what might of could have happened without supporting evidence. Here defendant had the burden to prove by a preponderance of the evidence Mason's contributory negligence. No direct evidence was introduced to meet this burden. It cannot be reasonably argued that that the physical facts involved in the slip could be accepted as evidence of Mason's failure to grasp the handrails or take other precautionary measures. It is a matter of common experience that a person can slip on a stairway, due to extremely slippery conditions, with such force that his hands would be loosened from the handrail. Robert Lee Mason v. Mathiasen Tanker Industries, Inc., 298 F.2d 28 (4th Cir. 1962).

      Like Mason, where it was contended that the oil in his shoes caused him to slip while descending the steep steel stairs and the counterargument was made that the unseaworthiness was vitiated by Mason's failure to grasp the handrail, our case involves the contention that the defective ladder was

offset by Smith's failure to take a firmer handhold on the hatch coaming. The question of Mason's contributory negligence was held to have been erroneously submitted to the jury; Smith's acts, too, afford no foundation for a finding of contributory negligence. And in light of Robert Bernard Smith v. U.S.A. v. Whitehall Terminal Corporation, 336 F.2d 165,166 (4th Cir. 1964)

**Defendant's position**:    Two witnesses have testified that Ms. Jain was not holding on to the handrails at the time that she fell. The materials set forth above, as if they were quotes from cases, are not accurate quotes of the text, and moreover the cases in question are cases involving injuries to seamen, who are governed by an entirely different legal regime than passengers. The cases cited are thus utterly inapplicable and are improperly misleading.

4. Effect of Massachusetts Statute

    **Plaintiff's position:**   A presumption exist that Ms. Jain was in the exercise of due care (not negligent) and that the defendant has the burden to prove that she was not by a preponderance of the evidence.
    MGL ch. 231, § 85  (2007)

    > **§ 85.  Contributory Negligence No Bar to Recovery of Damages; Findings of Fact or Special Verdict; Reduction of Damages by Court.**
    > The burden of alleging and proving negligence which serves to diminish a plaintiff's damages or bar recovery under this section shall be upon the person who seeks to establish such negligence, and plaintiff <u>shall be presumed to have been in the exercise of due care</u> (emphasis added).

    **Defendant's position;**   This case is governed by federal maritime law under the "reverse Eire doctrine," for reasons including that the plaintiff's designation of this as an admiralty and maritime case under Fed. R. Civ. P. 9(h) in her complaint.

5.    Effect of Massachusetts Building Code.
    **Plaintiff's position:**   The Massachusetts Building Code on Ramps and Handrails (Board of Building Regulations and Standards) Chapter 10 Means of Egress, 780 C.M.R. 1016, Ramps, is applicable or informative to the Court as the nature of a slip and fall on a ramp is local and not uniquely maritime in nature.
    1016.3 Maximum slope:   The maximum slope of means of egress ramps in the direction of travel shall be one unit vertical in 12 units horizontal (1:12); except the maximum slope shall be: one unit vertical in eight units horizontal (1:8) if the rise is limited to three

>   inches (76 mm); one unit vertical in ten units horizontal (1:10) if the rise is limited to six inches (152 mm). The maximum slope across the direction of travel shall be one unit vertical in 48 units horizontal (1:48).
>
>   **Defendant's position:   For reasons set forth elsewhere, neither the Mass. Building Code nor OSHA regulations are applicable here.**

6. Effect of crewmember's testimony:
   **Plaintiff's position**: Testimony of repeating seasonal crewmembers, given in the off-season, is binding as an admission of a party opponent.

   **Defendant's position:** Seasonal crewmembers are not authorized representatives of their employers. Their testimony is that of themselves alone.

7. Presumptions as to Walking Surface
   **Plaintiff's position:** A presumption exist that a slippery-sloped walking surface is unreasonably dangerous putting a burden of production of evidence onto the defendant to come forth with evidence that it is not unreasonably dangerous.

   **Defendant's position:** Plaintiff is seeking to avoid carrying her fundamental burden in a tort case. There is no such presumption, and no evidence to support the invocation of any presumption. Plaintiff has to prove the fundamental elements of her case.

