## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MADHU JAIN, | ) | C.A. No. 05 11267 MEL |
| PLAINTIFF | ) | |
| v. | ) | |
| A CAPE ANN WHALE | ) | |
| WATCH, INC. | ) | |
| DEFENDANT | ) | |

### PLAINTIFF"S MOTION TO ADMIT ATTACHED PHOTOS OF THE GANGWAY

Plaintiff, immediately after the accident sent 4 certified letters (Exhibit 1) to defendant requesting that the gangway is preserved. Plaintiff purchased another gangway and offered it to defendant and offered storage.

These requests were ignored, Captain Danikas testified that the rails were adjusted and the stanchions moved at some vague times (Exhibit 2).

As a result the plaintiff was deprived of an opportunity to inspect the gangway as it was on the day of the accident.

Plaintiff has had difficulty authenticating her photographs of the gangway because of the changes.

Plaintiff asks that the attached photographs (Exhibit 3) of the gangway be presumed admissible. Defense has had an opportunity to examine them.

WHEREFORE, the plaintiff respectfully moves that the evidence be admitted.

By the Plaintiff,

JEFFREY C. CONIARIS
BBO# 555907
84 State Street
Boston, MA, 02109
(617) 720-5888

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each party and any party appearing pro se by first-class mail postage prepaid or (by hand delivery).

Dated 6/6/07

EXHIBIT 1

Friday, August 27, 2004

Cape Ann Whale Watch
Roses Wharf
415 Main St.
Gloucester, MA 01930

Dear Sirs:

We represent Ms. Madhu Jain. We request that we be allowed to examine and photograph the gangplank (a metal structure manufactured by Werner) used for unloading passengers on the afternoon whale watch, probably off the Hurricane II, on August 19, 2004.We are investigating a fall by a passenger and would like to assure our client that the gangplank was reasonably safe.

Please call or fax available times for this to be done (preferably within two weeks and not on September 1,2 or 3rd). Please do not alter or destroy the above-described piece of physical evidence.

Please also preserve the list of the names of passengers on the ship that day in case those names become necessary and please preserve any photographs related to the fall and any statements or reports.

Ms. Jain is recovering from the fall and we are optimistic that she will improve greatly.

Thank you for your attention to this matter.

Very truly yours

Jeffrey C. Coniaris
84 State Street
Boston MA 02109

SENT CERTIFIED MAIL R R R ON THE ABOVE DATE
CERTIFIED MAIL NO. 7004 0550 0000 6125 0005

Monday, September 13, 2004

Cape Ann Whale Watch
Roses Wharf
415 Main St.                              **SECOND NOTICE**
Gloucester, MA 01930

Dear Sirs:

We represent Ms. Madhu Jain. We request that we be allowed to examine and photograph the gangplank (a metal structure manufactured by Werner) used for unloading passengers on the afternoon whale watch, probably off the Hurricane II, on August 19, 2004. We are investigating a fall by a passenger and would like to assure our client that the gangplank was reasonably safe.

Please call or fax available times for this to be done (preferably within two weeks). Please do not alter or destroy the above-described piece of physical evidence.

Please also preserve the list of the names of passengers on the ship that day in case those names become necessary and please preserve any photographs related to the fall and any statements or reports.

Ms. Jain is recovering from the fall and we are optimistic that she will improve greatly.

Thank you for your attention to this matter.

Very truly yours

Jeffrey C. Coniaris
84 State Street
Boston MA 02109

SENT CERTIFIED MAIL R R R ON THE ABOVE DATE
CERTIFIED MAIL NO. 7004 0550 0000 6124 9955

Tuesday, September 21, 2004

Cape Ann Whale Watch
Roses Wharf
415 Main St.                              **THIRD NOTICE**
Gloucester, MA 01930

Dear Sirs:

We represent Ms. Madhu Jain. This is our third request that we be allowed to examine and photograph the gangplank (a metal structure manufactured by Werner) used for unloading passengers on the afternoon whale watch, probably off the Hurricane II, on August 19, 2004. We are investigating a fall by a passenger and would like to assure our client that the gangplank was reasonably safe.

