UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MADHU JAIN,<br>          Plaintiff,<br>v.<br>A CAPE ANN WHALE WATCH, INC.,<br>          Defendant. | CIVIL ACTION NO. 05-11267-MEL |

**DEFENDANT'S REQUESTS FOR FINDINGS OF FACT,
RULINGS OF LAW AND/OR ADJUDICATIONS
ON MIXED QUESTIONS OF FACT AND LAW**

The defendant A Cape Ann Whale Watch, Inc ("Cape Ann") hereby submits its Requests for Findings of Fact and Requests For Rulings of Law and Requests for Adjudications On Mixed Questions of Fact and Law, all pursuant to Rules 52 of the Federal Rules of Civil Procedure, and urges that the present action be resolved in accordance with the following. This submission is accompanied by a memorandum of law.

1.     There is no evidence that the gangway surface was or had previously been unreasonably slippery when used in the rain or when it was otherwise wet.

2.     There is no evidence that Cape Ann knew or should have known that the gangway surface was unreasonably slippery on the day in question.

3.     Diamondplate is a surfacing material in widespread and common use for enhanced traction in situations of high passenger traffic such as MBTA trains.

4.     Diamondplate is marketed as an anti-slip surface material.

5.     Diamondplate is commonly used in marine applications in exterior locations where passenger traffic is to be expected.

6.     Diamondplate is a surface widely used in the marine industry in applications such as engine rooms where the surface may be tilted due to the roll of the vessel, and where the surface can be expected to be wet, or where it can be expected to experience spillage of oil upon it.

7. The Coast Guard instructed Cape Ann to install diamondplate as a walking surface in spaces aboard the *Hurricane II*.

8. Use of diamondplate on the gangway did not violate any Coast Guard regulation.

9. The Coast Guard had the power to prohibit the vessel from using the gangway in question.

10. The Coast Guard's representatives had been aboard the vessel at least once per year over five or more years preceding Ms. Jain's injury — coming and going by way of the gangway — and had raised no objection to the gangway.

11. Use of diamondplate on the gangway did not violate any regulation of any kind.

12. Use of diamondplate on the gangway did not violate any recognized standard.

13. The diamondplate surface of the gangway had been used by approximately 100,000 passengers over the course of more than five years, in all conditions of weather, including rain, all without injury, problem, or incident before Ms. Jain's injury.

14. Cape Ann did not have any reason to believe the use of diamondplate on the gangway was unreasonably slippery or dangerous for passenger use.

15. Use of diamondplate on the gangway was reasonable.

16. The angle of the gangway surface did not violate any Coast Guard regulation.

17. The angle of the gangway surface did not violate any standard that was binding upon the vessel.

18. There is no evidence or basis to conclude that OSHA ("Occupational Safety and Health Agency") regulations applied to the vessel or to the gangway.

19. There is no evidence or basis to conclude that ADA ("Americans With Disabilities Act") regulations applied to the vessel or to the gangway.

20. A transitory and localized condition of slipperiness could have been created by a passenger spilling a substance (such as, for example, suntan oil) on the surface of the gangway without the knowledge of the crew.

21. A transitory and localized condition of slipperiness could have been created by a passenger having stepped in a slippery substance (such as, for example, suntan oil)

spilled onto the deck while standing in line to disembark, and tracking the same onto the gangway surface, all without the knowledge of the crew.

22.    If any individuals experienced any slipperiness on the surface of the gangway on the day in question, there is no evidence that this was due to anything other than a transitory and localized condition.

23.    If any individuals experienced any slipperiness on the surface of the gangway on the day in question, there is no evidence that any information about this was communicated to anyone connected with the vessel.

24.    Apart from the testimony of the plaintiff herself, no witness testified (and there is no other evidence) that she lost her footing — or fell — at the top of the gangway, or at the point of her first step upon it.

25.    No witness whatsoever places the plaintiff as being off her feet on the gangway at a location in the upper half of the gangway.

26.    Several separate witnesses saw the plaintiff sitting on the bottom of the gangway with her feet on the barge; this included witnesses not associated with Cape Ann.

27.    No one has testified that the plaintiff fell at the top of the gangway and slid to the bottom of it.

28.    The plaintiff could not have fallen at the top of the gangway and slid to the bottom unless the gangway surface had been so slippery as to be impossible to walk upon without slipping.

29.    Kusum Jain testified that she was on the gangway and felt the tremor of plaintiff falling behind her, but Kusum Jain was not knocked down.

