UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MADHU JAIN,<br>         Plaintiff,<br>v.<br>A CAPE ANN WHALE WATCH, INC.,<br>         Defendant. | CIVIL ACTION NO. 05-11267-MEL |

**DEFENDANT'S POST-TRIAL MEMORANDUM**

Defendant, A Cape Ann Whale Watch, Inc, ("Cape Ann") submits this memorandum of law to accompany its requests under Fed. R. Civ. P. 52, for findings and rulings.

Briefly, the plaintiff has failed to establish fault or causation on the part of Cape Ann, but her own lack of due care is clear.  The most likely cause of her injury is her own fainting (if not her failure to hold on to handrails), and the fainting situation renders her own testimony unreliable.  Her injuries must be valued in the light of the economy of India and not the United States, and are in any event capped by her own failure to introduce critical evidence.

**I.   LEGAL STANDARD AND FACTS DEFEATING THE CASE FOR CULPABILITY ON THE PART OF CAPE ANN**

Cape Ann's conduct is to be measured against the standards of federal maritime law applying to passenger injuries.  This is true, initially, because the plaintiff brought the case through the invocation of admiralty jurisdiction.  But it would be true even if the case had been brought in state court (or in diversity in federal court), because of the "reverse-Erie" doctrine that requires that maritime cases

be governed by rules of decision drawn from federal maritime law, regardless of the forum selected. *Offshore Logistics v. Tallentire*, 477 U.S. 207, 222-3 (1986).

A "shipowner is responsible for defective conditions aboard ship only when it has actual or constructive notice of them." *Montleone v. Bahama Cruise Line, Inc.*, 838 F.2d 63, 65 (2nd Cir. 1988). In *Montleone*, a passenger was injured, claiming she tripped on a screw that protruded from the front of the "nosing" strip on a stair on board the vessel. Judgment was for the defendant, because it was not established that the defendant had actual or constructive knowledge of the defective condition. This holding provides the rule of decision for this case.[1]

On the record before the Court, there is no evidence that Cape Ann knew or should have known about any dangerous condition on the gangway. Two members of the crew (Newman and Douglass) had walked on the gangway immediately beforehand in preparation for passenger disembarkation, and both found its condition to be fine and normal. The gangway had been in use for something in excess of five years, rain and shine, and had never been the source of any problem or complaint, despite having served some 100,000 passengers during that time. Indeed, there is no evidence that anyone complained or reported any dangerous condition to Cape Ann on the day in question, prior to the plaintiff's injury. Lisa Bodnar testified that she

---

[1] At various times in the case, including in the pre-trial memo, plaintiff has sought to rely on seamen's cases. The plaintiff was not a seaman, and she is therefore not entitled to rely on legal principles that operate in favor of seamen, such as the Jones Act and the unseaworthiness doctrine. Any case involving a seaman, therefore, is utterly inapposite and of no authority, and cannot serve as a basis for deciding this action. All principles of passenger injury law, including those set forth in *Montleone*, trace back to the enunciation of this principle in *Kermarec v. Compagnie Generale etc.*, 358 U.S. 625 (1959).

2

had come down the gangway to the barge and had made a comment to her mother (still standing in the line along the side of the vessel to get off) to the effect that Ms. Bodnar had felt the gangway to be a "little slippery." Her mother, Alice Berg, testified that her daughter had made this comment to her after the plaintiff fell. And there is no evidence that Ms. Bodnar or anyone else had reported anything untoward to the crew of the vessel.

It is possible that on some limited portion of the diamondplate surface of the gangway, some substance had made the gangway unusually slippery in that limited location. This might have occurred if a passenger had spilled some suntan lotion or baby oil or food substance while walking down the gangway. It might also have occurred if some passenger had spilled a substance in a location in the disembarkation line, where disembarking passengers might have stepped in it and tracked it onto the gangway. The plaintiff herself might have had a slippery piece of paper, etc. briefly clinging to her shoe as she stepped onto the gangway. But despite the possibility of such things contributing to a localized condition of unusual slipperiness, there is no evidence that any such thing was known to Cape Ann, or that Cape Ann was in a position to have done anything about such a condition in the absence of awareness of it.

