**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

FILED
IN CLERKS OFFICE

| | |
|---|---|
| MADHU JAIN, | ) |
| PLAINTIFF | ) |
| v. | ) |
| A CAPE ANN WHALE | ) |
| WATCH, INC. | ) |
| DEFENDANT | ) |
| | ) |

C.A. No. 05 14267 MEL2  ℗ 4: 33

U.S. DISTRICT COURT
DISTRICT OF MASS.

## PLAINTIFF'S REQUESTS FOR RULINGS OF FACT

## A. Background

1. Plaintiff, Madhu Jain, is 57 years old, married, a college graduate and resides in New Delhi, India (Trial transcript, Madhu Jain, p. 5).

2. Madhu Jain fell and was injured getting off the Cape Ann Whale Watch ship, the Hurricane II, on 8/19/04 (Trial transcript, Madhu Jain, p. 5).

3. As Madhu Jain was getting off the ship she fell and fractured her right ankle and received surgery and had screws and plate placed inside the right ankle (Trial transcript, Madhu Jain, p. 6).

4. E.M.S. workers administered first aid and noted in their report that Ms. Jain was pale, had blood pressure initially at 80/40 and had an obvious deformity of her right ankle and they transported her to Addison Gilbert Hospital (Ex. 19).

5. At Addison Gilbert she was diagnosed as having a displaced bimalleolar fracture with subluxation of the ankle joint that included a displaced fracture of the fibular and a fracture of the medial malleolus (Ex.14).

6. Although, later, she could not recall the gangplank being slippery, plaintiff is quoted, immediately upon hospital admission, in the Addison Gilbert Hospital record, as stating that it was slippery coming off the boat (Ex. 14).

1

7. Surgery was performed at Beverly Hospital, under general anesthesia, and, after a fully threaded cortical screw was placed lag fashion, a seven hole Synthesone-third tubular side plate was affixed to the displaced lateral fracture with 3 proximal and 3 distal screws (one fully threaded cortical screws and two cancellous screws) and the medial malleolus fracture was reapproximated with two 44mm, partial threaded 3.5 screws (Ex. 14).

8. The screws and plates are presently still inside the plaintiff's ankle (Trial transcript, Madhu Jain, p. 6).

9. The hospital charged $10,086.30 for her inpatient stay (Ex. 8).

10. The anesthesiologist charged Ms. Jain $1,430.00 (Ex. 12).

11. Ms. Jain's vacation to the U.S.A. was brought to an abrupt end (Trial transcript, Madhu Jain, p. 27).

12. Ms. Jain was forced to impose upon relatives for a place to convalesce (Trial transcript, Madhu Jain, p. 27).

## B. The Fall

13. To leave the ship by way of the gangplank Madhu Jain had to step up to get onto the top end of the gangplank (Trial transcript, Madhu Jain, p. 15).

14. Madhu Jain did not recall crewmembers helping her off or warning her of slipperiness (Trial transcript, Madhu Jain, p. 16).

15. Madhu Jain couldn't reach the gangplank handrails when getting up on ramp (Trial transcript, Madhu Jain, p. 48, 54).

16. Madhu Jain testified that she didn't hear any crewmember tell her to hold onto the handrails (Trial transcript, Madhu Jain, p. 17).

17. Madhu Jain testified credibly one foot was on the gangplank and the other foot was lifted at the immediate time of fall (Trial transcript, Madhu Jain, p. 19).

18. Madhu Jain slipped at the point of just having put one foot on the gangplank (Trial transcript, Madhu Jain, p. 17).

19. Madhu Jain's left foot probably never reached the gangway-walking surface (Trial transcript, Madhu Jain, p.54).

20. Madhu fell at the very beginning of the gangplank while in midstep getting up onto the gangplank (Trial transcript, Madhu Jain, P. 54).

21. Ms. Jain could not reach the handrails at the place where she got up onto the gangplank to leave the ship (Trial transcript, Madhu Jain, p. 54).

22. Ms. Jain testified credibly that she fell at the gangplank top and never took steps on the gangplank itself (Trial transcript, Madhu Jain, p.54).

## C. Witness Testimony

23. Lisa Bodner, Alice Berg and Jonathan Bodner were passengers on the Hurricane II on the relevant date who reside in New Jersey (Ex. 11a, 11b and 11c).

24. Lisa Bodner, Alice Berg and Jonathan Bodner's depositions were put into evidence.

25. Lisa Bodner, a witness from New Jersey testified at her 6/21/06 deposition, that immediately before the time of the fall the gangplank was slippery and that after she got off the ship, before Ms. Jain, that she called up top her mother [who was still on the ship with the children] to be careful because the ramp was a little slippery (L. Bodner Deposition, Ex.11c, p.10).

26. Ms. Kusam Jain, a passenger descending before Ms. Jain testified that she remembers
    thinking that she should alert Ms. Jain to danger because a person in front of her
    barely saved himself from falling (trial testimony day 1).

27. Ann Berg, a witness testified that she was behind the Plaintiff by six feet with her
    husband, oldest granddaughter and her grandchildren.
    (A. Berg deposition, Ex. 11b, p.12).

28. Ann Berg, a witness from New Jersey testified that she heard her daughter, who had
    already gotten off, call to her to take hold off the kid's hands because it's slippery
    (A. Berg deposition, Ex. 11b, p.12).

54. Jonathan Bodner, another passenger, "I do remember people (passengers) saying the
    gangplank was slippery." (J. Bodnar deposition, Ex. 11a, p.9).

29. At the time Madhu Jain fell the gangplank was slippery and another passenger had
    almost slipped on it (Exs. 11a, 11b, 11c and testimony of Varnit Jain day 1).

30. Sidarth Jain, a passenger, testified that the gangplank was wet at the time Ms. Jain was
    attempting to leave the ship (Trial testimony day 1).

31. Jonathan Bodner testified that he did not feel there was anything adequate to grab onto
    that there definitely were not two handrails that you could grab (J. Bodnar deposition,
    Ex. 11a, p. 13).

32. Jonathan Bodner testified that no crewmember told him to hold onto the handrail. (J.
    Bodnar deposition, Ex. 11a, p.9)

33. Jonathan Bodner testified that other passengers said the gangplank was slippery before
    Ms. Jain fell (J. Bodnar deposition, Ex. 11a, p.9).

Jonathan Bodner testified that the gangplank was slippery and he could feel his sneakers
slipping when he stepped on it (J. Bodner deposition deposition, Ex. 11a, p.11).

4

## D. Injuries

34. Madhu Jain's right ankle is presently of easily noticeable greater circumference than her left ankle due to her fall (Ankle viewed at trial and Ex. 1,2).

35. On Madhu Jain's right ankle there exists 2 scars, one scar with a lot of discoloration and a second purple scar is present on the other side of the right ankle (Trial transcript, Madhu Jain, P. 7, photos, Ex.1, 2).

36. For five or six months after her fall the plaintiff was unable to walk (Trial transcript, Madhu Jain, p. 27).

37. Ms. Jain still experiences pain and from the injury (Trial transcript, Madhu Jain, p. 37).

38. Ms. Jain had to use a wheelchair and later a walker and was not to walk for 5 to 6 months (Trial transcript, Madhu Jain, p. 27).

39. Ms. Jain missed four months of work and has a continuing diminished capacity to perform certain aspects of her occupation such as going on visits to client's factories to do tests and collect funds. It is difficult to calculate any future wage losses because Ms. Jain was self-employed and her income was shared with family and was based on yearly profits (Trial transcript, Madhu Jain, p. 35).

40. Ms. Jain is slowed in her activities and is generally less active than before (she was in good health prior to injury (Trial transcript, Madhu Jain, p. 27, p. 37).

41. Plaintiff has gained 7 or 8 kilos (15-17 pounds) in weight since the injury most likely due to inactivity (Trial transcript, Madhu Jain, p. 37).

42. Ms. Jain has suffers a permanent reduction in her ability to enjoy life and do things as a result of her injury.

43. Presently Madhu Jain experiences decreased stamina (Trial transcript, Madhu Jain, p. 34).

44. Presently Madhu Jain has difficulty standing for any extended periods. Sitting for any significant length of time causes her leg pain (Trial transcript, Madhu Jain, p. 35).

45. Presently, because of her injury, she experiences regular pain and has become slower in many of her activities (Trial transcript, Madhu Jain, p. 37).

**46.** Madhu Jain testified credibly that she is presently able to walk for exercise far less than she could before the injury and has had extreme difficulty walking barefoot and is unable to jog. (Trial transcript, Madhu Jain, p. 59, Ex. 6)

## E. Expert Testimony

47. The clamps that hold the vertical stanchions to the horizontal stanchions are unsatisfactory in a gangplank specification and the handrails are supposed to be without any interruptions at all for users (Trial transcript, Capt. Culver, p. 15).

48. Captain John Culver testified credibly that a standard angle for a gangplank is around 8 degrees and Exhibit 3 shows gangplank with an angle of probably 10-15 degrees. (Trial transcript, Capt. Culver, p. 18).

49. Gangplanks can have handrails that curve around at the ends rather than abruptly end as depicted in the second unrelated gangplank in the background of the photograph of the gangplank of the Hurricane II (Ex. 3).

50. Captain John Culver testified credibly that the gangplank is steeper than it should have been (Trial transcript, Capt. Culver, p. 18).

51. Captain John Culver testified credibly that, to his knowledge, diamond plate is not used on gangplanks; it is not a non-skid application. (Trial transcript, Capt. Culver, p. 19).

52. Captain John Culver testified credibly that, in his experience, he never observed diamond plate being used as a gangplank (Trial transcript, Capt. Culver, p. 20).

53. Captain John Culver testified credibly that the normal gangplank uses what is called non-skid (Trial transcript, Capt. Culver, p. 22)

54. Captain John Culver testified credibly that non-skid has a grain to it, a rough surface something similar to asphalt shingles (Trial transcript, Capt. Culver, p. 23). David Dubois (defense expert witness) testified that rough surfaces had more favorable coefficients of friction (trial testimony).

55. Captain John Culver testified credibly that non-skid, by analogy is paint with sand and that it dries and has a sandpaper effect (Trial transcript, Capt. Culver, p. 23).

56. Captain John Culver testified credibly that Merchant Marines and Navy put batons, U shaped metal things, where the foot can rest when descending (Trial transcript, Capt. Culver, p. 24).

57. Captain John Culver testified credibly that diamond plate was unsafe for use on incline surfaces (Trial transcript, Capt. Culver, p. 38).

58. Captain Jeff Eagan testified that the ramp was sometimes at a 10-15 degree angle to the ground (Trial testimony).

59. The gangplank got slippery when it was wet and that, on occasion, passengers were warned by the crew of that fact (Trial testimony).

60. In Captain Culver's report he states that as the downward angle of the gangway increases, the traction it provides is decreased (Ex. 20).

61. In Captain Culver's report he states Navy and commercial gangway manufacturers
    have the top handrails smooth for the entire length with no obstructions such as
    clamps holding the top rail (Ex. 20).

62. Although not necessarily controlling law, in Captain Culver's report, he illustrates
    comparable regulations such an O.S.H.A. requirement mandating the elimination of
    slippery surfaces in immediate working areas and other regulations that suggest a
    maximum slope not greater than 8.33% and that gangways should be kept clear of any
    substance likely to cause a person to slip or fall and if that is not possible, a warning
    should be given (Ex. 20).

## F. Exhibits

63. A photograph of the gangplank depicts the gangplank protruding overhanging the side
    of the Hurricane II so that it overhangs the ships deck. (Ex.3).

64. The photographs depict the upper handrail has clamps that could inhibit grasping of
    the handrail, as they appear difficult to grasp comfortably (Exs. 3,4).

65. A photograph of the gangplank, used by both parties at trial, depicts that it is sloped
    downward at a significant angle (Exs.3, 4).

66. A photograph of the gangplank depicts tubular top rails that do not substantially
    extend out beyond the shipside upper clamps interrupting the handrail (Ex.4).

67. A photograph of the gangplank depicts a substantial space between the top handrail
    and the ship (Ex. 3).

68. A photograph of the gangplank depicts that the walking surface of the gangway is
    metal plate and does not have battens or abrasive strips (Ex.3, 4).

69. There is no transition plate at the place where passengers go from the ship's deck to
    get onto the gangplank (Ex. 3).

Madhu Jain, by counsel,

JEFFREY C. CONIARIS
BBO# 555907
84 State Street
Boston, MA   02109
(617) 720-5888

July 12, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served
upon the attorney of record for each party and any party appearing
pro se by (first class mail  postage prepaid) or by hand delivery),

Dated 7/12/07

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11267-MEL

```
                              )
MADHU JAIN,                   )    TRANSCRIPT OF TRIAL PROCEEDINGS
                              )          TESTIMONY OF MADHU JAIN
          Plaintiff,          )
                              )              (Excerpt)
v.                            )
                              )
A CAPE ANN WHALE WATCH,       )
INC.,                         )
                              )
          Defendant.          )
                              )
```

BEFORE:  The Honorable Morris E. Lasker,
         Senior United States District Judge

John J. Moakley United States Courthouse
Courtroom No. 20
One Courthouse Way
Boston, Massachusetts  02210
Monday, June 11, 2007

Marcia G. Patrisso, RPR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3507
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

Page 2

```
1    APPEARANCES:
2
     LAW OFFICE OF JEFFREY C. CONIARIS
3    By: Jeffrey C. Coniaris, Esq.
     84 State Street, 6th Floor
4    Boston, Massachusetts 02109
     On behalf of the Plaintiff
5
     CETRULO & CAPONE LLP
6    By: Michael J. Rauworth, Esq.
     Two Seaport Lane, 10th Floor
7    Boston, Massachusetts 02210
     On behalf of the Defendant
8
9    ALSO PRESENT: Tamjid Kazi, Interpreter
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1              I N D E X
2
          Direct Cross Redirect Recross
3
4    WITNESSES FOR THE
     PLAINTIFF:
5
     MADHU JAIN
6
     By Mr. Coniaris    4
7    By Mr. Rauworth        39
8
9
10            E X H I B I T S
11   Exhibit No.   Description      In Evd.
12   1  Photograph          9
13   2  Photograph          9
14   3  Photograph          13
15   4  Photograph          14
16   5  Shoe            23
17   6  Plaintiff's responses to defendant's
        interrogatories       62
18
19
20
21
22
23
24
25
```

Page 4

```
1         MR. CONIARIS: Madhu Jain, could you please come
2    up and have a seat where Kusum was.
3              MADHU JAIN, sworn
4         THE CLERK: Please be seated. Would you give
5    your full name to the Court, spelling your last.
6         THE WITNESS: Madhu Jain, M-A-D-H-U J-A-I-N.
7         THE COURT: Thank you.
8         MR. CONIARIS: May I approach the witness, your
9    Honor? She just --
10        THE COURT: Yes.
11        Am I correct this is the plaintiff?
12        MR. CONIARIS: Yes.
13        THE COURT: Ms. Jain, as I asked your relative,
14   would you keep your voice up, please, because I have
15   some trouble hearing. There's a microphone there.
16        THE WITNESS: Okay. Okay.
17        I want interpreter.
18        MR. CONIARIS: Okay. We have an interpreter
19   here, your Honor, and she would like an interpreter.
20        THE COURT: He's the one I'll ask to keep his
21   voice up.
22              TAMJID KAZI, sworn
23        THE COURT: Thank you, sir. You'll keep your
24   voice up. If you can hear the witness, that's for you
25   to decide; I have to hear you, okay?
```

Page 5

```
1         I'm talking to you, sir. I'm not asking you to
2    translate that. Thank you.
3              DIRECT EXAMINATION
4    BY MR. CONIARIS:
5    Q. Good morning, Ms. Jain. Where do you presently
6    live?
7    A. New Delhi, India.
8    Q. And how old are you today?
9    A. I'm 57 years old.
10   Q. Are you presently married?
11   A. Yes.
12   Q. How long have you been married?
13   A. For the last 33 years I'm married.
14   Q. Okay. Do you have any children?
15   A. Two.
16   Q. And what's the highest level of schooling that
17   you've reached?
18   A. I completed college.
19   Q. Now, you got injured on the Cape Ann Whale Watch on
20   August 19th, 2004; is that correct?
21   A. Yes.
22   Q. Can you describe your injury?
23        MR. RAUWORTH: Objection.
24        THE COURT: Mr. Coniaris, I'd ask you to keep
25   your voice up.
```

Page 6

1      MR. CONIARIS: Okay.
2      MR. RAUWORTH: Your Honor, I'm not sure if the
3  question is asking for a physical description of the
4  injury or the events.
5      THE COURT: What was question?
6      MR. CONIARIS: I asked, "Can you describe your
7  injury?" And I can certainly ask another -- ask a
8  different question.
9      THE COURT: I know it's not intended to be a
10  technical medical question.
11      I'll allow the question.
12      THE WITNESS: As I was getting off the Cape Ann,
13  I fell down and I hurt -- I had both my ankles fractured
14  [sic], and I needed to get surgery. And I have screws
15  and plates joined inside that.
16  BY MR. CONIARIS:
17  Q. Do you have any scarring, or is there anything else
18  that we can see with your ankle?
19  A. Yes, I do.
20      MR. CONIARIS: Can we exhibit her ankle to the
21  Court, your Honor?
22      THE COURT: If she doesn't mind.
23      MR. CONIARIS: If I may, can I just approach?
24      THE COURT: Do you want to come here?
25      Counsel wants to come, too.

Page 7

1      MR. CONIARIS: Jennifer, can you bring those
2  photos up, too, please?
3      THE COURT: I would note a mark, and it's
4  purplish.
5      MR. CONIARIS: Can we compare that ankle with
6  the other ankle, your Honor?
7      THE COURT: Yes. I'm glad she only has two
8  ankles.
9      MR. CONIARIS: Now, can you put them both up
10  there together?
11      And if I may, I'd like to draw the Court's
12  attention to the difference in size between those
13  ankles, especially -- can you put them like this?
14      THE COURT: I observe a somewhat greater
15  circumference of the injured ankle.
16      MR. CONIARIS: And if I may point out to the
17  Court, there also is a lot --
18      THE COURT: There is a scar.
19      MR. CONIARIS: -- there's also a lot of
20  discoloration right around this scar --
21      THE COURT: Yes, there is. Around the scar.
22      MR. CONIARIS: -- and also around this scar.
23      Can we turn that around? Because that's quite
24  prominent.
25      THE COURT: There's a purple scar.

Page 8

1      MR. CONIARIS: Okay. And, your Honor, if I
2  could introduce into evidence, after you had just seen
3  them, a couple of pictures of the scars.
4      THE COURT: Any objection?
5      Can you tell us who took them?
6      MR. CONIARIS: I think Mr. Rauworth did. This
7  one I believe Mr. Rauworth did; this one I think the
8  family did.
9      THE COURT: If she testifies that those are
10  photographs of her ankle, that will be all right. It
11  will be admissible.
12  BY MR. CONIARIS:
13  Q. Ms. Jain, I'm just going to show you a picture of
14  your ankle --
15      THE COURT: You're showing her a picture. What
16  is it?
17      MR. CONIARIS: Okay. I'm sorry.
18  BY MR. CONIARIS:
19  Q. Miss Jain. I'm showing you a picture. What is it?
20  A. (In English) I think it's my foot.
21      (Through the interpreter) I think it's my foot.
22  BY MR. CONIARIS:
23  Q. Is that an accurate depiction of your foot?
24  A. Yes.
25  Q. And I'm going to show you another picture. Can you

Page 9

1  tell me what that is?
2  A. Yeah, I think it's also my foot.
3  Q. Is that an accurate depiction of your foot?
4  A. Yes, it's right.
5      MR. CONIARIS: Okay. Can we mark these, please?
6      MR. RAUWORTH: Can I see them?
7      MR. CONIARIS: Sure.
8      THE COURT: Can I ask counsel, please, to mark
9  their exhibits in advance?
10      MR. CONIARIS: I'm sorry, your Honor.
11      THE COURT: I mean -- okay.
12      THE CLERK: The full foot will be Exhibit No. 1,
13  and the blowup is Exhibit No. 2.
14      So marked and entered.
15      (Exhibit Nos. 1 and 2 were received into
16  evidence.)
17      MR. CONIARIS: Thank you.
18  BY MR. CONIARIS:
19  Q. Now, going back to August 19, 2004, can you tell us
20  how your day began?
21  A. I got up in the morning, I took a shower, I took my
22  breakfast -- we all were very happy -- and we left for
23  whale watching.
24  Q. Who went with you to go whale watching?
25  A. My son, my sister-in-law and my nephew.

