UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


MADHU JAIN,
          Plaintiff,

v.                              CIVIL ACTION
                                NO. 05-11267-MEL
A CAPE ANN WHALE WATCH, INC.,
          Defendant.


FINDINGS OF FACT AND CONCLUSIONS OF LAW

September 12, 2007

LASKER, D.J.

          This case was tried to the Court without a jury.  The
witnesses testified as follows.

          Madhu Jain, the plaintiff, lives in New Delhi, India,
is 57 years old, and is married and has two children.  On August
9, 2004 she was a passenger on the whale watch vessel the
Hurricane II with her son, nephew and sister-in-law.  The weather
was good, she was wearing an Indian costume, she had no problem
with sea sickness and never had fainted.  In disembarking she put
her foot on the ramp or gang plank.  She had to step up to get on
to it.  No one helped her or told her to hold the plank or if so,
as she put it "I didn't hear it."  She then said "I just put my
foot on the ramp and then my second foot - - did not have chance

1

to hold the rails." She could not remember where her second foot was at the time of the accident. She does not remember if she held the rails of the ramp or not. She believes that her hands could not reach the rail because she fell too soon. She did not remember the condition of the rails but then remembered that "water was splashing." After her fall, she was in considerable pain and she remembered worrying about whether she could return to India. Her clothes did not catch on anything. Her shoes (Plaintiff exhibit 5) had rubber soles. She was taken in an ambulance quickly to a hospital and she underwent surgery and spent 4 to 5 days there. She convalesced in her sister-in-law's house and was in a wheelchair for an extended period of time and could not walk around without a walker for 5 to 6 months.

At the time she was employed by the business which she and her husband operated which sold enzymes. The company's revenue was 600-800,000 rupies. Since her fall she and her husband have had to close down the business because of problems caused by her disability.

She still has trouble walking and climbing stairs. She cannot stand for a long time and comes down stairs one at a time. She has gained weight, suffered from a leg which is sometimes stiff and is painful when she gets up or down. She suffers from numbness and stiffness.

On cross-examination, she testified that she

2

customarily holds hand rails in a situation like this and said
that on her way down the gang plank that she did not remember
hearing any safety instructions.  She was talking to her son or
sister-in-law.  She testified that the deck was wet, the ramp was
wet and that her shoes were probably wet.  The moment she stepped
"out" on the gangway she slipped.  She customarily holds a
railing in such situations and agrees that it was the right thing
to do.  She could not specify the profits or losses for her
business for the years 2005 and 2006.  She agreed that in the
application for travel insurance she described herself as a
"housewife."

Varnit Jain, son of the plaintiff, testified that he
did not see his mother fall.  He said that no crew member had
told him or instructed him to hold the handrail of the gang
plank.  On cross-examination, he testified that he held the gang
plank rails.

Another member, Shetar Jain, testified that he was on
the whale watch and that the ramp was slightly wet.  He was in
front of the plaintiff and did not see her fall.

Plaintiff's expert, John Culver, testified that he
graduated from the Massachusetts Maritime Academy in 1947 and
later attended George Washington University and American
University receiving a B.S. in marine engineering.  He served as
an engineering duty officer in the Navy from 1957 to 1985, was in

3

the ship building and ship repairing business, and also worked
for General Dynamics in Quincy and had written a book on ships of
the U.S. Merchant Fleet. He served as a chief engineer and has a
chief engineer's license issued by the Coast Guard. In his
opinion the gang plank was steeper than it should have been. He
testified that diamondplates are not a non-skid material,
although he admitted that they are regularly used in engine rooms
where the floors do get wet or oily. He testified that he had
never observed a diamondplate as flooring for gang planks; that a
normal gang plank uses non-skid material like dried paint and
sand or asphalt shingles with rough grain. On cross-examination
he contended that diamondplate is unsafe on inclined surfaces;
that this opinion was based on his personal experience and Coast
Guard standards which are the same as the Navy's. He did not
specify what authority he was referring to. He conceded that the
Coast Guard had no independent provision on this narrow subject
(diamondplate surfaces) but that it failed OSHA regulations which
he contended (not correctly, as indicated below) controlled the
subject. He stated that the angle of the ramp was unsafe and
that the certificate of registration granted by the Coast Guard
which approved the condition of the vessel did not apply to the
gang plank.

Nicholas Danakis testified that he is in the whale
watching business, Cape Ann, and is one of the two shareholders

4

of the defendant company. He has been in business since 1983. He is a licensed vessel operator for a 100 gross ton vessel. The Hurricane II is owned by the defendant company. It carries about 20,000 passengers a year with a crew of about 5 or 6 and a capacity per trip of 292 passengers. The company started using the ramp or gang plank in question 7 years ago or so and has used it ever since. 100,000 passengers have traversed it without injuries or complaints. The Coast Guard inspects the ship annually including the ramp or gang plank. The Coast Guard has never told the defendant to change anything with regard to the gang plank.

Diamondplate is used in the engine room of the ship. Passengers are told to hold the rails when moving on the ship. Announcements are made to them on the public address system throughout the boat.

Danakis has traversed the gang plank in rain and never has had a personal problem. In sum, Danakis has never had any reason to believe that the ramp which has been used for so many years and by so many passengers was unsafe in any manner.