8. Effect of physical examination:
   **Plaintiff's position:** The report of defendant's I.M.E. doctors, Kyung Ae Hahn, is admissible as an admission by a party opponent.

   **Defendant's position:** A non-testifying physician is not a representative or agent of a defendant.

## VII.  JUDICIAL NOTICE:

1. Defendant requests that the Court take judicial notice of official federal weather records for August 19, 2004, for the two weather stations closest to Gloucester, namely Essex, Massachusetts, and Beverly, Massachusetts.

   Plaintiff opposes judicial notice since the detail of the route the ship took is uncertain and the weather reports of the stations were limited in scope to certain areas and because New England weather changes quickly. The question of what the weather was at various times in places where the ship might have been cannot be judicially noticed .Defendant's kept a log and stated that their only knowledge of the weather was the ship's log. Plaintiff requests these reports are not subject to judicial notice as the term official weather records does not accurately describe recognized records and the content

of the records is not generally understood and they have not been disclosed to plaintiff. The records are also summaries and the National Climatic Data Center's data requires explanation by an expert because other data is available and it must be put in context andotherwise explained.

2.    Plaintiff asks that tide charts be judicially notice.

Defendant observes that this position is inconsistent with plaintiff's position on judicial notice as to the weather.

3.    Plaintiff asks that medical records and bills be noticed as records of regularly conducted activity be judicially noticed.

Defendant objects, inasmuch as there is no basis for judicial notice of such case-specific details.

4.    Plaiintiff asks that judicial notice be taken that there exists a relationship between the steepness of a ramp and the traction necessary to descend it. The steeper the ramp, the more traction is necessary.

Defendant objects, in that this is either a matter for expert testimony (if it is of enough substance to be admitted), or that it is so generically obvious as not to constitute evidence to begin with.

**VIII.  SPECIAL ISSUES**

1. Based on the deposition of the plaintiff and her admission in her interrogatories about her lack of facility in English, the defendant submits that the testimony of the plaintiff will require an interpreter.

Plaintiff asserts that she speaks English well enough to testify.

2. The medical report and corresponding X-Rays of the plaintiff's treating doctor in India, Dr. Vinod Datta, were attested to and put under seal in India by a Chief Metropolitan Magistrate and Sessions Judge of the Karkardeoma Court in New Deli and provided to defense months in advance of the trial.

Plaintiff requests they be noticed as authentic.

Defendant objects; these are inadmissible hearsay.

3. Despite 5 early written requests not to change and to preserve as evidence the gangway (including an offer to store the original and replace it), the gangway was changed by defendant. Plaintiff asks that defendant be excluded from asserting that any photograph does not accurately depict the gangway as it was on the day of the fall because it was changed (stanchions and rails moved) after the fall and the plaintiff was deprived of the gangway in its original condition.

>Defendant objects.  Plaintiff had numerous opportunities to make photographs and inspections of the gangway, and is solely responsible for whatever advantage she took or did not take of them.  Defendant continued to use the gangway in the ordinary course of business, as was proper, and plaintiff suffered no prejudice, having had a full opportunity to inspect the gangway, which she never took advantage of.

IX.   **ESTIMATED LENGTH OF TRIAL:**
   3 full days

| | |
|---|---|
| **MAHDU JAIN** <br> By her attorney, <br><br> /s/ Jeffrey C. Conairis  <br> Jeffrey C. Coniaris, Esq., BBO# 555907 <br> **LAW OFFICES OF JEFFREY CONIARIS** <br> 84 State Street <br> Boston, MA  02109 <br> Tel. (617) 720-5888 <br> Fax. (617) 720-2164 <br> **Dated:  June 4, 2007** | **CAPE ANN WHALE WATCH, INC.** <br> By its attorneys, <br><br> /s/ Michael Rauworth  <br> Michael J. Rauworth, BBO# 547711 <br> **CETRULO & CAPONE LLP** <br> World Trade Center East <br> Two Seaport Lane — 10th Floor <br> Boston, Massachusetts 02210 <br> Tel:  (617) 217-5500; <br> Fax:  (617) 217-5200 |