Please call or fax available times for this to be done (preferably within two weeks). Please do not alter or destroy the above-described piece of physical evidence.

Please also preserve the list of the names of passengers on the ship that day in case those names become necessary and please preserve any photographs related to the fall and any statements or reports.

Ms. Jain is recovering from the fall and we are optimistic that she will improve greatly.

Thank you for your attention to this matter.

Very truly yours

Jeffrey C. Coniaris
84 State Street
Boston MA 02109

SENT CERTIFIED MAIL R R R ON THE ABOVE DATE
CERTIFIED MAIL NO. 7004 0550 0000 6125 0197

Tuesday, September 28, 2004

Cape Ann Whale Watch
Roses Wharf
415 Main St.
Gloucester, MA 01930

Dear Sirs:

As you know we represent Ms. Madhu Jain. We have purchased another platform
of the same Werner model which is new and which we can give you. In return, we
request that we both preserve the original "gangplank" for safekeeping. We have reserved
locked storage space to preserve the item for future inspection by jurors and/or experts
and will pay costs for storage.

We still must examine it prior to storage. It apparently has already been changed
and we would want to photograph the original surface. We reiterate our request to do so.

Pease do not alter or destroy the above-described piece of physical evidence.

Thank you for your attention to this matter.

Very truly yours

Jeffrey C. Coniaris
84 State Street
Boston MA 02109

SENT CERTIFIED MAIL R R R ON THE ABOVE DATE
CERTIFIED MAIL NO. 7004 0550 0000 6125 0135

EXHIBIT 2

Jeff_s_Disk_File
11     A.    Stellwagen Banks. Let me see. That would be on the
12     stern port side. That wouldn't have any effect at all. You
13     shouldn't get any spray. Even if it was blowing twenty-five
14     you shouldn't get any spray going that way?
15     Q.    You don't know what the wave heights were?
16     A.    No, I really don't.
17     Q.    What kind of wave heights would generate a spray
18     relative to the direction we just discussed in the prior
19     question?
20     A.    Probably like fifteen, fifteen knots.
21     Q.    How about wave height?
22     A.    Fifteen knots from that direction wouldn't be very
23     much, you know. One to two foot I would think.
24     Q.    One to two foot waves would generate spray?
25     A.    I thought you meant with a fifteen knot wind how

COPLEY COURT REPORTING - (617) 423-5841

15

1      much would it generate. I said one to two foot with a
2      fifteen knot wind. Spray, no, you wouldn't get any spray on
3      that.
4          Q.    Now can you describe the inspection that you did of
5      the gangplank subsequent to Ms. Jain's fall?
6              MR. RAUWORTH: Objection. Assumes facts not in
7      evidence.
8          Q.    Did you inspect the gangplank after Ms. Jain's
9      fall?
10         A.    Not really, no. I kind of looked at it. It was the
11     same as it was earlier. There were no changes that I

Page 14

Jeff_s_Disk_File

12  noticed.

13      Q.   Subsequent to this fall, were any changes made on

14  the gangway?

15      A.   Before it?

16      Q.   After it.

17      A.   After it. Yes, there was a lot of changes made.

18      Q.   Go into them, tell me what they were?

19      A.   What happened was the ramp at one point wasn't

20  taken off the boat because we were working on the boat and

21  it had fallen in between and got completely dismantled, it

22  just got wrecked. It ruined one of the seats on the boat.

23  It got jammed between the barge and everything.

24      Q.   Okay.

25      A.   I had to put it all back together.

COPLEY COURT REPORTING - (617) 423-5841

16

1      Q.   When did that occur?

2      A.   It was after that. Quite a ways after that.

3      Q.   A month after that?

4      A.   I really can't even remember when it was but it was

5  a while.