30.    The plaintiff could not have fallen and then ended up at the bottom of the gangway without knocking over Kusum Jain or some other passenger ahead of the plaintiff on the gangway, and no other passenger fell on the day in question.

31.    No one other than Ms. Jain fell on the gangway.

32.    Alice Berg, a passenger witness from New Jersey, testified that her daughter did not mention anything about the condition of the gangway until after the plaintiff's injury.  (Page 12, lines 7-18).

33.     If the plaintiff had fallen at the top of the gangway, she would have hurt one of her legs by landing on the upper edge of the walking surface of the gangway, and there were no such injuries.

34.     The plaintiff had a duty to exercise reasonable care for her own safety in departing the vessel.

35.     John Newman specifically instructed the plaintiff that she was to hold on to the handrails while proceeding on the gangway off of the vessel.

The plaintiff has admitted that it is important to hold onto handrails.  Deposition Page 63, Line 21 to Page 64, Line 5.

36.     John Newman and Evan Douglass testified that the plaintiff took a number of steps down the gangway and reached the bottom half of the gangway before she fell.  John Newman testified to this effect at a time when he had no affiliation with Cape Ann.

37.     Pipe handrails were in place on both sides of the gangway at all points along the lower half of the gangway.

38.     The testimony of Jonathan Bodnar that there was a handrail on only on side of the gangway (Page 13, Lines 11-15) is directly contradicted by the photographic evidence, and by all of the other evidence in the case on this point.

39.     John Newman and Evan Douglass observed the plaintiff walking along the lower half of the gangway at a time when she was not holding onto the handrails.

40.     The plaintiff did not testify that she held onto the handrails in proceeding down the gangway.

41.     There is no evidence whatsoever that the plaintiff was holding onto the handrails at the time she lost her footing.

42.     Handrails are provided for the purpose of assisting people in keeping their balance and their footing.

43.     The failure of the plaintiff to hold onto the handrails amounted to a lack of due care for her own safety.

44.     The failure of the plaintiff to hold onto the handrails was a substantial contributing cause of her loss of her footing and her injuries.

4

45.    As reflected in the medical records of the Gloucester EMTs, the plaintiff was incontinent of urine at the scene.

46.    Incontinence of urine is a medical circumstance strongly suggesting that the plaintiff experienced at least a brief loss of consciousness contemporaneous with her experience on the gangway.

47.    The plaintiff has vigorously denied being incontinent of urine at the scene. Deposition Page 75, Line 13 to Page 76, Line 24; and stipulation at sidebar.

48.    As reflected in the medical records of the Gloucester EMTs, the plaintiff experienced dizziness at the scene.

49.    As reflected in the medical records during her hospitalization following the injury, the plaintiff admitted a history of dizziness and/or vertigo, as well as a prior history of mild spinal irregularity.

50.    As reflected in the medical records during her hospitalization following the injury, the plaintiff experienced further episodes of dizziness while an in-patient.

51.    Plaintiff denied the condition of dizziness that appears in her medical history taken post-injury.  Deposition Page 73, Line 21 to Page 74, Line 23.

52.    Plaintiff also denied the condition of spondylolisthesis that appears in her medical history taken post-injury.  Deposition Page 79, Line 12 to Page 80, Line 6.

53.    Dr. Winkler testified that in his professional medical opinion that the plaintiff had experienced a fainting episode.

54.    Dr. Winker testified that it would not be professionally sound to rule out a fainting episode as the cause of the plaintiff's loss of her footing.

55.    There is no medical evidence that the plaintiff lost her footing by reason of any cause other than fainting.

56.    The plaintiff's fainting and incontinence of urine are shown by independent medical evidence, unaffected by bias or any indicia of unreliability, and recorded by persons with a professional responsibility and incentive to record medical facts accurately.

57.    The plaintiff's denial of fainting and denial of incontinence of urine and denial of her history of spondylolisthesis shows that her ability to perceive and remember events of the incident are not reliable.

58. The plaintiff's testimony about her fall is not corroborated by any other evidence, and is contradicted in the key particulars by the testimony of John Newman and Evan Douglass. Her account of precisely where she fell is at odds with all other evidence on this point.

59. Due to her unreliability as a percipient witness, the plaintiff's account of how she fell cannot be credited.

60. Due to the plaintiff's unreliability as a percipient witness, there is no evidence that the plaintiff actually slipped on the gangway.

61. Due to the plaintiff's unreliability as a percipient witness, there is no evidence that the plaintiff slipped on the gangway by reason of any cause for which Cape Ann is responsible.