Some witnesses have suggested that the gangway might have been somewhat wet, possibly even from passengers tracking water onto the gangway from spray on the deck. But the diamondplate surface had been in use for years, even in conditions

of rain during disembarkation, and the surface was quite adequate for use in wet conditions — it is even specified as an anti-skid surface. There is no evidence that the surface afforded insufficient traction, even in the rain.

It is particularly of note that John Culver, who testified about gangways for the plaintiff, never made any measurements of the traction on the gangway whatsoever, whether wet or dry. In fact, he never even visited the vessel or set foot on the gangway to assess its traction by merely walking on it. Plaintiff came forward with no evidence of the traction characteristics of the gangway surface, in wet or dry conditions.

As a result, Cape Ann had no reason to believe that the diamondplate surface was less than adequate for passenger disembarkation, even if it had been raining at the time the plaintiff left the vessel. And there is no evidence that it was raining — the plaintiff herself has acknowledged that it was not.

Mr. Culver addressed the concept of coefficient of friction, but only in the abstract — he had nothing at all to say about the coefficient of friction on this gangway, under any conditions. Thus his comments on the subject are irrelevant. He did admit that there is no prohibition on the use of diamondplate in a gangway. He also admitted that it is widely used as deckplating in enginerooms of ships — an application where the deck surface can be expected to take up considerable angles when a vessel rolls at sea. Mr. Culver did seem to feel that the Navy typically used a different surface for its gangways, but there is no basis to conclude that every marine

4

application is required to be done as the Navy does things. There is certainly no standard or regulation to that effect.

Mr. Culver also claimed that the case was somehow governed by the regulations of the Occupational Safety and Health Administration ("OSHA"). This is simply incorrect. In the first place, OSHA regulations set standards for safety of employees — they do not purport to speak to the provisions that must be taken for passenger safety. But even more importantly, OSHA standards cannot apply to this vessel, because it is a Coast Guard inspected vessel, as is shown by its certificate of inspection — an exhibit in the case. The Supreme Court has ruled that OSHA regulations can be applied only to *uninspected* vessels, and even then under limited circumstances. Thus as to inspected vessels such as the *Hurricane II*, OSHA regulations are pre-empted by both a memorandum of understanding between OSHA and the Coast Guard, and by Coast Guard regulations themselves.[2]

Mr. David DuBois is a marine consultant of wide experience in dealing with safety conditions aboard small passenger vessels such as the *Hurricane II*, and in

---

[2]    "The parties do not dispute that OSHA's regulations have been pre-empted with respect to *inspected* vessels, because the Coast Guard has broad statutory authority to regulate the occupational health and safety of workers aboard inspected vessels, 46 U.S.C. § 3306 (1994 ed. and Supp. V), and it has exercised that authority. Indeed, the Coast Guard and OSHA signed a "Memorandum of Understanding" (MOU) on March 17, 1983, evidencing their agreement that, as a result of the Guard's exercise of comprehensive authority over inspected vessels, OSHA "may not enforce the OSH Act with respect to the working conditions of seamen aboard inspected vessels." 48 Fed. Reg. 11365. The MOU recognizes that the exercise of the Coast Guard's authority–and hence the displacement of OSHA jurisdiction–extends not only to those working conditions on inspected vessels specifically discussed by Guard regulations, but to all working conditions on inspected vessels, including those "not addressed by the specific regulations." *Ibid.* Thus, as OSHA recognized in the MOU, another agency may "exercise" its authority within the meaning of §4(b)(1) of the OSH Act either by promulgating specific regulations or by asserting comprehensive regulatory authority over a certain category of vessels." *Chao v. Mallard Bay Drilling, Inc.*, 534 U.S. 235 (2002).