Page 10

1  Q. And how did you get to the whale watch?
2  A. My nephew drove us up to that point.
3  Q. Okay. Now, what happened at the whale watch prior
4  to you getting onto the ship?
5  A. There was some time before it would start, so we
6  just looked around. There were shops, and we bought a
7  few gold rings and chips and walked around the ship.
8  Q. Do you recall what the weather was?
9  A. The weather was good.
10  Q. Okay. And at some point you got on the boat?
11  A. You mean, what time we got inside the boat?
12     MR. CONIARIS: Oh, no. I just said to her, "At
13  some point you got on the boat?"
14     THE WITNESS: Yes.
15  BY MR. CONIARIS:
16  Q. And did the whole party that had come up to
17  Gloucester with you, did they get on the boat with you?
18  A. Yes.
19  Q. And at some point the boat left the dock?
20  A. Yes.
21  Q. Can you describe the ride out on the boat that day?
22  A. It was very nice weather. It was a little bit
23  windy, and there was bright sunshine.
24  Q. And did you see any whales while you were out there?
25  A. Yes.

Page 11

1  Q. And when you were out there, can you describe the
2  clothing that you were wearing on the whale watch trip?
3  A. (In English) Something like this, salwar, kameez,
4  dupatta.
5     (Through the interpreter) I wore something like
6  this, comprising of salwar, kameez and dupatta.
7     THE COURT: Is that an Indian costume?
8     THE WITNESS: (In English) Yes.
9     (Through the interpreter) Yes.
10  BY MR. CONIARIS:
11  Q. And can you describe the return trip back to the
12  dock -- or back to a dock -- on the whale watch ship
13  that day?
14  A. You mean on the ship that very day?
15  Q. Yes.
16  A. We were sitting outside, and when there was a lot of
17  splash of water we would go back inside the cabin, and
18  then we would come out again to see the whale. We were
19  enjoying the trip.
20  Q. And at some point the boat got back and docked; is
21  that correct?
22  A. Yes.
23  Q. Do you have any problem with seasickness? Do you
24  ever get seasick?
25  A. No.

Page 12

1  Q. How about dizziness? Do you have any problem with
2  dizziness?
3  A. No.
4  Q. Have you fainted unexpectedly in the last ten years?
5  A. No, never.
6  Q. At some point you wanted to get off the boat?
7  A. Once the boat came to a halt, everybody was getting
8  down at that time.
9  Q. And do you have an idea of how many people got off
10  before you, or did you get off first, or were you the
11  last -- where were you in terms of the order of the
12  passengers leaving?
13  A. We were standing in a queue. And the boat was
14  basically full. There were approximately 100 people.
15  Q. And people got off before you?
16  A. Yes.
17     MR. CONIARIS: May I use a couple of photos
18  here, your Honor?
19     THE COURT: I'm sorry?
20     MR. CONIARIS: Can I use a couple of the
21  pictures?
22     THE COURT: Yes.
23  BY MR. CONIARIS:
24  Q. I'm going to --
25     THE COURT: Would you refer to the exhibit

Page 13

1  number?
2     MR. CONIARIS: This will be 3.
3     THE COURT: Photo of the plank, that will be
4  Plaintiff's Exhibit 3.
5     (Exhibit No. 3 was received into evidence.)
6     MR. CONIARIS: Would the Court like to pre-mark
7  these, too? I'll get them.
8     THE COURT: When you bring them up, yeah.
9     MR. CONIARIS: Okay.
10  BY MR. CONIARIS:
11  Q. Ms. Jain, what's that a picture of?
12  A. It seems as though this was the ramp that we got up
13  and got out of the boat.
14  Q. Is that an accurate picture of the ramp?
15  A. (In English) I don't remember it now, but it seems
16  like it.
17     (Through the interpreter) I don't clearly remember
18  it, but it appears to be the one.
19     MR. RAUWORTH: Objection, your Honor.
20     THE COURT: I don't know if she's the one to
21  testify whether that's the gangplank or not, although
22  she might remember.
23     But it was one like that? Is there any dispute
24  that --
25     THE WITNESS: Yes, it was like this.

4  (Pages 10 to 13)

Page 14

1	MR. RAUWORTH: I don't dispute that that's a
2	photo of the vessel, your Honor, but I did note that
3	Ms. Jain answered in English, and the interpreter came
4	back in English with different words. He added a word.
5	THE COURT: All right. Am I correct that
6	counsel don't dispute that's the gangplank?
7	MR. RAUWORTH: I have no objection to that being
8	admitted, your Honor.
9	THE COURT: Okay.
10	MR. CONIARIS: May we mark this, your Honor?
11	THE CLERK: Okay. This will be Plaintiff's
12	Exhibit 4. And would you please state what it is.
13	(Exhibit No. 4 was received into evidence.)
14	THE COURT: If counsel agree as to what it is,
15	we don't need to ask the witness.
16	MR. RAUWORTH: That's fine.
17	THE COURT: What is it?
18	MR. CONIARIS: It's a picture of the top of the
19	gangway.
20	THE COURT: From the side?
21	MR. CONIARIS: Yeah. A side picture, upper
22	gangway.
23	THE COURT: Okay.
24	BY MR. CONIARIS:
25	Q. Ms. Jain, now, the time came for you to get off the

Page 15

1	boat; is that correct?
2	A. Yes.
3	Q. Can you describe what happened, when you attempted
4	to get off the boat, to us?
5	A. It was pretty windy, and there was a lot of water
6	coming in in splashes, so the corridor was wet, and the
7	stairs were also wet. So I put one foot on the stair --
8	THE COURT: Put one foot on what?
9	THE WITNESS: On the ramp.
10	It was somewhat higher, so I had to put a
11	step-up to get there.
12	BY MR. CONIARIS:
13	Q. Okay. Can you show the Court where the step-up is
14	on this Exhibit 3?
15	A. I think it's here.
16	THE COURT: Pointing to the portion of the
17	gangplank that's adjacent to the craft?
18	THE WITNESS: Yes.
19	BY MR. CONIARIS:
20	Q. Did --
21	MR. RAUWORTH: Your Honor, may the record
22	reflect that that photograph in question does not
23	include the entirety of the gangway?
24	THE COURT: If that's the case. I don't know
25	one way or the other.

Page 16

1	MR. RAUWORTH: Well, it cuts off. One can't see
2	the end of it.
3	THE COURT: Yes, it cuts off, but I have no way
4	of knowing whether it goes farther. I'll take your
5	representation.
6	MR. RAUWORTH: Thank you.
7	BY MR. CONIARIS:
8	Q. Do you remember any crew members assisting you
9	getting up onto that gangway that day?
10	A. No.
11	Q. I'll ask that a different way. Did any crew members
12	help you that day to get up onto the gangway?
13	A. No.
14	THE COURT: I just want to be sure. You talk
15	about them helping her up. The accident -- you're not
16	contending the accident occurred on her getting up, are
17	you?
18	THE WITNESS: Yes. That was the point on the
19	gangway where the accident occurred, up at the top.
20	THE COURT: At the top?
21	MR. CONIARIS: Yes.
22	THE COURT: Okay. But are you -- is it your
23	contention -- all right. Let me back up.
24	Am I correct that you don't contend that she was
25	not on the gangplank?

Page 17

1	MR. CONIARIS: She had one foot -- it's a little
2	vague, but she knows she was getting --
3	THE COURT: Well, let's ask the witness because
4	that's the best way to find out.
5	MR. CONIARIS: Okay. Okay. Sure.
6	BY MR. CONIARIS:
7	Q. Did anyone from the crew tell you to hold onto the
8	handrail on that day?
9	A. I didn't hear.
10	Q. Okay. Did anyone show you how to grasp onto
11	these -- I'll refer to Exhibit 4 -- right here? Did
12	it -- right here.
13	Did anyone tell you to hold onto these and show you
14	how to hold onto them?
15	THE COURT: Does the defendant contend that
16	somebody did tell her?
17	MR. RAUWORTH: Absolutely, your Honor.
18	THE COURT: Okay.
19	THE WITNESS: No. I didn't hear.
20	BY MR. CONIARIS:
21	Q. Did you recall -- did you ever have a chance to hold
22	onto these?
23	A. You know, I just put my one foot on the ramp, and
24	this -- again, when I tried to leave, at that point I
25	slipped.

Page 18

1   Q. So you answered no. You never got a chance to try
2   to hold onto either one of those?
3   A. No, I didn't even have a chance to hold on.
4   Q. So you recall that one foot was on the ramp. Do you
5   remember which foot?
6   A. Usually I step with my right foot first.
7   Q. Okay. And where was your left foot at the time when
8   your right foot was on the plank?
9   A. I don't remember exactly, but maybe in the air.
10  Q. Do you remember where your weight was placed at that
11  time?
12       THE COURT: I don't think that I could find it
13  credible that she would testify "My weight was here or
14  there."
15       I'll sustain your objection to the question.
16  BY MR. CONIARIS:
17  Q. Was your other foot, do you recall, lifted up off of
18  the deck of the boat at the time when you fell?
19  A. (In English) I don't remember exactly.
20       (Through the interpreter) I don't remember exactly.
21       THE COURT: Good for you. That's the truth.
22  BY MR. CONIARIS:
23  Q. Did you make any attempt to try to hold onto these
24  two areas here that stick out at the top rail of the
25  gangway?

Page 19

1   A. (In English) No, I don't remember. It happened so
2   suddenly. I simply don't remember.
3       (Through the interpreter) I don't remember because
4   it happened so suddenly. I simply don't remember.
5   Q. From where you were, could you have reached these?
6       MR. RAUWORTH: Objection. Objection.
7       THE COURT: Sustained.
8       MR. RAUWORTH: Objection.
9       THE COURT: I don't know that she's qualified.
10  Well, she might be.
11       Ask her if -- go ahead.
12       MR. CONIARIS: All right. I can do it. Sure.
13  BY MR. CONIARIS:
14  Q. When your foot was on the ramp immediately before
15  you fell, did you see where these handrails were? Did
16  you observe them?
17  A. No, I don't remember.
18  Q. That's fine. But you do recall that you never held
19  onto them?
20  A. It happened so suddenly that I couldn't even catch
21  it.
22  Q. Could you explain, you "couldn't even catch it"?
23  A. See, the moment I put one foot on the ramp and the
24  other foot I lifted, I fell immediately and suddenly.
25  Q. Okay. Can you exhibit to us -- could you stand up,

Page 20

1   please, and exhibit to us where those handrails were in
2   relation to you when you were stepping up onto the rail
3   [sic]?
4       MR. RAUWORTH: Objection, your Honor.
5   Foundation. I think she's indicated that she can't
6   remember really any details about this situation, so...
7       THE COURT: If she could remember this -- the
8   answer to this, then we have some inconsistent answers
9   you're prepared to comment on.
10  BY MR. CONIARIS:
11  Q. Could you please just stand up?
12  A. (Witness complies.)
13  Q. Now, if you were standing there and you were just
14  getting up onto the rail, if that was the situation --
15       MR. RAUWORTH: Objection. Calls for
16  speculation.
17  BY MR. CONIARIS:
18  Q. -- did you at that time see the gangway?
19  A. Yeah, I might have seen the gangway.
20       THE COURT: Okay. I note that she said she
21  "might have seen," which means she doesn't really
22  remember.
23  BY MR. CONIARIS:
24  Q. Do you remember where these rails were relative to
25  you?

Page 21

1   A. The ramp was there, I remember. And, you know, it
2   happened so suddenly, I put one foot up and suddenly I
3   fell down. I couldn't even hold there.
4   Q. Could you explain --
5   A. It didn't even reach my hand. My hand didn't even
6   reach there.
7   Q. Your hand couldn't reach these points here?
8   A. I tried to hold onto something, but I could find
9   nothing to hold onto.
10  Q. Do you remember if the ramp was slippery?
11       THE COURT: Sustained as to leading.
12       MR. CONIARIS: Okay.
13  BY MR. CONIARIS:
14  Q. Can you tell us the condition of the ramp on that
15  day?
16  A. I don't remember it exactly. I remember that water
17  was splashing in and it was wet.
18  Q. And that's -- okay. That's fine.
19       And you fell?
20  A. Yes.
21  Q. Can you explain what you remember about falling?
22  A. I had a lot of pain. And I was very nervous as to
23  how I would go back to India.
24  Q. Okay. Can you just tell us everything you remember
25  about the fall if, in fact, you remember anything about

Page 22

1  it?
2  A. It happened so suddenly. And I remember I had a
3  lot -- I sustained a lot of pain, and I was nervous.
4  And I kept telling my son again and again, "How will I
5  go back to India?" and "How am I going to meet your
6  dad?"
7  Q. Do you recall, did your clothes get stuck on
8  anything on that gangway before you fell?
9  A. No, not at all.
10  Q. And do you recall what kind of shoes you were
11  wearing on that day?
12  A. Sports shoes like this one.
13      THE COURT: Do you know what the undersurface of
14  the sole of the shoe was made of? Was it leather or
15  rubber?
16      THE WITNESS: I don't remember, but as far as I
17  recall, it should be something like this (indicating).
18      THE COURT: Excuse me. I can come look.
19      THE WITNESS: I can come there.
20      THE COURT: I see. Okay. Yes, I would say
21  these have rubber soles.
22      MR. CONIARIS: I have the shoe.
23      THE COURT: Oh, you do?
24      MR. CONIARIS: If you want, if the Court has
25  some interest.

Page 23

1  BY MR. CONIARIS:
2  Q. I'm going to show you a shoe, Ms. Jain. Can you
3  identify that?
4      THE COURT: Let's make it an exhibit. I assume
5  you're offering it?
6      MR. CONIARIS: Sure. I can. Sure. Can we put
7  an exhibit number on?
8      THE CLERK: Okay. The shoe is Exhibit No. 5.
9      (Exhibit No. 5 was received into evidence.)
10      MR. CONIARIS: And this is the shoe that you
11  were wearing on the day that you fell?
12      THE WITNESS: Yes, this is my shoe. I have the
13  other shoe with me in India.
14  BY MR. CONIARIS:
15  Q. Thank you very much.
16      Do you have the clothes that you were wearing that
17  day?
18  A. Yeah. I don't have that because they had to cut
19  open the salwar, the pants, and -- but, you know, it was
20  something like this: like kameez, the long shirt; and
21  the salwar, like the lower pants; and the dupatta, the
22  piece of cloth around my neck.
23  Q. Okay. Now, after you fell, what do you remember?
24  A. The ambulance came immediately. Fairly quickly.
25  Q. Do you recall where you ended up after the fall?

Page 24

1  A. Right at the bottom where it was landing.
2  Q. Were your feet on the gangway or were your feet off
3  it?
4  A. As far as I remember, it was outside.
5      THE COURT: I'm sorry?
6      THE WITNESS: As far as I remember, it was
7  outside.
8      THE COURT: Outside the gangplank?
9      THE WITNESS: Right where the gangway stops, it
10  was just beneath that.
11      THE COURT: All right.
12  BY MR. CONIARIS:
13  Q. And what position were you lying in?
14  A. I might have fallen like this.
15  Q. Indicating falling backwards?
16  A. Yes. I was laying on my back. And I also had some
17  bruise on my right elbow.
18  Q. And an ambulance came?
19  A. Yes.
20  Q. What do you remember about the ambulance crew, if
21  there was one, at the time at the scene? What do you
22  remember about the crew and what you said and what they
23  said, if they said anything?
24  A. Nothing much. They also said that it appears that I
25  have a fracture. I was nervous and I was afraid as to

Page 25

1  how I would go back to India.
2  Q. And at some point they put you in an ambulance and
3  took you to a hospital?
4  A. Yes.
5  Q. And what did they do for you at that hospital?
6  A. That hospital, perhaps, did not have facilities for
7  surgery, so they quickly shifted me to another hospital,
8  because at the first hospital they mentioned that
9  perhaps I would need surgery.
10  Q. Okay. And how did you get to the other hospital?
11  A. I went by ambulance.
12  Q. Do you remember the name of that hospital?
13  A. No, I don't remember.
14      THE COURT: I take it there's no dispute as to
15  what hospital it was.
16  BY MR. CONIARIS:
17  Q. And you arrived at that hospital. And in your first
18  couple of hours there, what did they do for you?
19  A. They might have conducted some tests on my ankle and
20  legs, and they might have X-rayed and some other things.
21  And at that point they had determined that I would need
22  surgery. And it was late in the evening, so they said
23  the next morning I would have the surgery done to me.
24  Q. And did they give you any pain medications?
25  A. I think they did. They also put some bandage on my

Page 26

1    ankle.
2    Q.  And at some point you had the surgery?
3    A.  The next morning I had my surgery.
4    Q.  Okay.  And how long after you had the surgery were
5    you in the hospital?
6    A.  Approximately four, five days I was there.
7         THE COURT:  Four or five days?
8         THE INTERPRETER:  Yes, sir.
9    BY MR. CONIARIS:
10   Q.  And then you returned to where?  Where did you go
11   after the hospital?
12   A.  I went back to my sister-in-law's house, who lives
13   in Boston.
14   Q.  Okay.  Now, your original trip, when had you planned
15   to leave?  How much more from August 19th were you
16   planning on staying?
17   A.  (In English)  End of August.
18   (Through the interpreter)  I think the 1st of
19   September.
20   BY MR. CONIARIS:
21   Q.  And what did you plan on doing the remainder of your
22   vacation had this not happened?
23   A.  I had a lot of plans to roam about, see places.  My
24   son was with me, so we had a lot of plans to roam about
25   places.

Page 27

1    Q.  And you ended up staying at Kusum's house for a
2    while; is that correct?
3    A.  Yes.
4    Q.  Just generally how did you feel at the time when you
5    were at Kusum's house; for example, pain-wise, or were
6    you able to get along -- around?  Can you tell us
7    something in those areas?
8    A.  I was in very bad condition, and I was in a
9    wheelchair.  And my son would help me from the bed, put
10   me in the wheelchair and put me to the toilet.  And in
11   that house they didn't have a bathroom on the ground
12   floor, so for a few days I couldn't even take a shower.
13        THE COURT:  How long were you unable to walk?
14        THE WITNESS:  About five, six months I could not
15   walk.  And when I even went back to India I could not
16   walk without a walker.
17   BY MR. CONIARIS:
18   Q.  Did you have any major health problems before this
19   fall occurred?
20   A.  Nothing.
21   Q.  Did you have any problems walking?
22   A.  No, never, because I took regular walk, morning walk
23   and jogging.
24   Q.  How often would you jog and how far could you jog
25   for?