David DuBois, an official of Marine Safety Consultants, Inc. has been with that company since 1980, after 11 years with the Coast Guard after graduating from the Coast Guard Academy and 4 years at sea after graduation. He served 6 years in the Coast Guard relating to marine safety functions at Norfolk, Virginia

5

and Providence, Rhode Island. While with the Coast Guard he
served as a full time inspector and has issued numerous
certificates of inspection under 46 C.F.R. Sub Chapter T. His
job was to look for unsafe conditions on a vessel. He testified
that OSHA requirements do not apply to Coast Guard vessels. He
has been aboard the defendant's ship and is familiar with the
ramp or gang plank upon which the plaintiff was injured. He has
inspected it and walked over the vessel itself. As to the
diamondplate flooring, he testified that it is used on the ramps
as well as elsewhere on vessels and is used "very widely." It is
sold on the internet and is featured as "durable, non slip,
corrosive resistant, widely used material" and is useable in
rain.

He testified that there is no Coast Guard regulations
regarding ramps but the good practice is to be safe, suitable and
good for its intended purpose. In his opinion, the diamondplate
did not constitute a safety hazard.

Evan Douglas testified that he worked aboard the vessel
and has helped passengers on and off the boat. He gives them a
hand to hold the railing and watching the steps onto the barge.
He saw the plaintiff descending the gang plank and she was not
holding to the rail. He saw her fall to the middle of the ramp.
He stepped toward her and touched her in the middle of the back
but could not catch her. He has served on the ship 10 years and

6

used the gang plank hundreds of times and never heard of another person slipping on the gang plank.

Gerald Winkler, M.D. graduated from the University of Manitoba, did an internship in Winnipeg, Canada and served on the staff of Beth Israel (2 years) and in the field of neurology at Massachusetts General Hospital (3 years) and did 3 years of research at Harvard Medical School. He is Board certificated in neurology. He is a consultant for the Social Security Administration and other government agencies and insurance companies. He has reviewed the medical record of the plaintiff in the ambulance and the hospital. He has never examined the plaintiff. After reviewing the records, he has concluded that the most likely explanation and the cause of her accident is that she was fainting or falling faint at the time she fell.

He reached this conclusion on the basis of the fact that the medical record showed that she had been incontinent, nauseated, and increasingly light headed immediately after the accident. That her blood pressure was unusually low and that the records refer to the absence of "syncope" (a synonym for fainting). Other records also referred to the plaintiff's dizziness or complaint of dizziness and cautioned her to sit on a bed before standing.

In his opinion the most likely cause of her accident was fainting.

7

Captain Jeffrey Eagan was the Captain of the vessel and has been for 6 years.  He has crossed the diamondplate flooring on numerous days including rainy days and never slipped.  He was Captain on the day of the accident but did not see the plaintiff fall.

John Newman, at the time of the accident, had worked for the defendant for 7 years and was first mate.  He saw the plaintiff and directed her by gestures to hold the rail.  He made eye contact with her and thought she would hang on.  In all his years as a crew member he has seen no one slip on the ramp in the rain or otherwise.

In light of the above, I make the following findings of fact:

1) At no time in its history was there any evidence that the surface of the gang plank upon which the plaintiff slipped had been unreasonably slippery when used in the rain or when it was otherwise wet.

2) Under the circumstances there was no reason why the Cape Ann knew or should have known that the gang plank surface was unreasonably slippery on the day of the accident.

3) Diamondplate is a surfacing material in widespread and common use for enhanced traction in situation of high passenger traffic and it is widely used in the marine industry in various parts of the ship including engine rooms where the

8

surface may be wet or slippery because of spillage of oil.

4) The coast Guard regularly inspected the vessel and had the power to prevent the vessel from using the gang plank. The Coast Guard inspected the vessel annually for more than 5 years before the plaintiff's injury and raised no objection to its use for any purpose.

5) The gang plank, with its diamondplate surface, had been used by approximately 100,000 passengers over the course of 5 years in all types of weather without injury or adverse events of any kind.

6) Accordingly, Cape Ann had no reason to believe that the use of diamondplate was hazardous or dangerous.

7) No person other than the plaintiff fell on the gang plank on the day of her injury.

8) Except for the plaintiff's contention, there is no evidence that the plaintiff was holding the rails at the time of her accident.

9) The medical records of the Gloucester EMT indicate that the plaintiff was incontinent of urine at the scene.

10) Such incontinence is a medical fact suggesting that the plaintiff may have experienced a loss of consciousness contemporaneous with her fall.

11) The records of the Gloucester EMT indicate that the plaintiff experienced dizziness at the scene as do the medical

9

records at the hospital at which she was treated.

12) The credible testimony of defendant's expert, Gerald Winkler, M.D., supports the proposition that the plaintiff experienced a fainting episode. The weight of the evidence supports the conclusion that she fell because of her faintness.

13) The evidence fails to support the claim that the plaintiff is now unable to earn as much as she earned before the injury.

14) The plaintiff has failed to carry her burden that Cape Ann did not exercise due care as to the condition of the gang plank.

I make the following conclusions of law:

1) Federal Maritime law governs in this dispute and OSHA standards do not apply to conditions on board a Coast Guard inspected passenger vessel. See, Carey v. Bahama Cruise Lines, 864 F.2d 201, 207 n.4 (1st Cir. 1988) and Butler v. Am. Trawler Co., Inc., 887 F.2d 20, 21 (1st Cir. 1989).

2) OSHA standards are applicable only to regulate an employer's obligations to its employees. Keller v. U.S., 38 F.3d 16,28 n.5 (1st Cir. 1994).

Based on my findings of fact above, I conclude that the plaintiff has failed to establish that the defendant was negligent in the circumstances of this case or that she was injured as a result of the negligence of the defendant.

10

Accordingly, the complaint is dismissed.

Morris E. Lasker
United States District Judge

9/12/07

11