6      Q.   Was it in the fall?

7      A.   I don't know when that was. I would say -- I don't

8  know. I can't remember. I just can't remember when it was.

9  It was after that, I'm sure.

10      Q.   You have no idea how long afterwards? Was it the

11  next day?

12      A.   No.

Page 15

Jeff_s_Disk_File
13      Q.    The next week?

14      A.    It was weeks later, yes. I would think.

15      Q.    Two weeks later, three weeks later, five weeks

16      later?

17      A.    I would have to investigate it more to find out.

18      Q.    How would you or where would that information be

19      kept?

20      A.    I probably would have to ask one of the guys that

21      helped me with it and he is not even around here. I don't

22      even know if I can find him.

23      Q.    What is his name?

24      A.    John Eric. I'm not sure of his last name.

25      Q.    Do you know what he does for a living?

COPLEY COURT REPORTING - (617) 423-5841

17

1       A.    No. He's in Florida somewhere off the coast. I

2       think he works on a boat now. I'm not sure.

3       Q.    So what changes did you make to the gangway after

4       you had this incident?

5       A.    Immediately after?

6       Q.    Yes.

7       A.    I think a few weeks later, a couple of weeks later,

8       we put that carpet on. A couple of weeks maybe.

9       Q.    And did you put the carpet on or did someone else

10      put it on?

11      A.    I think I put it on.

12      Q.    When you put the gangway after it fell in between

13      or wherever it fell that it sustained the damages, did you

Page 16

Jeff_s_Disk_File

7    Q.    Let me show you this photograph. Is that a fair and
8    accurate depiction of the gangway as it was on the date of
9    the incident?

10    MR. RAUWORTH: Objection. Assumes facts not in
11    evidence. Ambiguous. Foundation. You may answer.

12    THE WITNESS: I see the carpet is on there. I know
13    that wasn't on there. As far as the railing, like I said
14    before I don't know if that is the way they were or they
15    have been changed.

16    Q.    That was taken shortly after the fall. What would
17    the likelihood of them being changed be?

18    MR. RAUWORTH: Objection. Counsel is not in a
19    position to testify. I object to the preamble. The question
20    as stated assumes facts not in evidence.

21    MR. CONIARIS: What facts are in evidence?

22    MR. RAUWORTH: You made a statement as to when it
23    was taken.

24    MR. CONIARIS: What facts are in evidence right now?
25    What facts could possibly ---

COPLEY COURT REPORTING - (617) 423-5841

42

1    MR. RAUWORTH: I have stated my objection. He is not
2    obliged to give an answer to a question that is loaded with
3    your comments.

4    MR. CONIARIS: You are kind of coaching him, too.
5    Just object.

6    MR. RAUWORTH: I did. You asked what the objection
7    was and what the problem was. Now if you don't want me to
Page 40

Jeff_s_Disk_File

8   expand on it, don't, you know, pick a fight about it.

9           MR. CONIARIS: All right.

10      Q.   If I told that you this was taken shortly after the

11  incident, what would the likelihood of those railings being

12  changed be?

13          MR. RAUWORTH: Objection. Calls for speculation.

14  Assumes facts not in evidence. Foundation. You can answer.

15          THE WITNESS: Soon after?

16      Q.   Yes.

17      A.   How soon after the incident could they have been

18  changed?

19      Q.   Let's rephrase the question. How soon after the

20  incident could those railings have first been changed?

21          MR. RAUWORTH: Objection. Calls for speculation.

22          THE WITNESS: Well ---

23          MR. RAUWORTH: Assumes facts not in evidence.

24          THE WITNESS: I know they were changed because I

25  changed them. I don't know how long it was afterwards.


COPLEY COURT REPORTING - (617) 423-5841


43


1   Remember I told you the ramp fell down and they got all

2   dismantled.