62. Evan Douglass stepped toward the plaintiff in an attempt to catch her as she went down. He touched her back but was unable to catch her.

63. There was a gap of some three feet or more between the side of the vessel and the side of the barge on which the bottom of the gangway rested. The gangway spanned this gap.

64. If the plaintiff had lost her footing at the top of the gangway, it would have been impossible for Evan Douglass to have reached her back as she started to fall — he would himself have fallen into the gap between the vessel and the barge.

65. Evan Douglass was standing at the bottom of the ramp, assisting passengers in stepping from the gangway to the barge.

66. If the plaintiff had fallen as she has claimed — by reason of her foot suddenly slipping out from under her — she would have gone down so quickly that there would not have been time for Evan Douglass to reach her and get his hand onto her back before she went down.

67. Beginning at the point that the plaintiff showed signs of going down, Evan Douglass had time enough to react, to step toward the plaintiff, and for his hand to reach her back. There would not have been time for this to happen if the plaintiff had gone down by reason of her foot slipping out from under her, which would have been a sudden and instantaneous fall. The fact that there was time for Evan Douglass to reach the plaintiff at all supports the conclusion that she fell by reason of fainting, a process of falling that is considerably slower than falling by reason of slipping.

68.  The weight of all the evidence points most strongly to the conclusion that the plaintiff fell because she fainted while walking down the gangway.

69.  Under the circumstances, Cape Ann had no practical ability and had no duty to prevent the plaintiff from fainting.

70.  The plaintiff has failed to carry her burden that Cape Ann failed to exercise due care as to the condition of the gangway, *and* that such failure caused her to lose her footing.

71.  There is no evidence of medical expenses for treatment other than in the United States in the weeks before she first returned to India.

72.  Plaintiff introduced no expert medical evidence.

73.  There is no expert medical testimony of any permanent impairment of the plaintiff.

74.  There is no expert medical testimony of the prognosis of the plaintiff.

75.  There is no expert medical testimony of any quantification of any permanent impairment of the plaintiff.

76.  There is no expert medical testimony of any permanent impairment of the plaintiff.

77.  There is no evidence that the plaintiff is now unable to earn as much as she earned before the injury.

78.  There is no evidence that the plaintiff has incurred any enduring loss in earning capacity.

79.  There is no evidence that the plaintiff made any attempt to obtain gainful employment or otherwise mitigate her losses as regard to earning capacity.

80.  Plaintiff has failed to establish what her present earning capacity is.

81.  It is impossible — without speculation — to reach a conclusion quantifying any claimed loss of earning capacity.

82.  Plaintiff has failed to mitigate her claimed losses as regards earning capacity.

83. Plaintiff has failed to introduce any records that would support a loss in the revenue that she claimed to have lost in connection with an enzyme business that she testified that she owned.

84. A person who owns a business would have access to tax records and other business records showing the performance of the business.

85. The failure to come forward with such evidence leads to the inference that no records exist to support a loss of business revenue by the plaintiff, or that any such claimed loss was actually caused by the injury.

86. The plaintiff was required to disclose a proper itemization of her damages, both in her initial disclosures pursuant to the Federal Rules and in required supplementation thereto, and in addition by reason of interrogatories propounded to her. She failed to disclose the earnings, etc., information to which she testified at trial, over the objection of Cape Ann. These failures to disclose have prejudiced the defendant by depriving it of the opportunity to conduct discovery with regard to such claims. As a result, the plaintiff's evidence as to loss of earnings and earning capacity may not exceed what she disclosed in her Answers to Interrogatories (introduced into evidence by the defendant for the limited purpose of impeachment only.)

87. The plaintiff's loss of earnings and earning capacity did not exceed (in the aggregate) the sum of 220,000 Indian Rupees, as stated by the plaintiff in her answer to Cape Ann's Interrogatory No. 8. This converts to USD$5,000, at the rate of 44 Indian Rupees to the dollar, as quoted by the plaintiff.

88. The plaintiff has had no technical training whatsoever, and has testified that she was a housewife through her adult life up until 1995. Deposition Page 8, Lines 6-8.

89. The plaintiff's husband spent his whole working career in the enzymes business.

90. In an application for insurance contemplating her trip to the U.S. in the summer of 2004, the plaintiff filled out an application for insurance in her own handwriting. She listed her occupation as "housewife," and made no mention of enzymes or any involvement in any business activity, even on a wage-earner basis.

91. The weight of the evidence supports the conclusion that the plaintiff did not have any business income before the injury.