5

particular with the safety conditions aboard them  He is frequently called upon by shipowners, marine lenders, and insurance companies to provide an assessment of the safety and fitness of vessels, and of their compliance with Coast Guard standards of safety.  His civilian career builds upon a previous career as a front-line Coast Guard inspector in the field, with years of experience inspecting vessels quite comparable to the *Hurricane II*.

Unlike Mr. Culver, Mr. DuBois has been aboard the *Hurricane II*, and has directly inspected and walked upon its gangway, and is quite familiar with the vessel.

He is often called upon to report to insurance companies about the advisability of accepting the risk of writing a policy of insurance covering a specific vessel.  In this capacity, he is called upon to assess not only whether the vessel complies with Coast Guard standards, but also whether the vessel needs to take actions to correct specific safety hazards, before a policy is issued.  In this capacity, his obligation is to the insurance underwriter who is making a decision about binding a policy, and in it, he stands in a position adverse to the shipowner.  Mr. DuBois testified that he would have found the gangway of the *Hurricane II* to be quite adequate and unobjectionable.

He testified that diamondplate is a widely-used surface in marine and other applications where avoidance of slipping is a key consideration.  It is marketed as an anti-slip surface.  It is the most widely-used surface for deck plating in engine rooms, applications where it can be anticipated that the walking surface may experience

dripping or spilling of water or oil upon it, even while the vessel is rolling from side to side at sea.

Based on his wide experience and expertise, his familiarity with regulations and governing standards, Mr. DuBois testified that it was quite reasonable for Cape Ann to have used the gangway in question for passenger service, including the use of diamondplate on the walking surface in conditions of rain or shine.

Mr. DuBois confirmed that there are no regulations under the Americans With Disabilities Act ("ADA") that prohibit the use of the gangway in question, or that set any limits upon its angle[3]. The angle of the gangway violated no standard, and was proper for passenger service. Mr. DuBois pointed out that angles on ramps leading to or from floating docks at marinas are often quite steep at low tide, far exceeding the angle shown in the photographs of the *Hurricane II*. In addition, Mr. Culver acknowledged that the Navy often uses gangways for public access to its vessels that are vastly steeper than what was in use in this case. Thus it cannot be said that the *angle* of the gangway violated any standard, even the Navy's practice.

---

[3] The Department of Transportation is currently considering the issuance of regulations under the ADA for passenger vessels. At this point, DOT is reviewing public comments about the proposed regulations, which were due for submission or before June 22, 2007, after the trial of this matter. However, the regulations that were put out for the aforesaid public comment address only *operational* issues (*i.e.*, procedures aboard vessels). They expressly and deliberately do _not_ include any physical or structural standards for vessel — in other words, no regulations have even been so much as _proposed_ that might govern angles of gangways, ramps, and the like, used in connection with vessels. DOT has established Docket No. OST-2007-26829 for this purpose. The express exclusion of physical standards can be found in the Notice of Proposed Rulemaking at 72 F.R. 2833 (2007). As a result, there is no ADA regulation or standard that applied to the *Hurricane II* in August of 2004.

Taken in the aggregate, the plaintiff has failed to meet her burden of showing that Cape Ann failed to exercise due care in its use of the gangway in question, or in Ms. Jain's use of it. The use of the gangway would have been proper and reasonable even in the rain, and there is no basis to conclude that Cape Ann had any reason to believe that it was not reasonably safe for passenger use.

## II.   NEGLIGENCE OF THE PLAINTIFF

There is no evidence that the plaintiff was holding onto the handrails at the time she fell. Not even the plaintiff has so asserted. To the contrary, however, is the direct, percipient testimony from John Newman and Evan Douglass that she was walking down the gangway without holding onto the handrails at the point when she went down.

John Newman testified that he directly instructed the plaintiff, by word and gesture, that she should hold onto the handrails. The plaintiff admitted that she believes it is important to hold onto handrails. The plaintiff violated her own principles, the direct instruction, as well as the teachings of common sense, when she proceeded down the gangway without holding onto the handrails. The purpose of handrails, after all, is to assist people to avoid losing their footing in the event something goes wrong.