Page 28

1    A.  Every morning I used to go out for one hour to one
2    and a half hour.
3    Q.  And I think I mentioned earlier -- did you have a
4    job at this time?
5    A.  Not a job, but we have our own business.
6    Q.  Okay.  Can you tell us what that business does?
7    A.  My husband and I, we have two businesses.  And one
8    was in my name, so I was the proprietor of that.  And
9    between the two of us, we would manage -- I would assist
10   him and manage the business properly.
11        THE COURT:  What was the nature of the business?
12        THE WITNESS:  We have business in textiles.  We
13   had enzymes for softening of textiles.  one was for
14   softening of textiles, the other one was for picking the
15   starch.  So with the textiles, we had to go there and
16   try out our products.
17        THE COURT:  And did you get paid a salary?
18        THE WITNESS:  When we supplied the enzymes, we
19   would get our commission from there.  And it was good
20   business.  And until I had the accident, we used to
21   have, like, 6 to 800,000 rupees per year.
22        THE COURT:  That's the volume of business that
23   you did?
24        THE WITNESS:  Our profit was between 6 to
25   800,000 rupees.

Page 29

1         THE INTERPRETER:  There's a confusion because in
2    India we say lac, is 100,000 is one lac.  So she was
3    confused when I say "6 to 800,000."  Six to eight lacs.
4         THE COURT:  Can you estimate for me how much
5    that is in dollars?
6         THE WITNESS:  I can't.
7         THE COURT:  Okay.  That's your word, I guess.
8    BY MR. CONIARIS:
9    Q.  Okay.  So prior to this, what was your income in the
10   years prior?  Can you approximate that?  Do you know?
11   A.  Since that fall I could not keep up with my
12   business.  I could not pay any attention, I could not
13   keep in contact with my agents and I could not go and
14   follow up with them.  And so, you know, we lost that
15   business, and I was obliged to close down the business.
16   Q.  So you no longer have the business?
17   A.  Because we could not go and collect the funds from
18   our agents, and I could not follow up with them, and
19   there was so much loss we were incurring, that we had
20   decided that maybe this year we are going to close the
21   business.
22        THE COURT:  They're going to do what?
23        THE INTERPRETER:  We're going to close the
24   business.
25   BY MR. CONIARIS:

Page 30

1  Q.  Presently, prior to closing the business, since this
2  accident the business income has changed, has it?
3  A.  Yes, because instead of profit we are incurring
4  loss.
5  Q.  Okay.  That's understandable.
6      In the first year after the accident, how much loss
7  did you suffer in terms of how much less money did you
8  make than you made before?
9  A.  You see, my husband takes care of the financial side
10  of the business.  But I have an idea that we ran into so
11  much loss that we could not collect the money that was
12  due to us.  So now we are at the point that we will be
13  obliged to close the business.
14  Q.  Okay.  Now, how much money actually -- like, say, in
15  the first year after the fall, how much money less did
16  you make that year than you made the year before the
17  fall?
18  A.  There was enough less money I was making.
19      THE COURT:  There was enough what?
20      THE INTERPRETER:  Less money that we made.
21  BY MR. CONIARIS:
22  Q.  Can you give us a figure, a certain amount?
23  A.  Slowly, slowly it started diminishing.  The first
24  year it was half, and then slowly, slowly it has been
25  diminishing.

Page 31

1  Q.  Okay.  How much is half?
2      THE INTERPRETER:  Sorry?
3  BY MR. CONIARIS:
4  Q.  How much is half?
5  A.  I know the profit used to be approximately between 6
6  to 800 lac rupees, meaning 6 to 800,000 rupees.  So the
7  profits started diminishing, and we owed money, and
8  slowly, slowly, far from profit, we were running into
9  loss.
10  Q.  Okay.  So prior, you were making 6 to 800,000 lac a
11  year?
12      THE INTERPRETER:  No, one lac is 100,000.  So
13  six to eight lacs, or 600 to 800,000.
14  BY MR. CONIARIS:
15  Q.  That was before the accident?
16  A.  Yes.  Some year it could be even more than that.
17  Q.  And then after the accident -- the first year after
18  the accident you made half that amount?
19      MR. RAUWORTH:  Your Honor, in the interest of
20  time, I was -- based on what's in the interrogatories,
21  this is all new stuff.  I was planning to let it develop
22  a little bit more and move to strike it.  But this
23  business with -- this element of the business going out
24  of business is completely new.
25      There was a very different representation in the

Page 32

1  interrogatories about any kind of financial loss.  And
2  so all that we're hearing now is out of the blue and is
3  prejudicially undisclosed to me.  I didn't have a chance
4  to examine the witness about this at all in her
5  deposition.
6      THE COURT:  Since she's here from India I'll
7  allow the testimony, and we can then decide whether it's
8  properly to be considered or not.
9      MR. CONIARIS:  Okay.
10      THE INTERPRETER:  Let me tell you what she said.
11      MR. CONIARIS:  Okay, please.
12      THE INTERPRETER:  She said, "The first year the
13  loss was substantial because my husband had to come here
14  to pick me up.  And then after a while I had to go to
15  Houston --
16      THE WITNESS:  Dallas.
17      THE INTERPRETER:  -- to Dallas, and stay there
18  for 15 days to 20 days before I could return to India.
19  So my husband came to Dallas to pick me up.  So the loss
20  was very substantial in the first year.
21      THE COURT:  Well, ma'am, I understand why what
22  you've just said would incur expense for your husband to
23  come here and so forth.  How do you connect that to your
24  losses?  What caused your losses, as you see it?
25      THE WITNESS:  Our business is very competitive,

Page 33

1  and because my husband came here -- left his business
2  and had to stay here for about a week, so in the
3  meantime, some other people grabbed the business.
4      THE COURT:  In a week?
5      THE WITNESS:  Yes.  Because my husband was away
6  for a week, and it's so competitive that we have to run
7  from day to day.
8      THE COURT:  And what is the source of your
9  support at the present time?
10      THE WITNESS:  My husband has a second company,
11  and from that we meet all our expenses.
12  BY MR. CONIARIS:
13  Q.  So there was some expense in having your husband
14  come out here to fly you -- to accompany you back; is
15  that correct?
16  A.  Yes.
17  Q.  Okay.  During that time you lost some business
18  because your husband was absent from the company; is
19  that correct?
20      MR. RAUWORTH:  Objection.  Leading.
21      MR. CONIARIS:  I'm trying -- okay.
22      THE WITNESS:  Yes, my business suffered.
23  BY MR. CONIARIS:
24  Q.  Is there any other way other than the fact that your
25  husband was out there for that period of time that the

Page 34

1   business suffered?
2       THE INTERPRETER: Sorry. Repeat?
3   BY MR. CONIARIS:
4   Q.   Did the business suffer in any other ways other than
5   the fact that your husband was absent from that business
6   for that week?
7   A.   Yes. Also because I could not give much time,
8   because, otherwise, I would have to go to the
9   business -- go with my husband, go for the trial of the
10  products, and visit to pick up money and all that, which
11  I could not continue to do.
12  Q.   Okay. Just going over this slowly, after the
13  accident, for four months --
14      MR. CONIARIS: -- she testified --
15  BY MR. CONIARIS:
16  Q.   -- you were unable to walk at all?
17      THE WITNESS: Yes, about four months. And even
18  now I have problem. Once I walk a little more or I get
19  up on the stairs, and even if I sit for a long time, I
20  feel that I need to lie down and take rest.
21  BY MR. CONIARIS:
22  Q.   Okay. So there were things that you were unable to
23  do even after those four months?
24  A.   Yes, that's true.
25  Q.   Can you give us an example of one thing you were

Page 35

1   unable to do?
2   A.   Yes. One thing is that I cannot stand up for a long
3   time, and then I cannot get up the stairs. And even now
4   that I'm sitting for a long time, it's hurting my leg.
5   Q.   And how did that affect work, if it affected work?
6   A.   You know, I have to go to my clients and I have to
7   show them -- test my product. And all that has to be
8   done standing. And then I have to go and contact the
9   clients and go and collect the funds. All that I cannot
10  do much now.
11      THE COURT: Did you say that you have trouble
12  going up stairs?
13      THE WITNESS: Not to get up, but when getting
14  down.
15      THE COURT: Getting down?
16      THE WITNESS: Yes, sir.
17      THE COURT: And you come down one step at a
18  time?
19      THE WITNESS: Yeah. Once I step down -- I'm
20  coming down, descending -- I put one step at a time.
21      THE COURT: Right.
22  BY MR. CONIARIS:
23  Q.   Getting back to where we were prior to getting into
24  this business thing, you were at Kusum Jain's house, and
25  then you said your husband came out. Can you tell us

Page 36

1   what happened from there?
2   A.   From Kusum Jain's house I went to Dallas with my
3   son.
4   Q.   Was that part of the plan originally, prior to you
5   getting hurt?
6   A.   Yes. I had a plan to go to Dallas because my son
7   studied there.
8   Q.   Okay. Very good. And your husband came out?
9   A.   Yes, he came to Dallas.
10  Q.   Why did he come to Dallas?
11  A.   To pick me up.
12  Q.   Do you know how much it cost him to travel to
13  Dallas?
14  A.   I can't tell you exactly what it was, the airfare
15  that time.
16  Q.   Okay. Can you approximate what the airfare was?
17      MR. RAUWORTH: Objection.
18      THE COURT: I don't think she's an expert on
19  that.
20      THE WITNESS: No, I cannot put an estimate.
21      THE COURT: Maybe he put it on his credit card.
22  BY MR. CONIARIS:
23  Q.   How are you today in terms of your health? Has
24  anything changed since the fall that you took?
25  A.   See, I'm not as active as I used to be before, and I

Page 37

1   cannot participate in the things that I used to before,
2   and I've become somewhat slow in everything, in all my
3   activities.
4       THE COURT: I'm sorry. "I've become
5   somewhat" --
6       THE INTERPRETER: -- "slow in all my
7   activities."
8   BY MR. CONIARIS:
9   Q.   Is there any one thing that bothers you more than
10  other things?
11  A.   Yes. I feel that why did all this have to happen to
12  me?
13  Q.   Other than that, is there anything physical --
14  anything from your injury that bothers you nowadays that
15  you feel is especially bothersome to you that you feel
16  is especially important?
17  A.   Because of this I have gained some weight.
18  Q.   How much weight have you gained?
19  A.   Approximately seven, eight kilos.
20  Q.   Okay. And do you experience pain ever nowadays that
21  has resulted from this injury?
22  A.   Yes, it hurts. And sometimes my leg becomes stiff
23  and the pain acts up during the winter.
24      THE COURT: "Sometimes my leg becomes" --
25      THE INTERPRETER: Stiff.

Page 38

1    THE COURT:  Stiff?
2    THE INTERPRETER:  Yes.
3    THE WITNESS:  And sometimes in the winter the
4  pain accelerates.
5  BY MR. CONIARIS:
6  Q.  Is there any pain -- or any activity that causes
7  pain?
8  A.  Basically, my son got married, and I couldn't even
9  dance there.
10  Q.  You couldn't dance?
11  A.  I feel pain in everything, like getting up, getting
12  down, standing, sitting down.  And then I used to go out
13  for walks in the morning.  You know, everything has
14  become hard for me.
15  Q.  How do you feel right now?
16  A.  Right now my leg is becoming somewhat numb and
17  stiff, so I feel like, let me lift up my leg, it might
18  feel better.
19  Q.  Is that a common occurrence?
20  A.  Yeah.  If I sit down for quite a long time with my
21  legs hanging, it does happen.
22  Q.  For how long?
23    THE INTERPRETER:  You mean how long it's been
24  happening?
25    MR. CONIARIS:  No.  How long does she sit down

Page 39

1  before that happens?
2    THE WITNESS:  One hour to one and a half hour I
3  can sit, but after that, I begin feeling restless.
4  BY MR. CONIARIS:
5  Q.  Okay.  What do you mean "restless"?  Can you
6  explain?
7  A.  Yeah.  I mean, then I feel like either let me lie
8  down or take a rest or put my leg up so that my leg gets
9  a little rest.
10    MR. CONIARIS:  Okay.  That's all I have for
11  right now.
12    THE COURT:  We'll take a recess -- a ten-minute
13  recess at this time.
14    THE CLERK:  All rise.
15    Court now in recess.
16    (There is a recess in the proceedings from 11:05
17  a.m. to 11:30 a.m.)
18    THE CLERK:  All rise.
19    THE COURT:  Thank you.  Please be seated.
20    Mr. Rauworth?
21    MR. RAUWORTH:  Thank you, your Honor.
22        CROSS-EXAMINATION
23  BY MR. RAUWORTH:
24  Q.  Good morning, Ms. Jain.
25  A.  Good morning.

Page 40

1  Q.  You remember that you came to my office one day in
2  December of 2005?
3  A.  Yes.
4  Q.  That was a very snowy day, wasn't it?
5  A.  Yes.
6  Q.  You were planning to go on to Portland, Oregon,
7  after our deposition in Boston, weren't you?
8  A.  Yes.
9  Q.  And on that day you were asked some questions in the
10  presence of a court reporter like the one that's here,
11  correct?
12  A.  Yes.
13  Q.  And before the proceedings began you raised your
14  hand and took an oath like you did here this morning,
15  true?
16  A.  Yes, perhaps I did.
17  Q.  Well, you did do -- you remember doing that, don't
18  you?
19    THE COURT:  I assume she did.  This isn't a jury
20  trial.
21    THE WITNESS:  Yes, I did.
22  BY MR. CONIARIS:
23  Q.  And at the deposition you responded truthfully to
24  the questions you were asked, correct?
25  A.  Yes.  As far as I remember, I did answer truthfully.

Page 41

1  Q.  All right.  And you didn't say anything that was
2  untrue, correct?
3  A.  No.
4  Q.  Great.
5    MR. RAUWORTH:  Your Honor, if I may approach the
6  witness?  Thank you.
7  BY MR. RAUWORTH:
8  Q.  I want to leave with you for reference, Ms. Jain, a
9  copy of the transcript of that deposition because we may
10  have need to look at it as we proceed today.
11    Now, you are very conscious about handrails
12  yourself, are you not?
13    THE INTERPRETER:  Handrails?
14    MR. RAUWORTH:  Handrails.
15    THE WITNESS:  Yes.  Any time I get up, get down
16  or walk, I do try to hold onto them.
17  BY MR. RAUWORTH:
18  Q.  To the -- hold onto --
19  A.  Yes, to the handrail.
20  Q.  And you know that it's important to hold onto the
21  handrail in anyplace where there's a difference in level
22  of the walking surface, correct?
23  A.  Yes.
24  Q.  And you also know it's important to hold onto
25  handrails when you're on a surface that is not perfectly

Page 42

1   horizontal, correct?
2   A.  Yes.
3   Q.  And you've observed that precaution all the time in
4   your life, correct?
5   A.  Yes.
6   Q.  In fact, it was your testimony that you do hold onto
7   handrails generally -- well, not even generally --
8   always, correct?
9   A.  Yes.
10  Q.  Now, on the whale watch trip there were some
11  announcements made with a public address system,
12  correct?
13  A.  I heard announcements.  Like whenever the whales
14  would show up, they would say, "Now look at the whale."
15  Q.  Okay.  But there were other announcements about
16  safety matters, weren't there?
17  A.  I did not hear.
18  Q.  But you're not saying there were no announcements,
19  correct?
20      THE COURT:  I'll take judicial notice of the
21  fact that at least on the ferry line from Martha's
22  Vineyard to Cape Cod those instructions are said so fast
23  and so jumbled, that I've never been able to understand
24  them.  I'm not saying your client did the same thing,
25  but that could be the case.

Page 43

1       MR. RAUWORTH:  I guess I'm not sure what I am
2   able to do about that, Judge.
3       THE COURT:  There's nothing that you can.  I'm
4   just reacting.  You can go ahead and ask your question
5   and establish a record.
6       MR. RAUWORTH:  Sure.
7   BY MR. RAUWORTH:
8   Q.  Ms. Jain, could you kindly turn to page 56 in the
9   transcript that's in front of you?
10  A.  I need my specs.
11  Q.  Where are your specs?
12      Do you have page 56, Ms. Jain?
13  A.  Yes, sir.
14  Q.  Now, could you kindly take a look at line 13.  And
15  I'm going to read down to the bottom of that page and
16  over onto page 57.
17  A.  All right.
18  Q.  And I'm going to ask you to follow along as I do
19  that.
20  A.  Okay.
21  Q.  "Question:  But you remember that someone gave an
22  introduction that told where the lifejackets and safety
23  equipment was, correct?
24      "Answer:  I didn't really listen that much
25  because -- it might have been because of the

Page 44

1   pronunciation or something.  I didn't really catch what
2   they were saying because of the accent."
3   A.  Yes.
4   Q.  "Question:  So you're not sure if you understood
5   everything that was said?
6       "Answer:  Maybe."
7   A.  Yes, sir.
8   Q.  "Question:  But you recall someone speaking to all
9   the passengers before the boat left?"
10  A.  Yes.
11  Q.  "Answer:  No, I don't remember that also.
12      "Question:  So perhaps it happened, perhaps it
13  didn't, you just can't remember; isn't that right?"
14      And then there's an objection.  And the answer is,
15  "Right."
16  A.  Yes.
17  Q.  So if there was an announcement, you did not -- you
18  either didn't pay attention to it or you didn't
19  understand it; is that correct?
20      THE COURT:  Well, that's a hypothetical
21  question.  She said she doesn't know of any.  You could
22  prove there was one.
23  BY MR. RAUWORTH:
24  Q.  Now, if you'd kindly turn to page 61.  Do you have
25  page 61, Ms. Jain?

Page 45

1   A.  Yes.
2   Q.  And if you would kindly look at page 14?
3       THE COURT:  Page 14?  You mean line 14?
4       MR. RAUWORTH:  I'm sorry.
5   BY MR. RAUWORTH:
6   Q.  Line 14 through line 18, okay?
7       "Question:  And you recall that the man at the top
8   of the gangway told you to hold onto the handrails,
9   correct?
10      "Answer:  I don't remember.  I didn't listen or hear
11  anything."
12      Did I read that correctly?
13      THE COURT:  Counsel, don't ask her if you read
14  it correctly, ask her if she said it.
15      MR. RAUWORTH:  Sure.  Thank you, your Honor.
16  BY MR. RAUWORTH:
17  Q.  That was your testimony in your deposition, wasn't
18  it, Ms. Jain?
19  A.  Yes, sir.
20  Q.  When the man spoke to you, you didn't ask him to
21  repeat himself, did you?
22  A.  Which one are you referring to?
23  Q.  The man that was referred to in the question.
24      THE COURT:  I think you'll have to make it more
25  clear, what your question is.  Even I find it somewhat

Page 46

1  confusing.
2       MR. RAUWORTH: I'm sorry.
3       THE WITNESS: I don't remember, I told you.
4  BY MR. RAUWORTH:
5  Q. So you didn't listen to the man or you didn't hear
6  him, correct?
7       THE COURT: Excuse me. I'm the fact-finder
8  and --
9       MR. RAUWORTH: I beg your pardon, your Honor?
10      THE COURT: She didn't listen to something,
11  maybe, but I don't know what it is she didn't listen to.
12      MR. RAUWORTH: Well, it's to the man speaking to
13  her, but I'll ask it again.
14      THE COURT: Why don't you just ask questions
15  instead of going to the deposition right away. Why
16  don't you just ask the same question you asked before.
17      MR. RAUWORTH: Sure.
18  BY MR. RAUWORTH:
19  Q. As you approached -- well, strike that.
20      As you approached the gangway to leave the Hurricane
21  II, a man spoke to you before you stepped on the
22  gangway, correct?
23  A. You mean while getting down?
24  Q. Just before getting down.
25  A. No.