3       Q.   Is there any record of the ramp falling down?

4       A.   Like in writing?

5       Q.   Any kind of record.

6       A.   I don't think so. I can tell you it fell down and

7   when it did, I can show you the damage, it stuck into that

8   bench that you had on that other picture, this bench right

Page 41

Jeff_s_Disk_File

9    here.

10    Q.    Yes.

11    A.    And ripped the aluminum seat, that is how badly it

12    got jammed in there and these stanchions all broke so it

13    was after that but I don't know, like I say I have no way

14    of knowing how many days after the incident.

15    Q.    Was it more than three months after the incident?

16         MR. RAUWORTH: Objection. Asked and answered.

17         THE WITNESS: I don't know. I really need quite a

18    bit of time to think exactly within a month when it was. I

19    would have to like, because it wasn't that important to me.

20    Q.    Was it more than a month after the accident?

21         MR. RAUWORTH: The same objections.

22         THE WITNESS: Let me think now.

23    Q.    Take your time.

24    A.    I don't remember when this happened. Was it August

25    sometime?

COPLEY COURT REPORTING - (617) 423-5841

44

1    Q.    August.

2    A.    I don't know. I would have to do a lot of research

3    on it.

4    Q.    Did it put the boat out of commission, that

5    incident where it broke the bench?

6    A.    It was a nor'easter it was a storm and it blew the

7    boat away and we weren't going out and no, it didn't. I had

8    worked on it all day long and put it back together.

9    Q.    The best of your recollection is it was still

Page 42

Jeff_s_Disk_File

10    within the whale watch season?

11        A.    Yes, but I am not sure when.

12        Q.    Would that be noted in the log anywhere?

13        A.    No. I remember doing it, like I say, but I really

14    -- I have no idea when it was.

15        Q.    Did any whale watch trips have to be canceled

16    because of that?

17        A.    No. If you go down, you will see they have all been

18    broken. In fact I will probably have to repair them next

19    year.

20        Q.    So you can't tell me whether that picture depicts

21    how the gangway was on the day of the incident?

22            MR. RAUWORTH: Objection. Asked and answered

23    repeatedly. You may answer.

24            THE WITNESS: Exactly, no. Roughly, if it is three

25    inches either way or five inches either way, I would never

COPLEY COURT REPORTING - (617) 423-5841

45

1     know. It is not two feet off. I can tell you that. If it is

2     a few inches, I can't be, you know, I wouldn't bet my life

3     on it.

4         Q.    Other than the few inches, is there anything in

5     that picture that is different?

6         A.    The carpet was not on there when the woman got

7     hurt. Everything else looks roughly the same.

8         Q.    Did anything else change when you repaired that

9     gangway other than possibly the length of the rails?

10        A.    Yes.

Page 43

Jeff_s_Disk_File

11    Q.    What else changed?

12    A.    The stanchions that go up and down.

13    Q.    Yes.

14    A.    I think I had to move a couple of them because it

15    got torn underneath. I think I had to move them one way or

16    another. I had to redrill the flange right here.

17    Q.    You took the old flange off and moved it?

18    A.    I had to move it, yes, because it pulled the bolts

19    right through the ramp right here.

20    Q.    Was that on the top of the ramp or bottom of the

21    ramp or both?

22    A.    It was just this one. These here, I think it was

23    these right here or one of these two, I can't remember

24    which ones they were. I had to move both of them, one on

25    one side and one on the other. Like I say I can't remember

COPLEY COURT REPORTING - (617) 423-5841

46

1    if it was these two or these two.

2    Q.    Okay.

3    A.    Then obviously I had to slide these up a little bit

4    so they have all been changed. All four of them have been

5    moved.

6    Q.    All four of those flanges have been moved?

7    A.    That was completely dismantled, yes. I took that

8    whole thing right apart. Everything has been moved.

9    Q.    This incident occurred during the nor'easter?

10    A.    Yes, because it blows the boat away from the barge

11    and ---

Page 44

EXHIBIT 3



