92. The plaintiff has failed to carry her burden of establishing that she actually had any business income before the injury.

93.    The plaintiff has failed to carry her burden of establishing any loss of earning capacity.

94.    Post-injury, the plaintiff continues a program of walking exercise each morning, walking 30 to 40 minutes.

95.    Plaintiff has asserted that she placed her leading foot onto the ramp, to step *up* from the deck of the vessel onto it.  She claims she fell when this leading foot slipped, possibly before the trailing foot ever touched the ramp.  In order for her to take a step up onto the uphill end of the gangway, she had to have her weight over her leading foot, in a posture similar to that of climbing stairs.

96.    When a person slips while walking down a downslope, the slipping occurs as the person's weight shifts to the leading, or downhill, foot.  According to her own account, the plaintiff never got so far along the gangway as to allow this to happen.

97.    John Culver never set foot on the vessel or gangway, nor ever visited either, and made no measurements of the co-efficient of friction of the gangway surface, wet or dry.

98.    It is common knowledge that virtually any surface affords at least slightly less traction when it is wet.

99.    There is no evidence that the gangway had been unreasonably slippery — even in the rain — on any past occasion.

100.   There is no basis to conclude that any unreasonably slippery condition of the gangway surface on the day in question was foreseeable to Cape Ann, inasmuch as Cape Ann had long experience in using the gangway to disembark passengers even in the rain, without incident or complaint.

101.   A "shipowner is responsible for defective conditions aboard ship only when it has actual or constructive notice of them." *Montleone v. Bahama Cruise Line, Inc.*, 838 F.2d 63, 65 (2nd Cir. 1988).

102.   A shipowner's duty to a passenger is reasonable care under the circumstances. A passenger is not entitled to remedies under the Jones Act or under the doctrine of unseaworthiness. *Kermarec v. Compagnie Generale, etc.*, 358 U.S. 625 (1959).

103.   OSHA regulations did not apply to the *Hurricane II*. *Chao v. Mallard Bay Drilling, Inc.*, 534 U.S. 235 (2002).

104.   No regulations under the ADA applied to the *Hurricane II*.   Notice of Proposed Rulemaking at 72 F.R. 2833 (2007).

105.   A plaintiff in admiralty has an obligation to take reasonable precautions for her own safety.  *Menin v. Wilner*, 424 F.2d 1058 (5th Cir. 1970).

## DESIGNATION OF TESTIMONY

By virtue of leave granted to Cape Ann in open court, and in lieu of taking the time during the trial schedule to read the same into the record, Cape Ann hereby introduces into evidence the following deposition testimony of the plaintiff, the text of which Cape Ann will provide under separate cover:

Page 8, Lines 6-8  (housewife)

Page 53, Lines 11-12  (no rain)

Page 56, Line13 to Page 57, Line 6 (didn't hearken to briefings)

Page 61, Lines 6-13 (can't recall how many steps taken on gangway)

Page 63, Line 21 to Page 65, Line 20  (handrails and sequence of feet)

In addition, Cape Ann hereby introduces into evidence the following deposition testimony of the plaintiff, not for its truth, but for the limited purpose of impeachment only:

Page 73, Line 21 to Page 74, Line 23 (dizziness)

Page 75, Line 13 to Page 76, Line 24 (urine)

Page 79, Line 12 to Page 80, Line 6(spondylolisthesis)

WHEREFORE, Cape Ann respectfully requests that the Court enter the foregoing findings, rulings and adjudications, and enter judgment for the defendant.

**CERTIFICATE OF SERVICE:** By my signature below, I hereby certify that on the date set forth below, I have electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification of such filings(s) to the attorneys designated below as ECF recipients, and I hereby certify that on the same date, I have mailed, via United States Postal Service, the document(s) to the non-registered participants reflected below as being provided copies by mail.

Dated: July 12, 2007

*served upon:*
Jeffrey C. Coniaris, Esq.  *(By ECF Filing)*
84 State Street, 6th Floor
Boston, Massachusetts 02109
Tel. (617) 720-5888
Fax. (617) 720-2164

**A CAPE ANN WHALE WATCH, INC.**
By its attorneys,

    /s/ Michael Rauworth
Michael J. Rauworth,  BBO# 547711
**CETRULO & CAPONE LLP**
World Trade Center East
Two Seaport Lane — 10th Floor
Boston, Massachusetts 02210
Tel: (617) 217-5500; fax: 617-217-5200

02006-0042
844627v1