A plaintiff in admiralty has an obligation to take reasonable precautions for her own safety. *Menin v. Wilner*, 424 F.2d 1058 (5th Cir. 1970). The plaintiff failed to do so, and thus she bears responsibility for her injury.

The weight of the evidence shows that plaintiff could not have fallen at the top of the gangway as she claims. Not a single other witness corroborates this account. John Newman and Evan Douglass saw her walking down the gangway as far as the bottom half before she fell. All of the evidence on the subject places her at the bottom of the gangway immediately following her fall, and most place her with her feet on the barge. No evidence places her at any location further up the gangway.

Her own account is that her leading foot slipped before she could take a step with her trailing foot. If this had happened, she would have gone down right at the inboard edge of the gangway, and most probably, halfway on the deck of the vessel, essentially right at the feet of John Newman. This would have caused bruises and/or cuts to her legs — on the backside of her leading leg, and on the shin or knee of her trailing leg, by reason of her weight coming down on the inboard edge of the gangway. But there is no evidence of such injuries.

Should it be suggested that she slipped at the entrance to the gangway and slid down to the barge end, this simply defies logic. The slope of the gangway was far less than that of a children's playground slide, and a playground slide is not surfaced with diamondplate. For the plaintiff to have slid to the bottom would have required, essentially, that the gangway be coated with the slickest of lubricating oil — even assuming that it was somehow possible to make it *that* slippery, deliberately. If it had been so, then no one would have been able to traverse it successfully at all, at any point. But obviously, many people did.

9

Moreover, to have fallen at the top and landed on her backside at the bottom of the gangway, the plaintiff would have to have knocked over her own relative, Kusum Jain, who claimed she was on the gangway ahead of the plaintiff at the very moment of the fall — Kusum Jain stated that she felt the tremor of plaintiff falling. But Kusum Jain was not knocked down, or even contacted by the plaintiff. And there is no evidence that the plaintiff was moved from one location on the gangway to *another* on the gangway following her fall — indeed, it would have made no sense to do so. Instead, from her initial point of rest, she was assisted off the gangway into a chair beside the gangway — for her comfort awaiting the prompt arrival of the Gloucester EMTs.

Finally, had the plaintiff lost her footing at the top of the ramp, there is no way that Evan Douglass could have reached her in his attempt — sadly unsuccessful — to catch her in her fall. This is because there was a gap of some three feet between the barge where he was standing and the side of the vessel. To reach even *any* part of a person standing at the top of the gangway, he would have to have been immediately at the ship's side. In trying to reach such a point, however, he would have stepped off the edge of the barge and fallen to the floats (between the *Hurricane II* and the barge) several feet below. Evan Douglass testified without contradiction that was able to step and reach the plaintiff's back, and this makes the situation described by the plaintiff even more impossible.

The accumulation of the evidence, then, shows that the plaintiff could not have fallen as she has described.

### III.  CAUSE OF THE FALL

The testimony of Dr. Winkler explained and embodied evidence that shows a more likely scenario — that the plaintiff fainted while she was walking down the gangway.  A great deal of independent medical evidence bears this out, but one point is especially significant — that the plaintiff was incontinent of urine.  Dr. Winkler explained that this strongly indicated at least a brief loss of consciousness.  All of the evidence indicates that Ms. Jain was observed to be conscious, even if somewhat disoriented, following her injury.  These lead to the conclusion that a loss of consciousness was contemporaneous with her going down.

The other explanation for her incontinence would be a seizure of some kind, but even if this were so, it would mean that her fall was not due to any fault of the defendant.

Dr. Winkler pointed out that the assessment of fainting is consistent with the blood pressure observations of the EMTs — so low that the EMTs felt the need to administer IV fluids to the plaintiff, even before she arrived at the hospital moments away.