Page 47

1  Q. No one spoke to you at all?
2  A. I was talking to either my son or with Kusum, my
3  sister-in-law, but with no other people.
4  Q. So you said in this last answer, "I didn't listen or
5  hear anything." You didn't listen to the man that was
6  there, correct?
7       THE COURT: You're assuming a man was there.
8       MR. RAUWORTH: I'm trying to work with her
9  testimony, your Honor, if I may. She's denying it, or
10  she's apparently not remembering it now.
11      THE COURT: You're entitled to put before me the
12  fact that she said something inconsistent before.
13      MR. RAUWORTH: Right.
14      THE COURT: I'll accept the deposition without
15  even asking the witness. But let's see what she
16  remembers now.
17      MR. RAUWORTH: All right.
18  BY MR. RAUWORTH:
19  Q. Ms. Jain, you just told us you were speaking with
20  people in your party, correct?
21  A. Yes.
22  Q. So you're not sure, as you sit here today, that
23  there was no one from the crew at the top of the
24  gangway, are you?
25  A. I didn't talk to any crew. I didn't talk to

Page 48

1  anybody.
2  Q. My question is: You're not prepared to say that
3  there was no crew there at all?
4  A. I didn't see, so I don't know.
5  Q. Okay. Now, as you were on the gangway and falling,
6  you were not holding onto handrails; is that true?
7       MR. CONIARIS: Objection.
8       THE COURT: Overruled.
9       THE WITNESS: The moment I stepped out -- and I
10  couldn't even reach the handles with my arms.
11  BY MR. RAUWORTH:
12  Q. So the answer is you were not holding on; is that
13  correct?
14  A. Yeah. As I put my one step, I couldn't even hold
15  onto the handle. I couldn't reach the handle.
16  Q. You --
17      THE COURT: Obviously she couldn't reach and she
18  wasn't holding on.
19      MR. RAUWORTH: Right.
20  BY MR. RAUWORTH:
21  Q. Now, you testified before that you recall that the
22  deck of the boat on which you were walking was wet,
23  correct?
24  A. Yes.
25  Q. And you testified when Mr. Coniaris was asking you

Page 49

1  questions that the ramp going away from the boat was
2  also wet, correct?
3  A. Yes.
4  Q. So you understood that your shoes were wet from
5  walking on a wet deck, correct?
6  A. Yeah, definitely when I was walking on the wet
7  surface, it's very likely that my shoes would get wet.
8  Q. Okay. And you knew that that day, correct?
9       THE COURT: I don't think she was sitting there
10  thinking about these things. What you're proving, and
11  you are proving it, is that she admits that the deck was
12  wet, and her shoes were on the deck, so her shoes would
13  have to be wet.
14      MR. RAUWORTH: Okay.
15  BY MR. RAUWORTH:
16  Q. And what did you see that made you think that the
17  gangway was wet, Ms. Jain?
18  A. It was pretty windy and sea water was splashing on.
19  And even at that time we had to retire to the cabin
20  because the water was coming on the gangway.
21  Q. The gangway wasn't on the ship while it was at sea,
22  was it, Ms. Jain?
23      THE COURT: How would she know?
24      THE WITNESS: I don't mean gangway, but I mean
25  the area around the ship.

Page 50

1   BY MR. RAUWORTH:
2   Q. Okay. Before you stepped down on the gangway, what
3   is it that made you believe that the gangway was wet?
4   A. I didn't even have time to think so much because the
5   moment I stepped out to go out, I slipped.
6   Q. At the time you approached the gangway, you felt
7   that you could not reach the handrails. Do I understand
8   that correctly?
9   A. As I stepped -- the gangway -- the railings would
10  not even be within my reach -- I slipped.
11  Q. Mr. Coniaris asked you if you attempted to hold onto
12  the rails, and your answer was, "I don't remember";
13  isn't that true?
14  A. Yes, I don't remember. And also, that it didn't
15  even come within my reach.
16  Q. You don't remember or it didn't come within your
17  reach?
18  A. It happened so fast that I don't remember clearly.
19  The whole thing happened within a fraction of a moment.
20  Q. You've told us that holding onto handrails is
21  important to you, haven't you, Ms. Jain?
22  A. Yes. One should hold onto the gang rail [sic] while
23  getting down, and usually I do hold onto them.
24  Q. And you didn't ask anyone for any help before you
25  stepped onto the gangway, did you?

Page 51

1   A. I didn't feel that I would need any help from
2   anybody.
3   Q. You were speaking with your son, correct?
4   A. My son got down before me, and I tried to get down
5   after him. And I was not talking to him while he was
6   getting down, I was talking to him while we were on the
7   deck.
8   Q. Okay. Now, let's take a look at Exhibit 4, if we
9   may, and I'll rest this within your reach, Ms. Jain, and
10  ask you to point out where your body first contacted the
11  gangway as you fell.
12       THE COURT: You mean how far down the gangway?
13       MR. RAUWORTH: To point out where her body first
14  hit the gangway.
15       MR. CONIARIS: I would object to that, your
16  Honor. It's not a complete picture.
17       THE COURT: You mean where she fell was farther
18  down?
19       MR. CONIARIS: No.
20       THE COURT: I mean, I thought this was intended
21  to show me where she fell.
22       MR. CONIARIS: That's correct.
23       THE COURT: Can you make a mark where you fell?
24       THE WITNESS: I might have fallen from there,
25  and I come and rested here. It happened -- here below.

Page 52

1   It happened so fast that I can't even recollect the
2   exact position.
3        THE COURT: Okay. But it was somewhere on that
4   photograph?
5        THE WITNESS: It might have been there at the
6   end of the gangway. I might have fallen there
7   (indicating).
8   BY MR. RAUWORTH:
9   Q. At the bottom, you mean?
10  A. Approximately here.
11       THE COURT: Do you think that's probably where
12  you fell?
13       THE WITNESS: Yeah. I remember that I came from
14  up, I came down here (indicating).
15       THE COURT: All right. Thank you.
16       Can anybody -- can either counsel, or both
17  counsel, tell me in feet how far that is?
18       MR. RAUWORTH: Well, it looks to me where she's
19  pointing out looks to be two feet.
20       THE COURT: No, not what it looks to be. I was
21  just wondering if anybody can tell me accurately.
22  Anyways, okay, I can estimate it as well as you can.
23  BY MR. RAUWORTH:
24  Q. Now, Ms. Jain, you didn't -- you told us in your
25  testimony before that you never placed your left foot

Page 53

1   onto the gangway, correct?
2   A. Could be, because I put one foot on it and the other
3   one must have been in the air.
4   Q. So your left foot never touched the gangway,
5   correct?
6   A. Could be.
7   Q. Let's take a look at Exhibit 3. So you're saying
8   that your right foot came here, correct?
9   A. Yeah, I started from here and I went there.
10  Q. You put your right foot here; is that correct?
11  A. I don't remember. It could be here, it could be
12  there, maybe there.
13  Q. But your right foot was somewhere up at this upper
14  end, correct?
15  A. Yes.
16       THE COURT: You know, I think it would be
17  impossible for the ordinary person to remember where
18  they put their foot as they were stepping onto a
19  gangplank before an accident occurred when there was no
20  reason to think about what foot you're using. So no
21  matter what people bring out, I don't believe it's very
22  trustworthy evidence of what actually happened.
23  BY MR. RAUWORTH:
24  Q. You didn't take any steps on the gangway, though?
25       MR. CONIARIS: Objection. It's ambiguous.

Page 54

1    THE COURT: No, it isn't ambiguous.
2    Would you repeat the question?
3    MR. RAUWORTH: Sure.
4 BY MR. RAUWORTH:
5 Q. You didn't take any steps on the gangway?
6 A. You mean I didn't walk on that?
7 Q. Right. You didn't walk even so far as to touch the
8 rails; is that your testimony?
9 A. Approximately -- you know, I don't remember, but
10 right at the beginning I couldn't even reach the rails.
11    THE COURT: Am I correct in understanding that
12 you believe you slipped right at the top of the gangway?
13    THE WITNESS: Yeah. As far as I think and I
14 remember, I might have fallen down right on the
15 beginning of the gangway.
16    THE COURT: I don't want "I might have." If she
17 doesn't remember, she could say so.
18    THE WITNESS: Okay. I do not remember
19 precisely, but I remember that it was right in the
20 beginning. I didn't walk down the gangway.
21    THE COURT: All right. That's what I want to
22 know.
23 BY MR. RAUWORTH:
24 Q. Are you saying, Ms. Jain, that you stepped on the
25 gangway at the top and then you slid all the way to the

Page 55

1 bottom?
2 A. Yes.
3 Q. I see. Now, your cousin's -- or your husband's
4 cousin, Kusum Jain, was in the courtroom earlier. Do
5 you recall that?
6 A. Yes.
7 Q. You heard her testify, correct?
8 A. Yes.
9 Q. And when you slipped you must have knocked Kusum
10 down?
11 A. As far as I remember, I didn't knock anybody down.
12 Q. You heard Kusum say that she was on the gangway and
13 felt you fall?
14 A. I don't know what she might have felt, but as far
15 as -- it happened so suddenly that I do not remember her
16 position.
17 Q. So you're not remembering -- able to remember that
18 you slid all the way down, correct?
19 A. Yeah. I have slipped and landed over there.
20    THE COURT: You know, in a case of this kind
21 it's unrealistic, in my opinion, to expect the witnesses
22 to have razor-sharp memories about the details. It
23 wouldn't be credible if they did in the middle of an
24 emergency of that kind. And I'm just making that
25 comment. You can't -- because I don't think you can go

Page 56

1 on forever trying to get a precise answer.
2    MR. RAUWORTH: No, your Honor. I'm really just
3 trying to respond to the testimony that she made -- that
4 she herself said about where she fell.
5    THE COURT: That's fair enough.
6 BY MR. RAUWORTH:
7 Q. Now, when you got to the hospital, your only
8 injuries were to your ankle and to your elbow, correct?
9 A. Yes.
10 Q. When you were at the bottom of the gangway you
11 were -- I'm sorry. After you fell you were
12 light-headed, correct?
13 A. Why would I have been light-headed?
14 Q. I'm simply asking if that -- I'm asking you to
15 confirm that that's correct.
16 A. Nothing happened to my head.
17 Q. You felt light-headed, correct?
18 A. No, I didn't feel anything of that type.
19 Q. You reported that to the emergency people who came
20 to help you to go to the hospital, didn't you?
21 A. I don't remember what I said, but when somebody
22 falls in a faraway, different country, one is likely to
23 feel nervous and afraid, and that's what I did.
24 Q. The emergency people took your blood pressure with a
25 cuff before they moved you to the ambulance, didn't

Page 57

1 they?
2 A. (In English) I don't remember it exactly.
3    (Through the interpreter) I don't remember exactly,
4 but they must have done something on me.
5 Q. By the way, when -- your ankle was not bleeding,
6 correct?
7 A. No.
8 Q. You're agreeing with me?
9 A. No. As far as I remember, it was not bleeding.
10 Q. Okay. And the emergency people gave you fluid from
11 a bag through a needle in your arm, correct?
12 A. Perhaps they could have.
13    THE COURT: What's the purpose of this
14 testimony? Is there any dispute about what happened
15 medically?
16    MR. RAUWORTH: Well, actually, I was just about
17 to suggest that we go to sidebar to deal with the issue
18 that Mr. Coniaris dealt with -- or had a motion about.
19    THE COURT: Okay. Let me see you. I don't
20 quite understand.
21    MR. RAUWORTH: Sure.
22    (Discussion at sidebar and out of the hearing of
23 the jury:)
24    MR. RAUWORTH: Your Honor, in the plaintiff's
25 deposition she contradicted a number of the things that

15 (Pages 54 to 57)

Page 58

1  were recorded by the Gloucester EMTs as going on, and
2  I'm trying to get a record as to what she's saying today
3  about that because I think there's some pretty
4  significant inconsistencies. But the reason we're at
5  sidebar on Mr. Coniaris's motion is one of the EMTs
6  noted that she lost control of her bladder, and she is
7  absolutely insistent that that didn't happen. Now, I'm
8  not interested in embarrassing her at all, but this is
9  an element that someone is not likely to forget about.
10      THE COURT: And am I to understand that your
11  purpose in going in to this is to show that her memory
12  wasn't very good or what?
13      MR. RAUWORTH: Yes. Yes.
14      THE COURT: Okay.
15      MR. RAUWORTH: And, your Honor, if I may, I'm
16  not sure of the best way to handle this. We clearly
17  have no need to have discussion about incontinence of
18  urine take place in open court. If we can stipulate to
19  it, that she denies being incontinent -- actually, I can
20  do that with the deposition and we don't need to --
21      THE COURT: Will you stipulate?
22      MR. CONIARIS: I'll stipulate to that, yeah.
23      MR. RAUWORTH: When she was asked, "At some time
24  did you have some difficulty of controlling your urine
25  while the paramedics were there to help you, correct?

Page 59

1      "Answer: No, no, not at all. No. No. No."
2      So I think that's about it.
3      THE COURT: Let me see that. So will you
4  stipulate that --
5      MR. CONIARIS: Yeah, I'll stipulate.
6      THE COURT: Okay. Thank you.
7      (In open court:)
8  BY MR. RAUWORTH:
9  Q. Now, Ms. Jain, let me ask you about some things that
10  relate to the time -- I'm sorry. Let me go back and
11  clarify one thing.
12      Your memory is that there was no rain on the day of
13  this whale watch trip, correct?
14  A. No, there was no rain.
15  Q. Now, when you came to the deposition at my office
16  you were already considerably improved from the time
17  that you were previously in the United States, correct?
18  A. Yeah. The biggest improvement was that I could walk
19  without a walker.
20  Q. And, in fact, you were already back to doing your
21  morning walking from 8 a.m. to 8:30 a.m. each morning,
22  or six mornings a week, correct?
23  A. Yes. As I had mentioned, I used to walk from one
24  hour to one and a half hours, but then I reduced it down
25  to a half-hour to 40 minutes.

Page 60

1  Q. But you had gotten into the routine of 40 minutes by
2  the time we had the deposition, correct?
3  A. Now it's up to that time. It has not improved since
4  then.
5  Q. Okay. And you walk without assistance, correct?
6  A. Yes.
7  Q. Before you came to the United States and had the
8  whale watch trip, you didn't drive a car, correct?
9      THE COURT: I'm sorry. I didn't hear that.
10  BY MR. RAUWORTH:
11  Q. Before you came to the United States and had the
12  whale watch trip, you did not drive a car, correct?
13      THE COURT: Okay.
14      THE WITNESS: Yes.
15  BY MR. RAUWORTH:
16  Q. And you got around because your family had a driver,
17  correct?
18  A. Yeah, we have a driver. And the driver leaves
19  early, so my husband does the drives.
20  Q. And you use the driver to get you to places you
21  needed to go around the city, correct?
22  A. Yes, the driver did.
23  Q. And how much was the driver paid?
24      THE COURT: What's the difference what the
25  driver was paid?

Page 61

1      MR. RAUWORTH: With reference to other elements
2  of mitigation, Judge, a comparison.
3  BY MR. RAUWORTH:
4  Q. I'm sorry. How much is the driver paid?
5  A. The driver, approximately -- we pay him
6  approximately 6 to 7,000 rupees per month.
7      THE COURT: How much is that in dollars, if you
8  know?
9      THE WITNESS: One dollar is, like, 40 rupees.
10      THE COURT: And how many rupees was it?
11      THE WITNESS: 6,000 rupees.
12      THE COURT: Thank you.
13  BY MR. RAUWORTH:
14  Q. And after the whale watch trip, when you came back
15  to India you hired a man to help with testing of the
16  enzymes at the client location, correct?
17  A. Yes, we did, but he was not up to the mark and he
18  was also not sincere, so we were obliged to remove him.
19  Q. And you paid him 10,000 rupees a month, correct?
20  A. Yes, sir.
21  Q. Okay. After he stopped working for you, what did
22  you do to locate someone to accompany your husband for
23  testing at client locations?
24  A. We had another boy, and then we figured out -- my
25  husband figured out that he couldn't perform well, and

Page 62

1   so it wasn't adequate to have him, so we were obliged to
2   remove him also.
3   Q.  How were those people paid, by check?
4   A.  I don't remember exactly because my husband works on
5   the financial side of the business, but it could be
6   through a check or otherwise. I don't know.
7        MR. RAUWORTH: Your Honor, at this time I would
8   like to introduce Defendant's Exhibit 6, which is the
9   plaintiff's responses to the defendant's
10  interrogatories, for the limited purpose only of
11  impeachment. They were previously identified in
12  testimony of the plaintiff in her deposition, and I
13  think they're agreed to.
14       THE COURT: Okay.
15       THE CLERK: That will be Exhibit No. 6, marked
16  and entered.
17       (Exhibit No. 6 was received into evidence.)
18       THE COURT: What did you say it was?
19       MR. RAUWORTH: I'm sorry. It's marked as
20  Defendant's 6.
21       THE COURT: Yes.
22       MR. RAUWORTH: And it is plaintiff's responses
23  to defendant's first interrogatories.
24       THE COURT: Okay.
25  BY MR. RAUWORTH:

Page 63

1   Q.  By the way, the measurements that the young men --
2   strike that.
3        The young men that we were just talking about that
4   you hired, they assisted in testing, correct?
5   A.  Yeah. Not so much for testing, but we make him
6   stand there so he would watch and see.
7   Q.  So he would --
8        MR. RAUWORTH: I'm sorry?
9        THE INTERPRETER: Watch and see.
10  BY MR. RAUWORTH:
11  Q.  Watch and see what?
12  A.  The clothes that were being processed.
13  Q.  All right. Now, you indicated that your husband
14  takes care of the financial aspects of the business?
15  A.  Yes.
16  Q.  Let me ask you to take a look, if you would, please,
17  at Defendant's Exhibit 6. On page 6, and at the bottom
18  of the page, starting with the answer to Interrogatory
19  No. 8, and then going on to page 7 before Interrogatory
20  No. 9, I'd ask you to take a look at that.
21  A.  Which one do you want me to look at, sir?
22  Q.  At the bottom of page 6 --
23       THE COURT: Number 8 and going to Number 9.
24  BY MR. RAUWORTH:
25  Q.  Stopping at Number 9.

Page 64

1        (There is a pause.)
2        THE WITNESS: I don't understand. What is this?
3        THE COURT: These are -- perhaps if you asked a
4   question, we could move along.
5        MR. RAUWORTH: Sure.
6   BY MR. RAUWORTH:
7   Q.  Let me ask you to turn to the very last page of the
8   document. The very last page. Do you see your
9   signature there?
10       THE COURT: Oh, come on. What is this? Is this
11  something she signed?
12       MR. RAUWORTH: Yes, it is, your Honor.
13       THE COURT: Okay. Why don't you just ask her if
14  she signed it.
15       MR. RAUWORTH: Sure.
16  BY MR. RAUWORTH:
17  Q.  You signed that, didn't you, Ms. Jain?
18  A.  Yes.
19  Q.  So the material on page 6 and 7 were your answers
20  about the finances of the business, correct?
21       THE COURT: I'm sure you could get a stipulation
22  on this. I mean, I don't think it's necessary to waste
23  time like this.
24       MR. RAUWORTH: I think the next question may
25  help clarify the point.