At the hospital, the medical records reflect a history (taken from the plaintiff) of a form of spinal abnormality — and dizziness.  These pre-existing conditions were supplemented by ongoing observations on the part of the hospital staff of difficulties

11

with dizziness, etc., and diminished blood pressure resulting from moving into a more upright position — from supine to sitting, or from sitting to standing. These required slow transitions on the part of the plaintiff to get up to visit the bathroom, etc.

That the plaintiff denies experiences of dizziness or fainting, of course, does not diminish the effect of the observations of medical professionals, on repeated occasions in the records, that she admitted to them a history of dizziness, and that they observed this phenomenon in treating her. Instead, it detracts from her credibility.

The plaintiff's denial of her incontinence of urine — in the face of the clear evidence of the same from the Gloucester EMTs — make for strong evidence that she did indeed have a loss of consciousness, in other words, that she denies the event because she was not conscious so as to have perceived it.

IV.   **UNRELIABILITY OF THE PLAINTIFF'S TESTIMONY**

The neurological evidence, from Dr. Winkler and the medical records, also bears quite strongly on the question of the extent to which the Court can rely on the plaintiff's testimony. The neurological assessment makes a potent showing that the plaintiff was in no position to have accurately perceived — or reliably remembered — what happened as she fell. Her vehement denial that she became incontinent of urine of course simply adds strength to this conclusion.

Indeed, the plaintiff fainting is the one scenario that permits nearly the whole of the evidence to be reconciled. With that in mind, it is quite conceivable that

stepping up onto the ramp is the last thing she remembers before she fell. It would account for her failure to have remembered John Newman's warning as she stepped onto the ramp, and for her failure to hold onto the handrails as she strode down the gangway. It accounts for her failure to remember walking down the ramp. It also accounts for the fact that her fall was slow enough that Evan Douglass had time to step towards her and get his hand on her back in his attempt to stop her fall — a fall due to one's foot slipping forward would be too rapid for anyone to have reacted that quickly. It also explains why the plaintiff's testimony about the specifics of her fall are so vague and spotty — she cannot recall which foot she placed on the ramp, or whether her trailing foot ever touched the ramp surface. It explains why all the evidence is that she landed in the lower half of the ramp, with her feet within reach of the barge, without her being able to explain how she got there.

      The plaintiff is a victim of her fainting, of course — it reflects no dishonor. But it does mean that her words cannot be treated as reliable percipient testimony — in means, in effect, that she was not a truly percipient witness.

      As a result, the plaintiff's claim that her foot actually slipped cannot be credited. The conditions occurring in a person's body immediately preceding a collapse due to fainting deprive the brain cells of blood — the very reason one faints. This means that all the plaintiff's capabilities just preceding her fall must be called into doubt. Thus her testimony, even if it is an honest statement of her best effort at recollection — can never be any better than the expression of an impaired memory.

The result, of course, is that the plaintiff's testimony about the events must be drastically discounted, if not wholly ruled out. It cannot counterbalance any significant evidence to the contrary.

## V. VALUATION

Plaintiff cannot be permitted to recover more than USD$5,000 in lost earnings or earning capacity. Assuming an exchange rate of 44 Indian Rupees to the US dollar, this is the equivalent of the only financial loss figure disclosed by the plaintiff in her answer to Cape Ann's Interrogatory No. 8 (admitted into evidence). That answer set forth a pre-injury figure of 850,000 Indian Rupees, and a post-injury figure of 630,000 Indian Rupees, for a difference of 220,000 Indian Rupees. Dividing this sum by 44 yields five thousand dollars.

Plaintiff cannot be allowed to rely on any evidence of loss that she failed to disclose in response to Cape Ann's interrogatories. She had the obvious opportunity and duty to supplement if she had in mind to present evidence supporting a larger recovery, and she did not do so. To allow any greater recovery would reward trial by ambush. In particular, plaintiff never provided any statement whatsoever of financial performance following March 31, 2005 — more than two years ago. Her testimony at trial that the business had been abandoned was entirely out of the blue, and highly prejudicial, since Cape Ann was afforded no opportunity whatsoever to have any discovery with respect to this assertion.