Page 65

1        THE WITNESS: Is it my deposition?
2   BY MR. RAUWORTH:
3   Q.  No, it's a paper that you signed, Ms. Jain. You
4   recognize your signature, correct?
5   A.  Yes.
6   Q.  That's information that --
7   A.  The information regarding the finances might have
8   been given by my husband, and I have signed on it.
9   Q.  Correct.
10       THE COURT: But you have no reason to believe
11  they're not correct, do you?
12       THE WITNESS: Yeah, this must be correct.
13       THE COURT: Okay.
14  BY MR. RAUWORTH:
15  Q.  You didn't participate in calculating the amounts of
16  the loss of your business, correct?
17  A.  I have a clear idea about how much loss or gain we
18  are making, I have a general idea, but I do not do that
19  type of calculation, that is done by my husband.
20  Q.  And who prepares the tax papers for the business?
21  A.  We have our CA.
22  Q.  I'm sorry?
23  A.  Our CA.
24       THE INTERPRETER: "CA" is charter accountant.
25  BY MR. RAUWORTH:

Page 66

1  Q.  I see. So the business makes filings with taxing
2  authorities, correct?
3  A.  Yes.
4  Q.  Does the business prepare financial statements?
5      THE INTERPRETER: Sorry?
6  BY MR. RAUWORTH:
7  Q.  Does the business prepare financial statements?
8  A.  Yes, it's prepared.
9  Q.  And we don't have any of those, do we?
10 A.  I don't know   You might have that.
11 Q.  You can't tell us the actual profit or loss for the
12 business year of 2005 or 2006, can you?
13 A.  Yeah, that must be, because my business papers are
14 there.  And since I'm under oath, I would definitely
15 tell the truth.
16 Q.  I beg your pardon?
17     MR. RAUWORTH: I'm sorry. Mr. Interpreter, I
18 didn't hear what you said.
19     THE INTERPRETER: No, that's what she said.
20     MR. RAUWORTH: I didn't hear what you said.
21     THE INTERPRETER: She said, "Yes, my business
22 papers should be here.  And since I'm under oath, I will
23 definitely be speaking the truth."
24 BY MR. RAUWORTH:
25 Q.  But you can't tell us the profit or loss for the

Page 67

1  business in the fiscal year of 2005-2006, can you?
2  A.  I haven't done this.
3  Q.  The business had results in the financial year after
4  you had your accident, correct?
5  A.  Yes.
6  Q.  And the business submitted tax materials to the
7  taxing authorities, didn't it?
8  A.  Yeah, they have done it, but my business has been
9  slowly, slowly going to loss.
10 Q.  So you can't tell us what the results were, a profit
11 or a loss, in the year of 2005-2006, correct?
12 A.  The profit had come to a minimum, and slowly, slowly
13 it's diminishing.  And this year we have sustained a
14 loss.  Now I become dependent on my husband's business.
15 Q.  You haven't provided us with any of the -- any
16 papers that would show the business performance since
17 your accident, correct?
18     MR. CONIARIS: Objection.
19     THE COURT: Overruled.
20 BY MR. RAUWORTH:
21 Q.  You may answer, Ms. Jain.
22 A.  What?
23     THE COURT: I think I understand the picture.
24     MR. RAUWORTH: Okay. Your Honor, let me just
25 provide the Court with a copy of this interrogatory

Page 68

1  answer.  This material on the top of page 7 is basically
2  all we got.
3      THE COURT: I understand what your point is.
4      MR. RAUWORTH: And as a result --
5      THE COURT: Well, the question, then, is whether
6  their proof is sufficient, and you've raised a serious
7  question, but I don't think --
8      I understand, and the witness can tell me if I'm
9  not correct, that you don't pretend that you prepared
10 the statements about the financial condition of your
11 business -- or prepared the tax returns; is that right?
12     THE WITNESS: I never prepared them.
13     THE COURT: So what is the source of your
14 information that makes you say that you've suffered
15 great losses?
16     THE WITNESS: I have that much knowledge that I
17 know that we are losing in the business.
18     THE COURT: Where does your knowledge come from?
19     THE WITNESS: Yeah, because we did not have
20 recovery of the sales process.  And we had lost contacts
21 and I could not try to make my sales.  So from that I
22 can understand that we're losing the business.
23     THE COURT: I'm not asking you to tell me what
24 you think caused your losses, I'm asking you to tell me
25 how you found out.  What figures do you have that you

Page 69

1  know; what documents do you look at?
2      THE WITNESS: (In English) Jeffrey, you have the
3  papers.
4      MR. CONIARIS: I'm sorry. Can you talk to the
5  judge if you have something to say?
6      THE WITNESS: Sir, could you -- would you please
7  like to ask him if our papers were submitted to him or
8  not?  I'm not aware.
9      THE COURT: Would you repeat that?
10     THE INTERPRETER: Yeah. She's requesting you,
11 sir, if you could kindly ask her lawyer if he has
12 received the papers regarding the documents that you're
13 asking for.  "I'm not aware."
14     THE COURT: Are there any documents on this?
15     MR. CONIARIS: Yes.
16     MR. RAUWORTH: They've not been provided to me.
17 That's the problem.
18     MR. CONIARIS: Your Honor, I apologize, but
19 she's got quite an extensive collection of documents she
20 could go over if you wanted to inquire about income.
21     THE COURT: I don't want go over it.
22     MR. CONIARIS: No. No, I mean --
23     THE COURT: It's your proof.  If you think that
24 it establishes something, it's your responsibility to
25 put them in evidence and give them to counsel so he can

Page 70

```
 1    cross-examine on them.
 2         MR. RAUWORTH: Well, your Honor, I would move
 3    that they not be permitted because they've never been
 4    disclosed.
 5         THE COURT: Yeah. I'm afraid I can't. I'll
 6    have to let it rest the way it is.
 7         MR. RAUWORTH: And, your Honor, for the record,
 8    I would like to put on the record a motion to strike
 9    this financial testimony because --
10         THE COURT: No, I don't think I'll strike it, I
11    just think it's very, very weak.
12         MR. RAUWORTH: Thank you.
13    BY MR. RAUWORTH:
14    Q. Let me hand you, Ms. Jain, a copy of -- I'm sorry --
15    the original of what was Exhibit 3 in your deposition
16    and is marked here at trial as Defendant's Exhibit 7.
17    And this was something that was provided to us as an
18    application for travel insurance before this trip. Let
19    me ask you to put these other things to one side, and
20    take a moment to familiarize yourself with Exhibit 7.
21         (Pause.)
22         MR. RAUWORTH: I would offer this to the Court
23    in case you would like to have a look at the document as
24    we review it.
25         THE COURT: Yes.
```

Page 71

```
 1    BY MR. RAUWORTH:
 2    Q. You've had a chance to look that over, Ms. Jain?
 3    A. Yes.
 4    Q. All right. And at the bottom is your signature,
 5    correct?
 6    A. Yes.
 7    Q. And that reflects the date of the 29th day in the
 8    seventh month of 2004?
 9    A. Yes.
10    Q. And this was an application for travel insurance for
11    the trip that brought you to the United States when you
12    took the whale watch voyage, correct?
13    A. Yes, sir.
14    Q. Now, it's a little faint, but up at the top left
15    there, there are some numbered lines. Do you see those?
16         THE COURT: Is this Exhibit 3?
17         MR. RAUWORTH: I beg your pardon, your Honor,
18    that's Exhibit 7 in the trial. I didn't get the sticker
19    on. I'll mark it accordingly.
20         THE COURT: Still, I can't understand what
21    you're referring to.
22         MR. RAUWORTH: Sure. What I'm alerting the
23    witness to is these lines. I just want to point out --
24         THE COURT: Okay.
25         MR. RAUWORTH: -- have her select one of them.
```

Page 72

```
 1    BY MR. RAUWORTH:
 2    Q. On Line No. 4, and the copy we have is a little
 3    faint, it says, "Proposer's actual occupation
 4    (specify)," correct? That's what it says, correct?
 5    A. Yes.
 6    Q. And this was a paper that you filled out before you
 7    had your accident, correct?
 8    A. Yes.
 9    Q. And on the line where it says, "Proposer's actual
10    occupation," you said you were a housewife, correct?
11    A. Yeah, I am housewife, because the home come first.
12    We maintain our home first and then look after the
13    business.
14    Q. Uh-huh. You didn't say "housewife and
15    businesswoman," did you?
16         THE COURT: It's a different culture, you know.
17         THE WITNESS: Yeah. I mean, we refer ourselves
18    as housewife first, and I haven't mentioned that I'm a
19    businesswoman.
20    BY MR. RAUWORTH:
21    Q. Uh-huh. And it's important in India when making
22    application for insurance to tell the truth, isn't it?
23    A. Yeah. I mean, whatever I fill in is all true. And
24    I am also housewife, and along with that, I do look
25    after my business.
```

Page 73

```
 1         MR. RAUWORTH: That's all the questions I have
 2    at this time, your Honor.
 3         THE COURT: Thank you.
 4         I'll return this to you, George.
 5         MR. CONIARIS: I don't have any questions, your
 6    Honor.
 7         THE COURT: Very good. Thank you, ma'am.
 8    You're excused.
 9         (The witness is excused.)
10              * * *
11         C E R T I F I C A T E
12
13         I, Marcia G. Patrisso, RPR, CRR, Official
14    Reporter of the United States District Court, do hereby
15    certify that the foregoing transcript constitutes, to
16    the best of my skill and ability, a true and accurate
17    transcription of my stenotype notes taken in the matter
18    of Civil Action No. 05-11267-MEL, Madhu Jain v. A Cape
19    Ann Whale Watch, Inc.
20
21
22         /s/ Marcia G. Patrisso
              MARCIA G. PATRISSO, RPR, CRR
23            Official Court Reporter
24
25
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11267-MEL

|  |  |
|---|---|
| )<br>MADHU JAIN, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>A CAPE ANN WHALE WATCH, )<br>INC., )<br>)<br>Defendant. )<br>) | TRANSCRIPT OF TRIAL PROCEEDINGS<br>TESTIMONY OF JOHN CULVER<br><br>(Excerpt) |

BEFORE:  The Honorable Morris E. Lasker,
Senior United States District Judge

John J. Moakley United States Courthouse
Courtroom No. 20
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, June 12, 2007

Marcia G. Patrisso, RPR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3507
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

Page 2

```
1   APPEARANCES:
2
    LAW OFFICE OF JEFFREY C. CONIARIS
3   By: Jeffrey C. Coniaris, Esq.
    84 State Street, 6th Floor
4   Boston, Massachusetts 02109
    On behalf of the Plaintiff
5
    CETRULO & CAPONE LLP
6   By: Michael J. Rauworth, Esq.
    Two Seaport Lane, 10th Floor
7   Boston, Massachusetts 02210
    On behalf of the Defendant
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1            I N D E X
2
       Direct  Cross  Redirect  Recross
3
4   WITNESSES FOR THE
    PLAINTIFF:
5
    JOHN CULVER
6
    By Mr. Coniaris    4       66
7   By Mr. Rauworth            25
8
9
10          E X H I B I T S
11  Exhibit No.   Description        In Evd.
12
    20    Photograph          29
13
    21    Photograph          60
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1        MR. CONIARIS: Your Honor, for my next witness,
2   I'd like to call John Culver.
3           JOHN CULVER, sworn
4       THE CLERK: Please take the stand, have a seat.
5   Give the Court your full name, spelling your last.
6        THE WITNESS: Thank you. My name is John
7   Culver, C-U-L-V-E-R.
8           DIRECT EXAMINATION
9   BY MR. CONIARIS:
10  Q.  Where do you presently reside, Mr. Culver?
11  A.  Seabrook, New Hampshire.
12  Q.  And who do you reside with?
13  A.  My wife.
14  Q.  How long have you been married?
15  A.  Fifty-eight years? Fifty-eight years.
16  Q.  I don't want to get you in any trouble today, sir.
17      And are you presently employed?
18  A.  Well, I'm in consulting.
19  Q.  What kind of consulting do you do?
20  A.  Marine engineering and quality engineering
21  consulting.
22  Q.  And can you describe briefly your educational
23  background?
24  A.  I graduated from the Massachusetts Maritime Academy
25  in 1947; then I attended George Washington University in
```

Page 5