But the whole of her financial recovery must be regarded as not credible and not proven. Plaintiff never produced in discovery — much less introduced into evidence — any documentation whatsoever of the operations of the enzyme business that she claimed to own. She did produce in discovery a single page of an illegible and unintelligible personal tax return, but this demonstrates nothing more than that Indian taxing authorities demand forms, just as the IRS does — forms that any such enzyme business would have to file periodically, reflecting its financial results.

Obviously, any business would likewise have other financial and operating records as well. None of these were provided in discovery, much less brought into evidence. It is quite difficult to fathom how one could hope to establish — credibly — a loss of income of any kind without providing this sort of documentation.

Plaintiff supplied no expert opinion on her loss of earnings or earning capacity. She provided no basis to conclude that she actually incurred a loss of earning power — there is no evidence that she could not have earned more than before the injury by taking up some different kind of work. She would leave the Court to speculate on what her post-injury earning capacity would be. A damage award cannot be left to speculation, but is a matter on which a plaintiff bears the burden of coming forward with evidence and the burden of proof.

The plaintiff's burden as to loss of earnings is only increased by her statement, in an insurance application, that her "ACTUAL OCCUPATION (sic)" was "housewife." Perhaps she made this statement to reduce the premium for the policy,

but even then, she should be held to it. The Court cannot permit the plaintiff to have matters both ways. A false statement on an insurance application is a serious thing, and it does not reflect favorably on the plaintiff's credibility, whatever the motivation.

Thus, apart from the loss of USD$5,000 set forth in Answer No. 8, there has been a complete failure of proof on earnings or earning capacity. All other evidence cannot be seen as credible, and should be excluded from consideration by reason of the plaintiff's violation of her discovery obligations. Cape Ann respectfully renews its motion to strike this evidence.

Plaintiff has introduced no expert medical testimony whatsoever. This means that there is no adequate basis for the Court to arrive at an assessment of permanent disability, any limitations on her range of motion or capabilities, etc.. It also means that there is no evidence to rebut Dr. Winkler's assessment that the plaintiff's fall was as the result of a fainting collapse.

There is documentation of medical expenses in the US before the plaintiff returned to India, but no evidence of any out-of-pocket expenses of any significance thereafter. Apart from these, then, the Court is left with only the interested testimony of the plaintiff herself as a basis to quantify any losses outside of financial ones. This is a serious shortcoming, and means that her provable losses are modest at best.

Whatever value might be assigned under these circumstances to the plaintiff's physical injuries in the context of the United States, however, this must be further reduced. The objective of any award of civil damages is to make the plaintiff whole

16

— but not more than whole.  If the plaintiff had been a wage earner, with a documented track record of earnings, and if she could no longer work, she would be entitled to the present value of her future wages — but at her wage rate *in India*, and not at a wage rate for the same work in the US.

The same calculus must apply in valuing pain & suffering and other non-pecuniary headings of damages.  The plaintiff is a citizen of India, and lives in the Indian economy.  According to her own account in Answer No. 8, before the injury, she was making 850,000 Indian Rupees per year — USD$19,319 at 44 Rupees to the dollar, for someone who asserts she owns and runs a highly technical business.  The *gross* sales revenue of the business pre-injury translates to only about USD$86,000.  She testified at trial that she hired a driver for 5,000 rupees per month — the equivalent of about USD$114 per month.  These figures are valid sources for comparing the cost of living where the plaintiff lives in New Delhi with the costs of living in the United States.  They show that any award for pain & suffering, etc., arrived at using norms in the United States would amount to a vast over-compensation — making the plaintiff more than whole.  Obviously, one US dollar buys a great deal more in India than it does in the US — otherwise, the phenomenon of "offshoring" of jobs would not have arisen.  Liability is obviously vigorously contested in this case, but even if liability were conceded in whole, the plaintiff would still never be entitled to a recovery determined by norms in the US, where the cost of living far exceeds that of India.