```
1   Washington, D.C., and American University in Washington,
2   D.C., to obtain my degree, a bachelor of science in
3   Marine Engineering.
4   Q.  Okay. Have you taken --
5   A.  Then I've had several courses in the Navy:
6   Industrial College of the Armed Forces, Naval War
7   College of Newport, several --
8        THE COURT: Is this information available in
9   writing?
10       MR. CONIARIS: Yes. We have his resume, your
11  Honor.
12       THE COURT: Good. Then I won't have to take
13  notes on it.
14      Go ahead, sir.
15       THE WITNESS: Thank you.
16  BY MR. CONIARIS:
17  Q.  Am I cutting you off?
18  A.  No. I could go on, but that's enough.
19       THE COURT: We want to know all of your
20  background.
21       THE WITNESS: Yes, sir.
22  BY MR. CONIARIS:
23  Q.  Can you tell us places where you've taken -- where
24  you've either taken courses or been instructed?
25  A.  Oh, sure. I took courses at the Naval War College
```

1  in Newport, Rhode Island; the Industrial College of the
2  Armed Forces in Washington, D.C.; Allison Division of
3  General Motors Gas Turbine school; and then after I
4  retired from the Navy, I taught --
5      THE COURT: Excuse me. How long were you in the
6  Navy?
7      THE WITNESS: Thirty-eight years, sir.
8      THE COURT: And what were -- what was your line
9  of work?
10     THE WITNESS: I was an engineering duty officer.
11 Well, first I was a line officer. When I first went in
12 the Navy I was a line officer, and I was on several
13 ships as a line officer in the Korean fracas.
14     THE COURT: And how long were you on engineering
15 duty in the Navy?
16     THE WITNESS: Engineering duty in the Navy, I
17 changed my designator in 1957 to engineering duty.
18     THE COURT: And how long did you stay?
19     THE WITNESS: Until I was retired in 1985.
20     THE COURT: So it was 28 years?
21     THE WITNESS: Yes, sir.
22     THE COURT: All right. Thank you.
23 BY MR. CONIARIS:
24 Q.  Can you -- you served on ships?
25 A.  Oh, yes. Twelve ships I served on. And I was in

1  the shipbuilding and ship repair business. And there
2  were a number of ships that we built. I was at the Navy
3  office down in Quincy, at Bethlehem Steel Shipyard; and
4  then I was there a so when General Dynamics ran the
5  shipyard, and we've built I don't know how many ships.
6  I could probably give you an estimate. Probably around
7  25 ships or something like that. And I was involved in
8  the engineering part of piping design and -- for a
9  while, and then I become the quality assurance manager
10 on the waterfront trying to put the ships together.
11     THE COURT: Where was that?
12     THE WITNESS: Say it again, sir?
13     THE COURT: I'm sorry?
14     THE WITNESS: What did you say?
15     THE COURT: Where were you quality assurance
16 manager?
17     THE WITNESS: At the General Dynamics -- well, I
18 worked for the U.S. Navy Department.
19     THE COURT: Yes. But what location?
20     THE WITNESS: General Dynamics Shipyard, Quincy,
21 Massachusetts.
22     THE COURT: All right. Thank you.
23 BY MR. CONIARIS:
24 Q.  Have you testified at a deposition within the past
25 four years?

1  A.  I've had depositions, yes.
2  Q.  How many would you estimate that you've had?
3  A.  Two depositions.
4  Q.  And have you testified in any trials?
5  A.  Not really. I've been involved in several
6  engineering --
7  Q.  Would you like a glass of water, sir?
8  A.  Maybe that would be a good idea.
9      THE CLERK: Right there.
10     THE WITNESS: It's right here, I think.
11     THE CLERK: Yes. All set.
12     THE COURT: Thank you.
13     THE WITNESS: I've got a frog in my throat.
14     Where were we?
15 BY MR. CONIARIS:
16 Q.  I think we were at the shipyard. In terms of
17 shipbuilding, what were your duties?
18 A.  Well, my duties varied, but I was first the head of
19 the Piping Design Group for the Navy at the Quincy yard,
20 but when Bethlehem Steel had the yard. And that's when
21 we built the Long Beach, it's a nuclear cruiser and
22 nuclear destroyer; Bainbridge; destroyers like McDonough
23 and Mullinex; submarines: Sunfish and Whale.
24     And at that time I was in the piping design
25 business, the design group, the Navy office at Quincy.

1  And when the General Dynamics Shipyard assumed the yard
2  or bought the yard or whatever they did, then they got
3  involved in building many more ships. At that time I
4  was pulled in as the head of the quality assurance
5  department and responsible for inspection/design changes
6  for all of the things that go on in building a ship.
7      That was a very challenging job, by the way.
8  The responsibilities were many. I had responsibility
9  for the process control section, responsibility for the
10 design section, responsibility for the inspection
11 department at that time. So they built two twin
12 ammunition ships; southern replenishment oilers for the
13 Navy; four landing ship docks for the Navy; two
14 submarine tenders for the Navy. Do you want the names
15 of all these or is that --
16 Q.  No, we have the resume.
17     Have you authored any books or articles?
18 A.  Yes, I've authored books.
19 Q.  What books?
20 A.  I authored a book "Ships of the U.S. Merchant Fleet"
21 back in 1969, '70. It still sells. And I also authored
22 a book on electric drive propulsion for ships, which was
23 recently published. And I've written numerous technical
24 papers for the American Society of Naval Engineers. And
25 I wrote several papers, I don't know if you want -- I

Page 10

1    think most of those are in my resume, the papers that
2    I've written.
3    Q. Can you brief y go over them?
4    A. Well, I wrote one when I was at the Bureau of Ships
5    years ago, I wrote the paper "The Series-Parallel
6    Turbine" on the destroyers and aircraft carriers that
7    they were building at the time, the Saratoga and the
8    Ranger and the Constellation, some of those; and the
9    destroyers that we built at Quincy -- I wasn't at Quincy
10   at the time, I was in Washington, then, when I wrote
11   that paper.
12       Oh, I don't know. I can't remember all the other
13   ones that I've written, but there's been a few more that
14   I've written. I wrote the paper -- after the General
15   Dynamics business, General Dynamics closed the shop down
16   there in Quincy --
17       THE COURT: When did they do that?
18       THE WITNESS: Oh, gosh. That was in 1970 --
19       THE COURT: Long ago? Okay.
20       THE WITNESS: Yeah. And I went as the quality
21   assurance manager for the supervisor of shipbuilding,
22   U.S. Navy in Boston. Here in Boston. And we were --
23   the office was at 656 Summer Street over here. And I
24   was a quality assurance chief for that operation. We
25   had 14 shipyards from Portland, Maine, to Newport, Rhode

Page 11

1    Island. There were several of them right here in
2    Boston, which they're not here anymore. They kind of
3    dried up and went home, I guess. And that was ship
4    repair work where ships would come in --
5    availabilities -- and we would set up the availability
6    with the contractor.
7        I didn't write the contracts but I was responsible
8    for making sure that the people that were doing the work
9    did it according -- in accordance with Navy
10   specifications and all that kind of thing. So that
11   worked out the pretty well. It was a pretty good job
12   and a very active job. And I went on many ships during
13   that time and went up many gangplanks.
14   BY MR. CONIARIS:
15   Q. Let me ask you: Have you ever got any commendations
16   for anything that you've ever done, or any medals?
17   A. Oh, yes. Yes.
18   Q. Can you explain?
19   A. I received the Navy Meritorious Service Medal for
20   setting up the quality assurance program, the Naval Sea
21   Systems Command in 1982 -- '82. Yeah, in '82. I
22   received the Navy Commendation Medal for setting up the
23   repair facility in Newport, Rhode Island, with the
24   Repair Barge 26 where we fixed ships for the Navy down
25   there in Newport, Rhode Island.

Page 12

1        THE COURT: Were you a naval officer or were you
2    a civilian?
3        THE WITNESS: I was a naval officer. It was
4    split: Some of the jobs I was a naval officer and some
5    I was a civilian.
6        THE COURT: What was the highest rank you
7    achieved?
8        THE WITNESS: I achieved Captain 06.
9        THE COURT: 06?
10       THE WITNESS: Yes.
11       THE COURT: What do you mean by "06"?
12       THE WITNESS: That's the pay grade, 06. A
13   captain in the Army, that's not the same as a captain in
14   the Navy.
15       THE COURT: Oh, I know. I was a captain in the
16   Army. I didn't have any ships under me.
17       THE WITNESS: No, no ships under you? Okay.
18       And let's see. Well, I -- the Korean Service
19   Medal with three stars and the United Nations Service
20   Medal. I was in Korean action. I was a line officer,
21   then, on board ships.
22   BY MR. CONIARIS:
23   Q. What did you do there?
24   A. Well, I first was on the USS Gull, the AMS-16, which
25   is a minesweeper, north of the 38th parallel in areas

Page 13

1    like Hung Nam and Wanson and San Soo Gap and the West
2    Coast of Chinnapo sweeping mines: contact mines,
3    acoustic mines and magnetic minus. I was on that ship
4    for -- I was on that ship as chief engineer, by the way,
5    but I also had to stand bridge watches on that ship.
6        And the captain of the ship, oh, about two months or
7    so after I was on there, he -- his lung collapsed, and I
8    was the next senior officer onboard the ship, so I was
9    designated as a commanding officer of the ship.
10       After that tour I went on -- back to San Diego to
11   pick up the destroyer, the USS Harry E. Hubbard DD-748,
12   and we again proceeded back to WestPac, which it was
13   called in those days, Western Pacific area. I was a
14   main propulsion assistant on that ship. And we had
15   diamond plate floor plates in the engine room.
16       On that ship we served Task Force 77. We left San
17   Diego with three other destroyers and two aircraft
18   carriers and went to Casper 77 off the East Coast of
19   Korea and we served as the screening ship and also as a
20   shore bombardment ship on the East Coast of Korea.
21       THE COURT: This is very interesting, but should
22   we get --
23       MR. CONIARIS: Yes. I'm sorry, your Honor.
24   Absolutely.
25   BY MR. CONIARIS:

Page 14

1  Q. Do you have any licenses?
2  A. Oh, yes, I do. That's what I kind of thought the
3  questions you were going to ask me would be, rather than
4  my seagoing career. But anyway, yes, I have a chief
5  engineer's license, the United States Merchant Marine,
6  issued by the United States Coast Guard; I have a
7  professional engineer's license, P.E., they call it, in
8  the state of Massachusetts; a professional engineer's
9  license, P.E., in the state of California. The
10 Massachusetts license is mechanical engineering and the
11 California license is quality engineering. I did have
12 one in New Hampshire but I let that one expire.
13 Q. Okay. Thank you, sir. Let me run way back here.
14 I'm going to show you a blown-up photograph marked
15 Plaintiff's Exhibit No. 3. Can you tell me what that
16 depicts?
17 A. That's an eight-foot scaffolding used in the
18 horizontal plane of buildings and things like that.
19 Q. Okay. And its present use here is as a gangway?
20 A. No, it's not. It's scaffolding.
21 Q. This is not a gangway?
22 A. No. A gangway is the place in the ship where the
23 gangplank is put. On the left top there, there's a
24 break in the railing. That's the gangway. The
25 gangplank is the object that goes from the ship to the

Page 15

1  shore. In this case it was a barge, I think.
2  Q. And you're familiar with gangways and gangplanks?
3  A. I am definitely familiar with gangways and
4  gangplanks.
5  Q. Pointing up here to these objects here, can you tell
6  me what those are?
7  A. Well, they're clamps that hold the vertical
8  stanchions and the horizontal stanchions in a
9  specification for a gangplank that's unsatisfactory.
10 It's supposed to be straight with no interruptions at
11 all for the people that are using those handrails.
12 Q. Okay. Can you tell us anything else about this in
13 terms of, for example, right here I notice -- can you
14 tell me what is going on right there?
15 A. A transition plate.
16    MR. RAUWORTH: May I see it, please?
17    THE COURT: You're pointing to the lower left
18 part of the photograph?
19    THE WITNESS: Is that the transition plate
20 you're talking about?
21    MR. RAUWORTH: Can I see where counsel is
22 pointing?
23    MR. CONIARIS: Right here.
24    THE WITNESS: I can't really make it out. I'm
25 sorry.

Page 16

1     THE COURT: What is the question?
2     MR. CONIARIS: I was going to ask him if there
3  is a transition plate there.
4     THE WITNESS: No, there isn't.
5     MR. RAUWORTH: Objection. I'd suggest the
6  photograph isn't able to depict that, and the photograph
7  is unclear.
8     THE COURT: That's for cross-examination.
9     What do you call it, the transition?
10    THE WITNESS: It's the transition plate.
11 There's a plate that goes from the deck of the ship to
12 the top of the gangplank.
13    THE COURT: Okay.
14    THE WITNESS: If it wasn't there, there's a
15 step --
16    THE COURT: What you're saying at the moment:
17 You don't see one, right?
18    THE WITNESS: I don't see one in that picture.
19    THE COURT: Okay.
20    THE WITNESS: What else did you say? Do you
21 want me to saying anything else about that?
22 BY MR. CONIARIS:
23 Q. Let me grab my notes, sir. I'm sorry, I didn't
24 bring them up with me.
25    Okay. You mentioned a handrail?

Page 17

1  A. It's not a continuous one, either. It should wrap
2  around on the top so people can grab ahold of it so they
3  could get onto the gangplank.
4  Q. And I have a couple of photographs with me that I'm
5  going to show you, if that's okay. And I want you to
6  tell me what these depict. I have them someplace.
7     (Pause.)
8     MR. CONIARIS: Excuse me.
9     MR. RAUWORTH: Your Honor, I'm going to move to
10 strike that last comment about wrapping around the end.
11 There's no disclosure to that effect coming from this
12 witness.
13    THE WITNESS: What?
14    THE COURT: I'm afraid I don't understand the
15 point.
16    MR. RAUWORTH: Well, the plaintiff was required
17 back in March of 2006 to make a disclosure of what the
18 expert was going to testify about.
19    THE COURT: All right. For the record, you're
20 entitled to make that objection. I can't rule on it
21 because I don't know what the disclosure was. I'd have
22 to compare it at a later date.
23    MR. RAUWORTH: Understood.
24 BY MR. CONIARIS:
25 Q. Can you tell us anything else that you've observed

Page 18

1  about this picture?
2       MR. RAUWORTH: Objection. That's open-ended.
3       THE COURT: Anything else? It's blue.
4       MR. CONIARIS: Okay. Sorry, your Honor.
5  BY MR. CONIARIS:
6  Q. Captain Culver, I notice that this is -- this object
7  here is at an angle?
8  A. Yup.
9  Q. Can you approximate that angle?
10 A. Well, I'd say it's probably 10 to 15 degrees, by the
11 looks. That's the standard for gangplanks, is 8
12 degrees. That looks like -- that looks like more than 8
13 degrees. And, also, there's a nameplate on there that
14 does not have the allowable angle, which is required on
15 a gangplank. The nameplate is supposed to have the
16 maximum angle that it's supposed to be used for -- or
17 at.
18      THE COURT: Are you -- as a landlubber, I have
19 to ask you in landlubber terms. Are you saying this is
20 steeper or not as steep as it should have been?
21      THE WITNESS: Steeper. Steeper than it should
22 have been.
23      MR. CONIARIS: Thank you.
24 BY MR. CONIARIS:
25 Q. Are you familiar with diamond plate -- yes?

Page 19

1  A. I've stood on many.
2  Q. Okay.
3  A. They use -- basically, they're used in engine rooms,
4  in the marine applications, anyway. And they're used as
5  a -- if it was a solid piece of aluminum or steel, it
6  would be pretty slippery, so these diamond plates are
7  put on there for decreasing the area that your shoe
8  feels when you're standing on the plate. So it
9  decreases the slipability or whatever you want to call
10 it. But it's really not a nonskid thing, it's just
11 something that gives a little more traction on your
12 shoes when you're walking around those things.
13 Q. Do engine rooms ever get wet?
14 A. Well, not as a general rule. Once in a while
15 there's a steam leak or a leak of some flange or
16 something like that -- yes, they get wet -- or an oil
17 leak or something like that. Sure, they get wet, but
18 they get cleaned up pretty quickly.
19 Q. Is diamond plate used on gangplanks, to your
20 knowledge?
21 A. No, not to my knowledge.
22 Q. Do you know why it's not used?
23 A. Well, I'm not sure why it's not used. I know it is
24 used, but I'm not sure why that isn't used except that
25 it's a non -- it's not a nonskid application.

Page 20

1  Q. Okay.
2       THE COURT: When you say it's not used, would
3  you go so far as to say you never observed such a
4  material used -- let me start again -- that you never
5  observed the diamond plate used on a gangplank?
6       THE WITNESS: That's correct.
7       THE COURT: Okay.
8       THE WITNESS: In my experience.
9  BY MR. CONIARIS:
10 Q. Okay. You've had experience with diamond plate in
11 engine rooms?
12 A. Right. They're used throughout the second level in
13 an engine room where the forward platform is.
14 Q. Does diamond plate behave any differently in terms
15 of traction if it's wet or dry?
16 A. Absolutely.
17      MR. RAUWORTH: Objection. Competence and lack
18 of any disclosure. There's no suggestion that this
19 individual has got any ability to --
20      THE COURT: All right. Decision is reserved.
21 Would you answer the question?
22      THE WITNESS: What was the question?
23 BY MR. CONIARIS:
24 Q. When it gets wet, is there any change in traction?
25 A. Oh, absolutely. I mean, that's pretty common sense.

Page 21

1  Q. Okay. Referring to this exhibit here, Captain
2  Culver, which is marked Exhibit 4, can you tell me what
3  that depicts?
4  A. That shows the gangway, which is the area where the
5  gangplank is inserted. It's chained; it doesn't have --
6  it has quite a reach from the step to the rail. And a
7  normal gangplank would have probably a circular area of
8  piping going down there for the person or whoever --
9       THE COURT: You said it's quite a reach from --
10 would you tell me from what place to the other place,
11 what the names of those places are?
12      THE WITNESS: This is the gangway here --
13      THE COURT: Right.
14      THE WITNESS: -- and the gangplank is
15 inserted --
16      THE COURT: Is what you walk on?
17      THE WITNESS: Is what you walk on.
18      THE COURT: Okay.
19      THE WITNESS: And this is a step. This is
20 higher than the deck. This plate here is higher than
21 the deck.
22      THE COURT: Right.
23      THE WITNESS: So you have to step up onto this
24 gangplank. In a normal design of a gangplank, this
25 would be a curved member coming down so that the

Page 22

```
 1    individual could grab ahold of that and step up on the
 2    step.
 3         MR. RAUWORTH:  I'll renew the previous
 4    objection, your Honor, by reason of nondisclosure.
 5         THE COURT:  All right.
 6    BY MR. CONIARIS:
 7    Q.  Just a couple of questions, Captain Culver.  What
 8    about the height of these?  Can you tell or is that too
 9    hard to judge?
10    A.  You mean the height of what, the rails?
11    Q.  Yeah, the top rails.
12    A.  I couldn't -- I could guess, but I don't know.
13    There's a requirement for that in gangway design or
14    gangplank design.  There's a requirement for that, and I
15    forget what it is, offhand.  But it is an
16    inch-and-a-half-diameter tubing that they're supposed to
17    use, and that's probably above that on there, but I
18    can't tell from the picture how high it is.
19    Q.  Are there any alternate, sir, surfaces that could be
20    used instead of the diamond plate that would give better
21    traction?
22    A.  The normal gangplank uses what they call a nonskid
23    material, or the Navy uses a grading --
24         THE COURT:  Excuse me.  What is a nonskid
25    material --
```

Page 23

```
 1         THE WITNESS:  A nonskid material --
 2         THE COURT:  -- made out of?
 3         THE WITNESS:  A quick definition -- not a
 4    definition, but a quick analogy is you take a bucket of
 5    paint and you throw a lot of sand in it, and then you
 6    apply the paint with the sand on whatever.  And when
 7    that dries, you have a sandpaper effect, so when your
 8    shoes come in contact with it, it grabs your shoe or the
 9    shoe grabs the sand.
10         THE COURT:  Is there a regular product
11    manufactured of that kind?
12         THE WITNESS:  Yes, sir, there is.
13         THE COURT:  You just don't happen to remember
14    the name of it or what?
15         THE WITNESS:  No, I don't.  Several paint
16    companies, I'm sure, put that out.  I could find out
17    but --
18         THE COURT:  All right.  To give me a feel of the
19    situation, would it be similar to the asphalt shingles,
20    for example, that are used for roofing?
21         THE WITNESS:  Yes, something like that.  Yes.
22    Yes, it would have a grain to it, a rough surface.
23         And then the other thing is, on the grading, the
24    Navy requirements and the Merchant Marine, too, they put
25    batons across the grading, maybe, probably, 10, 12
```

Page 24

```
 1    inches apart, and they're secured, welded onto the
 2    grading.
 3         THE COURT:  What material would the batons be
 4    made of?
 5         THE WITNESS:  It could be aluminum or steel.
 6    And they're welded on and --
 7         THE COURT:  Flat?  Flat?  Are they flat things
 8    or what?
 9         THE WITNESS:  No, they're -- well, they're
10    usually U-shaped --
11         THE COURT:  I see.
12         THE WITNESS:  -- with the flat part of the U
13    being welded onto the grading.  So you have a surface
14    where you can -- your foot can rest on when you're going
15    down or coming up the gangplanks.
16    BY MR. CONIARIS:
17    Q.  Now, I notice that on the side of this ship there
18    are -- it looks like little windows.  What are those?
19    A.  Well, those are just drain holes for water on the
20    deck.
21    Q.  Would it be a common occurrence on a ship to get
22    water on the deck?
23    A.  Well, it's --
24         THE COURT:  I'll take judicial notice of it.
25         MR. CONIARIS:  Okay.  That's all I have.
```

Page 25