## VI. CONCLUSION

The plaintiff has failed to carry her burden that Cape Ann failed to exercise due care for her safety. The fact of an accident is not evidence of negligence. The gangway was fully fit for its intended use. The testimony of John Culver must be disregarded, since it was based on his incorrect assumptions that the vessel and the gangway were governed by OSHA and/or the ADA, and by his failure to determine anything about the traction characteristics of the gangway, wet or dry. As shown by the pertinent expertise of David DuBois, supported by reference to the proper standards, the gangway was proper and fit for its intended use.

Based on the neurological testimony of Dr. Winkler, the most likely scenario of the plaintiff's injury is that she fell by reason of fainting. There is no evidence to the contrary, except that of the plaintiff herself. But the independent medical evidence shows that her own account cannot be relied upon — her testimony is at best seriously afflicted by the conditions documented at the time in those medical records.

This also has the effect that the plaintiff cannot establish that her fall was due to any condition that Cape Ann might have prevented. Her testimony that she slipped cannot even be relied upon. Still less can it be established that she slipped by reason of any fault of Cape Ann.

Even looking at the situation without the fainting element, the plaintiff would still be accountable for traversing the gangway without holding onto the handrails. Admiralty law imposes upon her the obligation of due care for her own safety, and

she did not live up to that duty.  Not a single witness states she was holding on to the handrails.  Her injury is obviously attributable to this — even if she had tripped on the feet of another passenger, she would have instinctively tightened her grasp on the handrails, had she only been holding on in the first place.  This would have arrested her fall, and reduced if not eliminated her injuries.

By any reckoning, the plaintiff's failure of due care is either the whole or the greatest cause of her injury, and it was a clear and easily avoidable violation of the instructions she received, of her own principles and practices, and of common sense.  Nothing of the kind can warrantably be said about Cape Ann.

The appraisal of her own negligence is swallowed by her fainting experience, of course, but her own fainting clearly cannot be a basis for holding Cape Ann liable.

Any pain & suffering or lack of mobility experienced by the plaintiff can only be valued against the backdrop of the cost of living in India.  This is far less than in the US, as the record reflects, and any higher award would make the plaintiff more than whole.   Her medical expenses, shown by records of treatment in the US, are relatively modest, and her loss of earnings and/or earning capacity could never properly exceed USD$5,000.

Taken as a whole the evidence shows that the plaintiff fell for a reason for which Cape Ann is not legally responsible — either her own fainting, her own lack of due care, or a loss of footing that Cape Ann could not reasonably have prevented.

Plaintiff has failed to carry her burden that any fault of Cape Ann caused her injuries. As a result, judgment should enter for Cape Ann.

WHEREFORE, Cape Ann respectfully requests that the Court enter the foregoing findings, rulings and adjudications that it has requested, and enter judgment for the defendant.

**CERTIFICATE OF SERVICE:** By my signature below, I hereby certify that on the date set forth below, I have electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification of such filings(s) to the attorneys designated below as ECF recipients, and I hereby certify that on the same date, I have mailed, via United States Postal Service, the document(s) to the non-registered participants reflected below as being provided copies by mail.

Dated: July 12, 2007

*served upon:*
Jeffrey C. Coniaris, Esq.  *(By ECF Filing)*
84 State Street, 6th Floor
Boston, Massachusetts 02109
Tel. (617) 720-5888
Fax. (617) 720-2164

**A CAPE ANN WHALE WATCH, INC.**
By its attorneys,

   /s/ Michael Rauworth
Michael J. Rauworth, BBO# 547711
**CETRULO & CAPONE LLP**
World Trade Center East
Two Seaport Lane — 10th Floor
Boston, Massachusetts 02210
Tel: (617) 217-5500; fax: 617-217-5200