```
 1         THE COURT:  If it rains, it sprays.
 2         THE WITNESS:  Yeah.  As water comes over, it
 3    takes over the bow, whatever, sure.  That's what those
 4    are for, is to drain water off the deck of the ship.
 5         MR. CONIARIS:  Thank you.  That's all I have.
 6    Mr. Rauworth probably has some questions for you.
 7         THE COURT:  Okay.
 8              CROSS-EXAMINATION
 9    BY MR. RAUWORTH:
10    Q.  Good morning, Mr. Culver.
11    A.  Good morning.
12    Q.  Now, you mentioned that -- well, strike that.
13         You said you've been to sea on a number of different
14    ships, correct?
15    A.  Correct.
16    Q.  And you've been to sea on ships in various sorts of
17    weather, correct?
18    A.  Yes.
19    Q.  When a ship is encountering a swell system coming
20    from right off the side, what kind of motion does a ship
21    experience?
22    A.  Roll.
23    Q.  And that means tipping from side to side, from left
24    to right, correct?
25    A.  Yes.
```

Page 26

1  Q. And that means that everything on the ship tips from
2  side to side, to the left and to the right and then to
3  the left, correct?
4  A. Correct.
5  Q. All right. And you've experienced that, sir?
6  A. I sure have.
7  Q. You've been in the engine room when that's
8  happening, correct?
9  A. Sure.
10  Q. Standing on the diamond plate, correct?
11  A. I sure have.
12  Q. That diamond plate takes on an angle, doesn't it,
13  sir?
14  A. It sure does.
15  Q. It can be wet and oily, too, can't it?
16  A. No, not necessarily. Wait a minute now. Some
17  people think that engine rooms are dirty places with a
18  lot of grease and oil. They're not. Most engine rooms,
19  you can eat off the deck. They're not wet, they're not
20  oily and they're not greasy.
21  Q. I think your own testimony mentioned that oil and
22  water can get onto diamond plate in engine rooms,
23  correct?
24  A. They can get on it, but not as a routine thing.
25  Q. Okay. I don't think I used the word "routine." So

Page 27

1  I was just asking you about the possibility of oil and
2  water -- I'm sorry -- oil or water getting onto diamond
3  plate engine room floors.
4        THE COURT: I'll take judicial notice that it is
5  possible.
6        THE WITNESS: Possible.
7  BY MR. RAUWORTH:
8  Q. And it is a condition that is contemplated by marine
9  engineers, correct?
10  A. Well, I'm not sure what you mean by "contemplated by
11  marine engineers."
12  Q. Let me put it another way. When someone is
13  specifying a material for a walking surface in an engine
14  room, in order to be professionally competent they have
15  to take account of the experience of water and/or oil
16  getting onto the walking surface, correct?
17  A. Yeah, they might.
18  Q. Well, they would have to, wouldn't they?
19  A. Not necessarily. You know, this is -- these are
20  standards that have been going on for years. These
21  platings are standard things. Marine engineers
22  designing the ship goes to the standard that the Navy
23  says you've got to put in a ship.
24  Q. Okay.
25  A. Now, the original guys that designed those things,

Page 28

1  yeah, they probably took into consideration oil, grease,
2  water, but it's not something that's going to be running
3  amuck in an engine room, and if it does, water -- if a
4  flange leaks, water gets on the plate, it's immediately
5  picked up.
6  Q. On every ship?
7  A. Just about. On all my ships, they did.
8  Q. All right. And you haven't been to sea yourself
9  since 1950 as a serving officer, correct?
10  A. Oh, no, that's --
11        THE COURT: I don't think things have changed on
12  this subject since then.
13        THE WITNESS: No, they haven't changed.
14        No, that's not correct --
15  BY MR. RAUWORTH:
16  Q. I withdraw the question, sir.
17  A. All right. I've been on ships since then.
18  Q. Now, you don't see -- strike that.
19        You described a nonskid treatment a little while ago
20  involving paint and sand, if you will, correct?
21  A. Well, that was an analogy, yeah.
22  Q. That treatment is not used in engine rooms even in
23  the Navy, correct?
24  A. No. No.
25  Q. And you're --

Page 29

1  A. It's used on the decks on Navy ships --
2  Q. Okay. It's --
3  A. -- throughout.
4  Q. It's not used in engine rooms?
5  A. No. No need for them in engine rooms.
6  Q. Where diamond plate is used?
7  A. That's correct.
8  Q. And when ships are rolling, they can experience a
9  considerable angle of roll, correct?
10  A. That's right.
11  Q. Okay.
12  A. It's a little bit scary at times, too.
13  Q. Okay. Good.
14        Let's talk about the angle here for a moment.
15        MR. RAUWORTH: Would you mark that as the next
16  exhibit? We're up to --
17        THE CLERK: Check with your brother and find out
18  if --
19        MR. RAUWORTH: That stuff hasn't been brought
20  forward yet, so we can make it 20 and take it out of
21  order.
22        THE CLERK: Twenty?
23        (Exhibit No. 20 was received into evidence.)
24  BY MR. RAUWORTH:
25  Q. You, sir, have never been aboard the Hurricane, have

Page 30

1  you?
2  A. Say again?
3  Q. You've never been aboard the Hurricane, have you?
4  A. No.
5      THE COURT: Is the Hurricane the ship in
6  question?
7      MR. RAUWORTH: Yes, the Hurricane II. I'm
8  sorry.
9      THE WITNESS: No, I have not.
10 BY MR. RAUWORTH:
11 Q. So you've not seen this ramp in the flesh yourself,
12 correct?
13 A. No.
14     THE COURT: That's a scary name for a ship.
15     MR. RAUWORTH: It's marketing, your Honor, you
16 know, passenger excitement.
17     THE WITNESS: A scary name.
18 BY MR. RAUWORTH:
19 Q. And your report doesn't mention any tests of any
20 surfaces, as I read it. I'm correct about that, right?
21 A. I don't understand the question.
22 Q. You provided a report to Mr. Coniaris that was
23 forwarded to me?
24     THE CLERK: Do you want to give what it is?
25     MR. RAUWORTH: Right.

Page 31

1      THE CLERK: Exhibit No. 20.
2      MR. RAUWORTH: Yes. Thank you, George.
3  BY MR. RAUWORTH:
4  Q. So in that report there's nothing written about any
5  tests on, for example, the ramp that you've seen in
6  pictures here this morning?
7  A. No.
8  Q. Right. And so you're not in a position to testify
9  to any tests of that surface, correct?
10 A. Of the surface of that particular gangplank or the
11 scaffolding?
12 Q. You're not in a position to testify as to any of
13 that, true?
14 A. Testify -- I'm not sure what I'm supposed to be
15 testifying to.
16 Q. Well, you're testifying right now.
17 A. I know. But, I mean, test?
18 Q. Testify.
19     THE COURT: He's just saying that you're not
20 testifying to any particular test of the gangplank that
21 is involved in this case?
22     THE WITNESS: No, I know nothing about any tests
23 on that gangplank.
24 BY MR. RAUWORTH:
25 Q. All right. And you don't -- you have not provided

Page 32

1  in your report any information about any comparative
2  characteristics of diamond plate versus any other
3  substance, have you?
4      THE COURT: Well, the report speaks for itself.
5      THE WITNESS: I thought I did, but I can't
6  remember. I don't recall. I thought I mentioned
7  diamond plate and I mentioned a nonskid and I mentioned
8  batons.
9      THE COURT: Whether he answers it one way or
10 another isn't going to control. Whatever's in the
11 report, is in the report; whatever isn't in the report,
12 isn't.
13     MR. RAUWORTH: Sure, your Honor, I just want to
14 clarify what we're dealing with here.
15 BY MR. RAUWORTH:
16 Q. You're not in a position to testify to, let's say,
17 the coefficient of friction of diamond plate as compared
18 to any other substance, true?
19 A. That's true.
20 Q. Okay. So, for example --
21 A. I did talk about the coefficient of friction in my
22 report, though.
23 Q. Yes, you did. And you did it in an abstract way,
24 didn't you, sir?
25 A. I did it in a technical way.

Page 33

1  Q. But you didn't do it with reference to any
2  particular substance that's at issue in this case,
3  correct?
4  A. That's correct.
5  Q. All right. So we're not in a position to -- you're
6  not here meaning to testify to, for example, the
7  difference in coefficient of friction of diamond plate
8  when it's wet versus when it's dry, correct?
9  A. Correct.
10 Q. You did say that in your view it's pretty common
11 sense that substances like that are -- have somewhat
12 less traction when they're wet than when they're dry?
13 A. Right.
14 Q. And you referred to that as common sense, didn't
15 you?
16 A. Yes, I did. Just like wood. If you put water on
17 wood, you're going to skid, too.
18 Q. Same thing with an asphalt surface in the street,
19 right?
20 A. Sure.
21 Q. Likewise, the sidewalk, right?
22 A. Sure.
23 Q. So what we're really saying is that virtually
24 everything is a little more slippery when it's wet,
25 correct?

Page 34

1    A. On a flat surface.
2    Q. Well, virtually everything under any circumstances
3    is a little more slippery when it's wet, isn't it?
4        THE COURT: That's pretty basic.
5        THE WITNESS: But this isn't a flat surface that
6    we're talking about.
7    BY MR. RAUWORTH:
8    Q. All right. Your --
9    A. The coefficient of friction that I used in that
10   report assumed a flat piece of metal, just with --
11   that's how you get the coefficient of friction on a
12   test: you don't do it with diamond plate, you don't do
13   it with nonskid, you do it with a common piece of metal,
14   20 pounds pulling 50 pounds, you get the .5 coefficient
15   is the normal coefficient. So that's got nothing do
16   with -- the number is on an incline basis on a flat
17   piece of metal. It's not taking into consideration
18   nonskid, it's not taking into consideration anything
19   else.
20   Q. Okay. Your discussion of coefficient of friction in
21   the report had to do with the method of determining
22   that, correct?
23   A. The numbers, right.
24   Q. Right?
25   A. The technical numbers that were used for the

Page 35

1    coefficient of friction.
2    Q. And it had nothing to do with any surface that's at
3    issue in this case, correct?
4    A. No, it had to do with the angle.
5    Q. Okay.
6    A. The angle of whatever.
7    Q. But you're not testifying to any opinions about the
8    coefficient of friction of any surface that's at issue
9    in this case, correct?
10   A. That's correct.
11       THE COURT: He doesn't have to testify to an
12   opinion to be able to say that one substance is -- has
13   got more traction, because it has more grit or whatever
14   it is, than another substance. I can take judicial
15   notice of that fact
16       MR. RAUWORTH: Understood, Judge. But I think
17   that's another way of pointing out the common sense
18   element that we were touching on before. I'm simply
19   trying to clarify what we're getting from this witness
20   and what he's meaning to bring to bear with his
21   background.
22       THE COURT: I haven't heard him make a claim
23   beyond what I think he reported.
24       MR. RAUWORTH: All right.
25   BY MR. RAUWORTH:

Page 36

1    Q. So, actually, you've not testified that the walking
2    surface -- the diamond plate itself of the ramp in
3    question in this case --
4    A. Scaffolding.
5    Q. Sorry?
6    A. Scaffolding in question.
7    Q. Well, I'm asking you about a ramp. It's the piece
8    that connects the vessel to the barge. If you want to
9    put a different name on it, you're welcome to, but it's
10   been referred to in this case as a ramp and a gangway,
11   with due apologies to the term you prefer.
12   A. Well, it's just not the correct terminology, that's
13   all.
14       THE COURT: All right. But that's what we lay
15   people have been calling it. Anyway, we're talking
16   about the thing that you walk down off the ship.
17       THE WITNESS: Right.
18   BY MR. RAUWORTH:
19   Q. So I did not hear you testify to an opinion that the
20   diamond plate surface on this particular ramp was
21   unsafe. Am I correct about that? You did not do so?
22   A. I did not say it was unsafe?
23   Q. You did not say it was unsafe, correct?
24   A. I don't think so, but it is unsafe.
25   Q. I beg your pardon?

Page 37

1        MR. RAUWORTH: Motion to strike, Judge.
2        THE COURT: The whole thrust of his testimony
3    is, obviously, it's unsafe. I'm not going to strike it.
4    BY MR. RAUWORTH:
5    Q. Now, sir, you haven't touched this surface, correct?
6    A. (No verbal response.)
7    Q. You haven't touched this surface, correct?
8    A. The surface being --
9    Q. The diamond plate on the ramp?
10   A. On that particular ramp? No. No. No, I haven't,
11   no.
12   Q. And you don't have any knowledge of its
13   characteristics other than it being described as diamond
14   plate and what you see in the picture, correct?
15   A. That's pretty standard stuff.
16   Q. Okay. You're not aware of -- strike that.
17       Are you --
18       MR. RAUWORTH: And, your Honor, I'm pursuing
19   that line of questioning with a reservation of my
20   objection about his testimony.
21       THE COURT: Right.
22       MR. RAUWORTH: Only by way of protecting myself
23   from prejudice.
24   BY MR. RAUWORTH:
25   Q. Your view that the use of the diamond plate is

Page 38

1  unsafe is, therefore, not based on any objective
2  knowledge you have about that surface, correct?
3      THE COURT: I understand that.
4  BY MR. RAUWORTH:
5  Q.  And I take it that you are having reference to some
6  sort of standard when you say that it's unsafe to use
7  diamond plate; is that correct, sir?
8  A.  On an incline surface, that's correct.
9  Q.  Okay.  And the -- I saw you make reference to -- in
10  your report to certain standards used by the Navy.  Do I
11  recall that right?
12  A.  That is correct.
13  Q.  And those are the ones you're referring to?
14  A.  I did refer to that, yes.
15  Q.  Okay.  And that's the basis for your view that
16  diamond plate is unsafe, correct?
17  A.  No.  My personal experience, too, and the Merchant
18  Marine ships use diamond plate, too.  Coast Guard
19  regulations require that, too.  So not just the Navy
20  ships have it, the Merchant ships have it, too.
21  Q.  I'm asking you about the use of diamond plate on a
22  walkway from a vessel to shore.
23  A.  It's unsatisfactory.
24  Q.  It's unsatisfactory because it doesn't comply with
25  some Navy standard; is that it?

Page 39

1  A.  It doesn't comply with the Coast Guard standards,
2  too.
3  Q.  Okay.  So we're not -- your opinion's not based on a
4  Navy standard, it's based on a Coast Guard standard,
5  right?
6  A.  They're both the same.
7  Q.  Really?  And where would one look that standard up?
8  A.  Oh, it's in my report, the drawing.  The ship's
9  drawing for the Navy isn't in my report, but they use
10  them on the new destroyers.
11  Q.  Okay.
12  A.  And the Merchant ships that are being built now also
13  have the diamond plate floor plates.
14  Q.  We're not talking about floor plates, sir.  I'm
15  sorry.  We're talking about diamond plate on a ramp,
16  walkway.
17  A.  It's unsatisfactory.  I don't want to comment on it
18  because it's wrong.
19  Q.  Well, I think we need to explore with you why it is
20  that you are asserting that it's wrong.  Now, what I'd
21  like to know is: What is the standard that you say is
22  violated by the use of diamond plate here?
23  A.  The standard doesn't allow it.
24  Q.  What standard, sir?
25      THE COURT: Which standard?  Is there a number

Page 40

1  to it or a name or -- I mean, we don't want to pin you
2  to the wall, I have to know whether there's a regulation
3  of some kind that I ought to observe or there isn't.
4      (Pause.)
5      THE WITNESS: Well, the Navy Department drawing,
6  the Coast Guard Safety Afloat spec, and there's an OSHA
7  requirement, too.
8  BY MR. RAUWORTH:
9  Q.  Is that it?
10  A.  Yeah.  OSHA, Coast Guard and Navy, right.
11  Q.  Okay.  So am I to understand, then, that it's your
12  professional opinion that if a fitting on this whale
13  watch vessel doesn't comply with a Navy standard, then
14  it's improper; is that right?
15  A.  I don't think it complies with OSHA standards
16  either.
17  Q.  I'm asking you about the Navy standard, sir.
18      THE COURT: No.  The question is if it violates
19  the Navy standard.
20      THE WITNESS: Yes, it does violate the Navy
21  standard.  Yes.
22  BY MR. RAUWORTH:
23  Q.  Does it have to conform to the Navy standard?
24  A.  This boat?
25  Q.  Yes.

Page 41

1  A.  No.
2  Q.  All right.  Then we can take that --
3  A.  It has to comply with the Coast Guard standard.
4  Q.  All right.  So the Navy standard drops out of the
5  picture; isn't that right, sir?
6  A.  Sure, if you want to do it that way.
7      THE COURT: Is the Coast Guard standard
8  different?
9      THE WITNESS: The Coast Guard uses OSHA
10  standards for gangplanks, and the OSHA standards have
11  the same basic requirements as the Navy's -- as the Navy
12  standards.
13      THE COURT: I understand.  But we're going
14  around in circles.
15      THE WITNESS: Yeah, I think so, too.
16      MR. RAUWORTH: I think we'll get to the next
17  step with regard to that, Judge.
18  BY MR. RAUWORTH:
19  Q.  First of all, what is your -- the basis for your
20  conclusion that this vessel, the Hurricane II, is
21  obliged to comply with OSHA standards?
22      THE COURT: I don't think it's important whether
23  he thinks so or not, that's a matter of law for me to
24  decide.
25      MR. RAUWORTH: Well, I'm trying to assess the

Page 42

1  validity of his opinions, Judge.
2       THE COURT: You can ask him what the -- you can
3  ask him what standards he's applied, but it's for me to
4  decide whether they're correct standards or not.
5       MR. RAUWORTH: Well, it also reflects on his
6  general competence in terms of performing his work as an
7  expert.
8  BY MR. RAUWORTH:
9  Q. Sir, there is ro Coast Guard regulation that imposes
10 OSHA standards on vessels of this kind, is there?
11 A. There is.
12 Q. Can you state it for us?
13 A. Well, I don't have the standard with me, but I have
14 it at home.
15      THE COURT: Can you satisfy it in writing under
16 oath hereafter?
17      THE WITNESS: The OSHA requirement -- I'd have
18 to drag out the Coast Guard regulations that refer to
19 the OSHA standard on gangplanks. The Coast Guard --
20 BY MR. RAUWORTH:
21 Q. Right.
22 A. -- regulations, they call it, spell out OSHA
23 standards for gangplanks.
24 Q. And you can't tell us where that is, sir?
25 A. I can tell you. Chapter 14, OSHA requirements for

Page 43

1  walking and walking surfaces, page 1 through 6.
2  Q. That's an OSHA requirement that relates --
3  A. That's an OSHA requirement that relates to the Coast
4  Guard.
5  Q. It relates to buildings, sir, doesn't it?
6  A. No, this is -- this is OSHA standards as to walking
7  surfaces on gangplanks as well as buildings.
8  Q. But you still haven't told us a Coast Guard
9  regulation --
10 A. I don't have it with me.
11 Q. All right. You're not aware of the case in the
12 Supreme Court of Chao v. Mallard Drilling, are you, sir?
13      MR. CONIARIS: Objection, your Honor.
14      THE COURT: Overruled.
15      I'm going to discontinue this line of
16 questioning. I understand your point and I continue to
17 believe that it's a matter of law for the Court,
18 whatever his opinion is. And he's admitted what you
19 wanted him to admit. We can go on.
20      MR. RAUWORTH: I guess I just want to clarify
21 that his opinion depends fully on the idea that the
22 Coast Guard incorporates OSHA regulations.
23 BY MR. RAUWORTH:
24 Q. Is that correct, sir?
25      MR. CONIARIS: Objection.

Page 44

1       THE WITNESS: That's my understanding, and
2  that's what I did in the research for this job.
3       THE COURT: Let me ask you this: If I decide --
4  if I find that as a matter of law the Coast Guard is not
5  bound by the OSHA regulations, would you still believe
6  that this material violated independent Coast Guard
7  requirements?
8       THE WITNESS: I don't think the Coast Guard has
9  requirements for this. They use the OSHA standards.
10      THE COURT: I understand.
11 BY MR. RAUWORTH:
12 Q. Sir, what body of regulations does the Coast Guard
13 apply to this vessel?
14 A. The vessel?
15 Q. Yes.
16 A. The whole vessel?
17 Q. What body of regulations does the Coast Guard apply
18 to the vessel?
19 A. The Coast Guard Regulations.
20 Q. Where are they found?
21 A. You find them in the library.
22 Q. And what citation? What's the title of the Coast
23 Guard -- of the regulations that applies to this vessel?
24 A. That's the name of it: Coast Guard Regulations.
25 And there are several chapters that deal with machinery,

Page 45

1  the hull.
2  Q. When's the last time you looked at regulations that
3  apply to this vessel, sir?
4  A. This vessel?
5  Q. Yes.
6  A. Oh, I don't know. About a year ago, maybe?
7  Q. And you actually didn't cite any Coast Guard
8  regulation at all in your report, correct?
9  A. Because there isn't any.
10 Q. But --
11 A. The gangplanks.
12      THE WITNESS: We're going around in circles
13 again, your Honor.
14 BY MR. RAUWORTH:
15 Q. Well, you're not familiar with what -- with what is
16 required for this vessel, are you?
17 A. You mean the vessel itself or gangplanks? Now, what
18 are we talking about?
19 Q. The vessel itself.
20 A. The vessel itself?
21 Q. Yeah.
22 A. I have a Coast Guard, United States Merchant Marine
23 license as a chief engineer, and through my career I had
24 to go through all these Coast Guard regulations and take
25 tests, all kinds of things, to get the license. And I

Page 46

1  don't know really what you're driving at. Sure I know
2  what they have to do on this ship, but it's the size of
3  the ship, the tonnage of the ship. There are so many --
4  and we're looking at all kinds of ships: steel ships,
5  wooden ships.
6  Q.  Right.
7  A.  I can't -- I just can't --
8      THE COURT:  Are you telling me on the basis of
9  your personal experience you know that whatever the law
10  is, the Coast Guard, in fact, does follow OSHA
11  regulations?
12     THE WITNESS:  That's my understanding.
13     THE COURT:  What's the basis of your
14  understanding?
15     THE WITNESS:  Looking up the regulations.
16     THE COURT:  Okay.
17     THE WITNESS:  The Coast Guard Regulations.
18     MR. RAUWORTH:  Well, your Honor, once again,
19  I'd --
20     THE WITNESS:  And also, I've talked to
21  professional people that build gangplanks on the
22  telephone -- aluminum -- American Aluminum Company, and
23  they gave me insight.
24     THE COURT:  That wouldn't help me much.
25     THE WITNESS:  Yeah.

Page 47

1  BY MR. RAUWORTH:
2  Q.  And your conversations -- you cited one of them.
3  You made a phone call to somebody, and you mentioned the
4  date of it. Do I remember that correctly? It's in one
5  of your references?
6  A.  Uh-huh.
7  Q.  How would you expect the owner of this vessel to
8  comply with whatever was contained in a conversation you
9  had over the telephone with these people at the other
10  end?
11 A.  He's responsible to comply with the regulations.
12 Q.  Okay. But whatever you said to these people on the
13 telephone is not a published standard, is it?
14 A.  They guided me to the standard.
15     THE COURT:  Mr. Rauworth, you made your point.
16     MR. RAUWORTH:  Thanks.
17 BY MR. RAUWORTH:
18 Q.  Now, you say in your report, "The gangway must be
19 clear of any substance likely to cause a person to slip
20 or fall (this includes water)"; is that right?
21 A.  That's correct.
22 Q.  So it would be unsafe and improper, in your opinion,
23 to use a gangway in the rain, correct?
24 A.  No, I wouldn't say that. No. I mean, if you're
25 going to get off the boat and it's raining, you've got

Page 48

1  to use something.
2  Q.  So you withdraw that statement I just read to you,
3  correct?
4  A.  What was it? Read it again, please?
5  Q.  "The gangway must be kept clear of any substance
6  likely to cause any person to slip or fall (this
7  includes water)."
8  A.  That's a perfectly good statement.
9  Q.  So, then, how is it that people are supposed to get
10 off of a vessel, or onto it, when it's raining?
11 A.  People have to help them on and off.
12 Q.  You didn't say that here. You said that the gangway
13 has to be kept clear of water, didn't you, sir?
14 A.  Okay. Keep it clear of water, then.
15 Q.  And how do you do that?
16 A.  Well, with mops, squeegees or whatever. There's
17 ways to do it. If it's raining real hard, you probably
18 wouldn't be able to do it.
19 Q.  All right. And so what's a reasonable mariner
20 supposed to do when it's raining real hard?
21 A.  He's supposed to help the people off the boat.
22 Q.  And where is it that you find a standard that says
23 that it is improper to traverse a gangway when it's wet?
24 A.  There isn't one. I just said that the crew of the
25 ship would have to help the people off if the thing was

Page 49

1  wet. But this is not a good gangplank to begin with.
2  This particular gangplank is not a gangplank.
3  Q.  The question has to do, sir, with the question of
4  use in the rain.
5  A.  Okay.
6  Q.  So let's stay with that.
7  A.  If it was a good gangplank, they wouldn't have a
8  problem with it.
9  Q.  You said in general that a gangway has to be kept
10 clear of water?
11 A.  Right.
12 Q.  And then you told us that that applies across the
13 board. So you're going to stand by that statement; is
14 that right?
15     THE COURT:  Yes.
16 BY MR. RAUWORTH:
17 Q.  Now, sir, let me show you a blowup of what's been
18 marked as Exhibit 20 in this case?
19     THE CLERK:  Tell her what it is.
20     MR. RAUWORTH:  Sure. Let me just hold it here.
21 This is an agreed exhibit. It's a photograph taken of
22 the Hurricane II vessel from a position off its
23 starboard bow. And that was authenticated by testimony
24 of one of the witnesses in New Jersey who took it on the
25 day of this incident and who clarified that the date

Page 50

1   legend in the bottom right is not correct, that that was
2   never reset on the camera.
3         That actually, your Honor, is in the testimony
4   that was presented in the depositions that you were
5   exposed to yesterday.
6         THE COURT: All right.
7   BY MR. RAUWORTH:
8   Q. All right, sir. Are you -- actually, let me hand
9   you, so you have a close view of it, Exhibit --
10        THE COURT: What's the number of the exhibit?
11        MR. RAUWORTH: Exhibit 20.
12  BY MR. RAUWORTH:
13  Q. Are you able to see the ramp in this picture, sir?
14  A. Just about.
15  Q. All right. Do you see people going up that ramp?
16  A. Yes, I see a person going up that ramp. That's
17  right.
18        MR. RAUWORTH: Okay. So, again, reserving our
19  rights, your Honor.
20  BY MR. RAUWORTH:
21  Q. It's your opinion that the use of this ramp in this
22  picture on this day is unsafe; is that right?
23  A. That's correct.
24  Q. Okay. And I'm going to put to one side the question
25  of the use of diamond plate. You've talked about that?

Page 51

1   A. I sure did.
2   Q. What I would like to talk to you now about is a
3   question of angle because that's the other parameter
4   that I think you disclosed in your report. That is the
5   angle of the gangway, correct?
6   A. I did put that in my report, yes.
7   Q. All right. The angle that you see there in that
8   picture, is that in violation of some standard?
9   A. I understand that somewhere along the line that
10  someone said what the angle was on this boat.
11  Q. Well, let me --
12  A. One of the crew or something said it was 10 to 15
13  degrees or something like that.
14  Q. You gave Mr. Coniaris an estimate of an angle
15  looking at a photo. I would like to give us an
16  estimate of an angle looking at Exhibit 20.
17  A. It's not 8 degrees. It's a lot more -- it's steeper
18  than that. It's steeper than 8 degrees.
19  Q. Okay. So is it your opinion --
20        MR. RAUWORTH: Again with reservation, your
21  Honor.
22  BY MR. RAUWORTH:
23  Q. -- that this -- that the angle of that gangway is
24  unsafe -- that's unsafe for all uses; is that right?
25  A. That's correct.

Page 52

1   Q. Okay. By reason of its angle, never mind what the
2   walking surface is, correct?
3   A. That's correct.
4   Q. Okay. And that the -- I assume that you are basing
5   your opinion on some kind of a published standard; is
6   that right?
7   A. That's correct.
8   Q. Okay. The published standard is what?
9   A. Well, I'm not sure I can pull it out that quick.
10  No, I can't pull that out. Maybe it's in the write-up.
11  American Disabilities Act, Accessibility Guidelines,
12  Accessibility: Fishing piers and platforms.
13        THE COURT: May I see what you're looking at?
14        THE WITNESS: Sure.
15        THE COURT: Is it attached to your report?
16        THE WITNESS: Yes, sir.
17        THE COURT: Okay. If it's attached to your
18  report, then I'll have a copy of it.
19        THE WITNESS: It's Note 8 on my -- Reference
20  Note 8.
21  BY MR. RAUWORTH:
22  Q. All right, sir. It refers to fishing piers and
23  docks, right, the reference you just told us about?
24  A. Yup.
25  Q. Is that right? Accessibility: Fishing piers and

Page 53

1   platforms?
2   A. Accessibility: Fishing piers -- what's
3   "accessibility to a pier" mean?
4   Q. I beg your pardon, sir? I think you wrote this,
5   didn't you?
6   A. Yeah, accessibility to a pier is getting off a boat
7   onto a pier or from a pier onto a boat.
8   Q. All right. So is it your professional testimony,
9   then, that the OSHA regulations you've just cited here
10  are legally -- I'm sorry -- the ADA regulations you've
11  cited here are legally binding on the operator of this
12  vessel?
13        THE COURT: I don't care what he thinks about
14  that. That's for me to decide. He has a right to rely
15  on them, whether they're legally binding on them or not,
16  as an expert.
17  BY MR. RAUWORTH:
18  Q. Well, sir, these regulations, you don't know that
19  they were written with the intent to apply to vessels at
20  all, correct?
21  A. They were written to apply to safety.
22  Q. And the Americans with Disabilities Act -- in fact,
23  these regulations are described as Accessibility
24  Regulations, aren't they?
25  A. Yeah.

Page 54

1   Q. In other words, whether wheelchairs can get there or
2   not?
3   A. Well, that's part of it.
4        THE COURT: That's not irrelevant.
5        MR. RAUWORTH: I beg your pardon?
6        THE COURT: That's not necessarily irrelevant.
7   I'm telling you for the final time: The question of
8   what regulations are binding is going to be decided by
9   me.
10       MR. RAUWORTH: Understood, your Honor.
11       THE COURT: And I understand that he doesn't
12  have an opinion on that subject, but if he did, it
13  wouldn't make any difference.
14       MR. RAUWORTH: Okay.
15  BY MR. RAUWORTH:
16  Q. Sir, as a matter of fact, the Americans with
17  Disabilities Act, there are currently no regulations
18  that apply to passenger vessels; isn't that true?
19       THE COURT: If you know.
20       THE WITNESS: I don't know, really. I remember
21  looking those up and reading them about 8 degrees or 5
22  degrees, I guess it was.
23       THE COURT: There's a difference between saying
24  something is required as a matter of law, on the one
25  hand, and as an expert, him saying that he thinks

Page 55

1   something is unsafe on the other hand. He has a right
2   to express an opinion either way.
3        MR. RAUWORTH: He certainly does, your Honor,
4   but he's expressed it in terms -- and I really have to
5   do this by way of clarifying the difference. He has
6   concluded that it's unsafe because of these standards.
7        THE COURT: All right. You have a right to say
8   that's not a proper basis, but there's no point in
9   hammering home that he isn't an expert on the law. I
10  know that.
11       MR. RAUWORTH: Right.
12  BY MR. RAUWORTH:
13  Q. And, in fact, the ADA regulations with regard to
14  passenger vessels are still in the pipeline and awaiting
15  commentary by the public?
16       THE COURT: That's the precise type of question
17  I'm saying he doesn't have to answer.
18       MR. RAUWORTH: All right. Fine.
19  BY MR. RAUWORTH:
20  Q. You're familiar with the phenomenon of a Certificate
21  of Inspection, aren't you, sir?
22  A. Definitely.
23  Q. What is that?
24  A. What is a Certificate of Inspection? Who's it put
25  out by, the Coast Guard?

Page 56

1   Q. You're not sure about that?
2   A. I'm asking you what Certificate of Inspection you're
3   talking about. Put out by the Coast Guard?
4   Q. I'm asking about the Coast Guard Certificate of
5   Inspection. You're familiar with that?
6   A. Absolutely.
7   Q. And what is it, in your understanding, that has to
8   happen before a vessel is entitled get a Coast Guard
9   Certificate of Inspection?
10  A. That would take a long time to answer.
11  Q. Can you summarize it for us?
12  A. What is in the Coast Guard regulations or
13  Certificate of Inspection?
14  Q. What does a vessel --
15       THE COURT: What does an owner have to do to get
16  a Certificate of Inspection?
17       THE WITNESS: He has to go to the requirements,
18  the Coast Guard regulations -- and usually the
19  shipbuilder does a lot of this when he builds the ship
20  or boat -- to make sure it complies with the
21  regulations. The ship owner would have to know that he
22  is in compliance by maybe not changing anything since
23  the ship was built; or if he did, he would have to have
24  records of what he changed and whether or not that was
25  in compliance with the regulations before he could get a

Page 57

1   Certificate of Inspection.
2   BY MR. RAUWORTH:
3   Q. Okay. And what's the significance of having a
4   Certificate of Inspection?
5   A. Well, you really have to have it for insurance
6   purposes and for safety. The Coast Guard won't certify
7   a vessel if it's -- if it can't pass. It's a safety
8   thing. You don't want a ship to go to sea unless it
9   meets the requirements.
10  Q. All right. So a vessel won't get a Certificate of
11  Inspection if it doesn't comply with the applicable
12  regulations, correct?
13  A. That's correct.
14  Q. All right. You didn't undertake to look into
15  whether the Hurricane II possessed a Certificate of
16  Inspection, did you, sir?
17  A. Yeah, I've seen this.
18  Q. Okay. And --
19  A. The Coast Guard inspection --
20       THE WITNESS: -- as I said this before, your
21  Honor --
22  A. -- but the Coast Guard uses OSHA for gangplanks.
23  This is a Certificate of Inspection for the boat, the
24  ship. And that -- and apparently he was definitely in
25  compliance. It's a nice ship. There's nothing wrong

Page 58

1  with the ship. And it's a certificate of compliance --
2  it looks like it's in order. But it has nothing to do
3  with the gangplank.
4  Q. You're not familiar with Coast Guard inspection
5  procedures as to vessels such as the Hurricane II, are
6  you, sir? You don't know whether they look at or don't
7  look at gangplanks?
8  A. I just said they don't.
9  Q. And --
10 A. OSHA does.
11 Q. I see. OSHA inspectors come out to vessels like
12 this and they look at gangplanks?
13 A. As far as I know. I don't know much about OSHA, I
14 know about the Coast Guard.
15 Q. I'd like to understand this. You've just told us
16 that OSHA sends out inspectors?
17 A. I think they do. I don't know that much about OSHA.
18 I know that when we were in the shipyard, the OSHA
19 people were around and they were answering complaints
20 and things like that.
21 Q. But you don't know how the supposed requirements for
22 gangplanks are enforced, do you?
23 A. Well, they're enforced by OSHA. The requirements
24 are spelled out by OSHA.
25 Q. And --

Page 59

1  A. Now, whether they inspect it or not, I don't know
2  whether they do or not. Whether they go out physically
3  and look at every boat in every harbor, I don't know
4  whether they do that or not.
5  Q. Are you telling us as a matter of your professional
6  opinion that Coast Guard inspecting officers take no
7  cognizance of gangplanks or ramps?
8  A. That's my understanding, yes.
9  Q. Well, what's the basis of your understanding?
10 A. I said that before. The Coast Guard regulations
11 throw the requirements for gangplanks onto OSHA.
12 Q. I'm asking you whether when a Coast Guard officer
13 comes out to do an inspection for a vessel like this,
14 whether they take a hands-off attitude with regard to
15 ramps, gangplanks? You don't know, sir, correct?
16 A. No, I don't know. He might, he might not. He
17 doesn't have to.
18 Q. Why is it that he doesn't have to?
19       THE COURT: It would be more productive for
20 somebody to testify what the facts are rather than to
21 testify that he doesn't know.
22       MR. RAUWORTH: We'll be at that in just a
23 moment. Just a moment, your Honor.
24       (Pause.)
25 BY MR. RAUWORTH:

Page 60

1  Q. Now, once again, I just want you to have reference
2  to the angle of this gangplank in Exhibit 20 that we
3  looked at before. Have you got that --
4  A. You can almost take a protractor and figure that
5  out.
6       THE COURT: I'm sorry?
7       THE WITNESS: You can almost take a protractor.
8  That drawing is straight on. You can almost take a
9  protractor and figure out what the angle is.
10      THE COURT: I suppose so, yeah.
11 BY MR. RAUWORTH:
12 Q. Let me show you another photograph.
13      THE COURT: What's the exhibit number?
14      MR. RAUWORTH: We haven't marked this as an
15 exhibit, your Honor. It was -- 21.
16      THE CLERK: That will be 21.
17      THE COURT: I asked you yesterday to mark things
18 in advance, please.
19      MR. RAUWORTH: I beg your pardon, your Honor, we
20 had a bit of a misunderstanding.
21      THE COURT: Okay. That's Exhibit No. 21.
22      (Exhibit No. 21 was received into evidence.)
23 BY MR. RAUWORTH:
24 Q. You see the gangplank in Exhibit 21, sir?
25 A. Yeah, that's pretty neat.

Page 61

1  Q. Right. That's going up to an aircraft carrier,
2  isn't it?
3  A. Yes, it is. I've been on those gangplanks before.
4  Q. Right. The angle on those is a lot more than in
5  Exhibit 20, isn't it?
6  A. It looks like it, yeah.
7  Q. So --
8  A. That's a regular gangplank, though. It's got the
9  batons on them and you can walk up it.
10      THE COURT: Can I see it, please?
11      MR. RAUWORTH: Sure. I beg your pardon, your
12 Honor.
13      THE WITNESS: That's a real gangplank.
14 BY MR. RAUWORTH:
15 Q. But it's unsafe, isn't it?
16 A. No.
17 Q. It's got an angle greater than 8 degrees.
18      THE COURT: I haven't heard the witness say that
19 automatically that makes any gangplank unsafe.
20 BY MR. RAUWORTH:
21 Q. Well, it doesn't comply with the ADA regulations,
22 does it?
23 A. No. In the Navy you don't -- the Navy doesn't get
24 involved with the ADA regulations.
25 Q. And so, once again, I guess we're back to it boiling

Page 62

1  down to whether the ADA regulations apply or not, right?
2  A. I guess so, yeah.
3  Q. So let me just be sure I understand. You're not
4  saying that it's always improper if a gangway exceeds 8
5  degrees; is that correct?
6      THE COURT: I wouldn't use the word "improper."
7  Doesn't obey the regulations.
8      MR. RAUWORTH: Well, I guess I -- we'll do it
9  two ways.
10     THE COURT: It's not always unsafe.
11     MR. RAUWORTH: Sure.
12     THE WITNESS: Was I able to find any degrees of
13  inclination on a Navy gangway?
14 BY MR. RAUWORTH:
15 Q. So it is --
16     THE COURT: I'm aware that if you board an
17  airplane via steps, they're usually pretty steep, aren't
18  they?
19     THE WITNESS: Yes, your Honor.
20     THE COURT: But there's a difference. There's
21  guardrails, there's steps, and so forth and so on.
22 BY MR. RAUWORTH:
23 Q. So as a matter of your own opinion, it's not the
24  case that an angle of 8 degrees or greater is always
25  unsafe; is that correct, sir?

Page 63

1  A. Would you repeat that, please?
2  Q. Sure. It's not your opinion that a gangplank angle
3  of 8 degrees or greater is always unsafe, correct?
4  A. I guess that's probably correct. We're crossing
5  swords here on whether it's a requirement by the Coast
6  Guard, a requirement by the Navy. The Navy has all
7  different standards on gangplanks that I've cited
8  here --
9      THE COURT: In addition, I'll express my view,
10  which I hope counsel will agree with that, too. That
11  safety is not just dependent on angles, it's dependent
12  on what other safeguards there are to protect you.
13     THE WITNESS: Right.
14     MR. RAUWORTH: Sure, Judge. I just want to
15  isolate the point so that we're quite clear on this.
16     THE COURT: I think I understand his testimony
17  on it.
18 BY MR. RAUWORTH:
19 Q. I think you had an expansive answer. Your answer to
20  the question is: No, you don't believe it's always the
21  case that a gangway is unsafe if it has an angle of more
22  than 8 degrees?
23  A. This gangway is perfectly safe, and it's probably
24  close to 18, 20 degrees. That's a gangplank that's
25  designed to do this.

Page 64

1  Q. Well --
2  A. The 8-degree requirement does not apply to Navy
3  ships.
4      THE COURT: Well, it's not just a question of
5  the requirement, there are other features that make it
6  safe.
7      THE WITNESS: That's correct.
8      THE COURT: Is that right?
9      THE WITNESS: That's correct. It's the grading,
10  and it's got batons, walking steps. It's altogether
11  different.
12 BY MR. RAUWORTH:
13 Q. You don't know what's actually on that gangway in
14  the picture, do you sir?
15  A. I'm pretty sure I do because Navy gangplanks are
16  pretty standard.
17  Q. So in your view, the 8-degree requirement depends on
18  whether there is an applicable --
19     THE COURT: You're beating a dead horse.
20     MR. RAUWORTH: All right.
21 BY MR. RAUWORTH:
22 Q. You've not found any regulation, Mr. Culver --
23  A. Captain Culver.
24  Q. I beg your pardon.
25     You've not found any regulation that states that

Page 65

1  diamond plate is improper for use in a gangplank?
2  A. I've never found it as a requirement for a
3  gangplank.
4  Q. You've never found that it was affirmatively
5  required; is that what you mean?
6  A. I've never found a requirement that allows that kind
7  of --
8      THE COURT: You've never seen anything that says
9  in so many words you cannot use diamond plate?
10     THE WITNESS: No.
11     THE COURT: Okay.
12 BY MR. RAUWORTH:
13 Q. So there's no prohibition you're aware of?
14  A. It depends on what spec you're looking at.
15  Q. I didn't catch that.
16  A. It depends on what specification you're looking at,
17  the specifications for gangplanks. And if you're
18  looking at the OSHA requirements that I've cited, you'll
19  build the thing according to the requirements and you'll
20  have a gangway that meets the requirements. Same thing
21  for the Navy: They have requirements for gangplanks.
22  Everyone who builds one these things build them to Navy
23  requirements.
24     THE COURT: I feel that cross-examination has
25  elicited everything you need.

Page 66

```
 1        MR. RAUWORTH: Thank you, your Honor.
 2              RED RECT EXAMINATION
 3   BY MR. CONIARIS:
 4   Q. Sir, referring to Exhibit 3 again, can I ask you a
 5   hypothetical question?
 6   A. A hypothetical question?
 7   Q. Yes. Let's say I called you over to my boat and I
 8   said, "I'm having people over for Father's Day and I
 9   don't care what the regulations say and I don't care
10   about the Coast Guard or the Navy or anything." What I
11   want you to do, sir, as a consultant with a lot of
12   experience in these matters, I want you to tell me: Is
13   my family going to be safe on that gangway?
14        MR. RAUWORTH: Objection, your Honor.
15        THE COURT: Sustained. Sustained.
16   BY MR. CONIARIS:
17   Q. Is this gangway safe?
18        MR. RAUWORTH: Objection.
19        THE COURT: He just spent an hour and a half
20   saying it isn't. You think I don't know that?
21        MR. CONIARIS: All right. Then I have nothing
22   further, your Honor.
23        THE COURT: I would like to take a brief recess,
24   then.
25        (The witness is excused.)
```

```
 1              C E R T I F I C A T E
 2
 3        I, Marcia G. Patrisso, RPR, CRR, Official
 4   Reporter of the United States District Court, do hereby
 5   certify that the foregoing transcript constitutes, to
 6   the best of my skill and ability, a true and accurate
 7   transcription of my stenotype notes taken in the matter
 8   of Civil Action No. 05-11267-MEL, Madhu Jain v. A Cape
 9   Ann Whale Watch, Inc.
10
11
12        /s/ Marcia G. Patrisso
             MARCIA G. PATRISSO, RPR, CRR
13           Official Court Reporter
14
15
16
17
18
19
20
21
22
23
24
25
```